# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **JANET NORTHRUP, as Chapter 7 Trustee for the Estate of Mountain Express Company and affiliated debtors,** ) ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | |
| **TURJO WADUD, INDIVIDUALLY AND AS TRUSTEE OF THE 317 IRREVOCABLE TRUST AND THE BAYT IRREVOCABLE TRUST; LAMAR FRADY, INDIVIDUALLY AND AS TRUSTEE OF THE LKF IRREVOCABLE TRUST; JOHN SCOTT; WALTER VIC LACY; MEHBOOB ALI HUSAIN; ILLUMINOUS CONSULTING, LLC; INDEPTH SERVICES COMPANY; TIME AND WATER, LLC; 4COURT HOLDINGS, LLC; 4COURT CONSULTING, LLC; 4COURT IMAGING, LLC; 4COURT LEASING, LLC; 4COURT SOLUTIONS, LLC; LTE CAPITAL, LLC; LTE ASSETS, LLC; ADELPHI, LLC; ADELPHI TRANSPORT, LLC; ADELPHI ENERGY GROUP, LLC; ADELPHI ENVIRONMENTAL SERVICES; ADELPHI FIELD SERVICES, LLC; GOLDEN GALLONS, LLC; RED MOUNTAIN FUEL TRANSPORT, LLC; ARASH INVESTMENTS INC.; BANO ENTERPRISES INC.; AR BRINKLEY 2102 HWY 49, LLC; HABIBA WADUD; RITA FRADY; and WINSTON PROPERTY VENTURES, LLC.** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No. _____**<br><br>**Jury Trial Demanded**<br><br><br>**COMPLAINT** |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Janet Northrup, as duly appointed Chapter 7 Trustee (the "**Trustee**") of the jointly administered bankruptcy estates of Mountain Express Oil Company and affiliated debtors (together, "**MEX**" or "**the Company**"), hereby brings this Complaint and asserts as follows:

## I.     INTRODUCTION

1.     This action arises out of a multi-year conspiracy through which the Defendants siphoned tens millions of dollars in funds, properties, and other assets from MEX to themselves, their companies, and their affiliates.  These actions, taken when MEX was already insolvent, drove the Company further into insolvency. Ultimately, MEX filed for bankruptcy on March 18, 2023 (the "**Petition Date**").

2.     One of the primary components of Defendants' conspiracy was their diversion of MEX's assets to companies owned by MEX's two controlling shareholders and co-CEOs, Lamar Frady (owning 48.5%) and Turjo Wadud (owning 48.5%). A transaction involving property in Minden, Louisiana (the "**Minden Property**") exemplifies Defendants' improper and unlawful conduct. An overview is as follows:

- On or around March 31, 2022, Frady and Wadud caused MEX to purchase WebsterP, LLC ("**WebsterP**") for $6.5 million. WebsterP's only assets were two properties in Minden, LA (2193 and 2918 Highway 532).

- On or about that same date, Frady and Wadud caused WebsterP (then MEX) to sell one of the two properties (2193 Highway 532) to Defendant Time and Water, LLC ("**Time & Water**") (a separate company Frady and Wadud individually owned 50/50) for only $500,000, *i.e.*, materially less than MEX had just paid for that property.

- Also on March 31, 2022, Frady and Wadud caused Time & Water to lease the property back to WebsterP (*i.e.*, MEX) for $240,000 per year, *i.e.*, a single year's rent is almost half of what Time & Water purportedly paid for the property. Thus, within roughly two years, Time & Water would have received sufficient rent from MEX to fully pay for the property, thereby giving Frady and Wadud ownership of 2193 Highway 532 for free as well as entitling it to ongoing rent of $240,000 per year which escalated over time.

3.     A similar example involves property located at 1218 North Loop Road 499, Harlingen, Texas (the "**Harlingen Property**"). The facts showing how Frady and Wadud siphoned profits from MEX and usurped its corporate opportunity with respect to the Harlingen Property are as follows:

- On September 3, 2020, MEX executed an agreement to purchase the Harlingen Property for $799,000.

- On November 12, 2020, before MEX closed on the Harlingen Property, a third party offered MEX $1.55 million for the property.

- Recognizing the nearly $750,000 in profits that were built into the acquisition of the Harlingen Property, just four days later (*i.e.*, on November 16, 2020), Frady and Wadud caused and directed MEX to assign the purchase agreement to their side company Time & Water for no consideration.

- In December 2020, Time & Water sold the Harlingen Property for $1.45 million, obtaining a roughly $650,000 profit that could and should have gone to MEX.

4.    Frady and Wadud also siphoned funds from MEX in connection with over Eight Hundred and Twenty-Five Million Dollars ($825,000,000) of sale-leaseback transactions MEX engaged in during their tenure as Co-CEOs. Those transactions generally involved: (i) MEX acquiring a property with a convenience store or travel center (together, a "**C-Store**"); (ii) immediately selling the property to a third party (typically, Blue Owl)[1]; and (iii) then immediately leasing the property back. Although Frady and Wadud were responsible for locating and conducting due diligence on properties in their roles as MEX Co-CEOs, they falsely claimed that their work on those transactions was for separate companies they individually owned known such as Illuminous Consulting, LLC (100% owned by Wadud), InDepth Services Company (100% owned by Frady), and 4Court Consulting (owned by Wadud, Frady, and Christopher Hunter Smith ("**Smith**"). Based on that false claim, Frady and Wadud caused over Fifteen Million Dollars ($15,000,000) in purported "fees" to be provided to their companies in connection with sale-leaseback transactions. Those funds should have gone to MEX.

5.    Frady's and Wadud's improper conduct did not end there. They also breached their fiduciary and Statutory Duties (as described below) to MEX by failing

---

[1] After June 2021, MEX's sale-leaseback transactions were often, but not always, with a company known as Oak Street Real Estate Capital LLC ("**Oak Street**"). Oak Street was acquired by Blue Owl Capital Inc. ("**Blue Owl**") in December 2021. Throughout this Complaint, "Blue Owl" refers to Oak Street before being acquired by Blue Owl and Oak Street and Blue Owl after the acquisition.

to establish, implement, and maintain internal controls, particularly with respect to MEX's retail business, *i.e.*, its operation of C-Stores leased through the sale-leaseback transactions. As shown herein, when Frady and Wadud became MEX's Co-CEOs in 2020, they decided to rapidly expand MEX's retail business, primarily through sale-leaseback transactions. But they utterly failed to establish any internal controls for that expansion. Among other things: (i) they did little, if any, due diligence on many of the C-Stores that were part of the sale-leaseback transactions; (ii) they often acquired C-Stores without having received, let alone adequately reviewed, their financials; and (iii) failed to integrate individual C-Store data into any centralized system that would allow them (or anyone at MEX) to review and analyze MEX's retail business to determine whether it was profitable and sustainable for the long term.

6.    The Trustee's claims have been confirmed by Gina Zamarelli, who was hired to serve as MEX's Chief Financial Officer ("CFO") in 2022. After only a few weeks on the job, Ms. Zamarelli discovered that MEX was "out of control" and that its financial records were "inaccurate" and a "complete mess." Upon making those discoveries, she became uncomfortable serving as MEX's CFO and instead elected to serve as an outside consultant for several months. During the time of her consultancy, Ms. Zamarelli uncovered a litany of material issues, problems, and

deficiencies in MEX's financial records and internal controls which she testified

about in her Rule 2004 examination. Among other things, she testified:

> Q: Based on your review of documents and discussions with Mr. Wadud, did you conclude that he knew that MEX lacked adequate internal controls?
>
> A: Yes.
>
> Q: Based on your review of documents and discussions with Mr. Frady, did you conclude that he knew that MEX lacked adequate internal controls?
>
> A: Yes.
>
> Q: And based on your work at MEX, did you conclude that Mr. Wadud and Mr. Frady refused to take the actions necessary to establish internal controls at MEX?
>
> A: Yes.
>
> ….
>
> Q: And you concluded, based on your review of MEX's documents, that the financial covenants [they provided to banks] were false, correct?
>
> A: Yes.
>
> **Q: And based on your review of documents and conversations with Mr. Frady and Mr. Wadud, you concluded that they knew that MEX's financial covenants were false, correct?**
>
> **A: Yes.**
>
> ….
>
> Q: And when MEX engaged in those sale-leaseback transactions, money was being syphoned off to Mr. Frady and Mr. Wadud's side companies, correct?
>
> A: With each of those closing, yes.
>
> **Q: So while MEX was in financial distress, its owners were taking money to their companies, correct?**
>
> **A: On any of the closing statement I saw, there was always a line item for that yeah.**
>
> ….
>
> Q: Mr. Wadud and Mr. Frady were taking money that MEX could have otherwise received at a closing from a sale-leaseback transaction, correct?
>
> A: Correct.

Q:    And had MEX received those funds, it would have helped MEX given its cash strap[ped] position, correct?

A:    Correct.

**Q:    And rather than help MEX resolve its cash flow problem, Mr. Frady and Mr. Wadud instead took the money for themselves, correct?**

**A:    Correct.**

….

Q:    And do you believe that Mr. Wadud [and] Mr. Frady [] did not comply with their duties as MEX directors?

A:    Yes.

…

Q:    And that's because Mr. Frady [and] Mr. Wadud [] failed to ensure that MEX had sufficient internal controls?

A:    Yes.

….

Q:    Is it fair to say that MEX's financial and accounting records were a complete mess?

A:    Yes.

**Q:    And its fair to say that Mr. Wadud [] and Mr. Frady utterly failed in their responsibility as officers and directors to make sure that MEX had accurate financial and accounting records?**

**A:    Yes.**

….

Q:    Is it fair to say that Mr. Wadud did not perform his duties as MEX co-CEO with a degree of care that an ordinarily prudent person in his position would use under similar circumstances?

A:    Yes.

Q:    And it fair to say that Mr. Frady did not perform his duties as MEX co-CEO with a degree of care that an ordinarily prudent person in his position would use under similar circumstances?

A:    Yes.

7.    In 2023, MEX declared bankruptcy, which harmed MEX and its creditors who are owed hundreds of millions of dollars.

8.     Through this action, the Trustee seeks to recover damages caused by the Defendants through their unlawful conduct and conspiracy and to strip them of their unlawful and illicit gains.

## II.    THE PARTIES

9.     Janet Northrup, is the duly appointed Chapter 7 Trustee of the jointly administered and substantively consolidated bankruptcy estates of MEX in Case No. 23-90147, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy**" or the "**Bankruptcy Case**").

10.     Mountain Express Oil Company ("**MEX**") is a Georgia corporation, whose last principal place of business was located at 3650 Mansell Road, Suite 250, Alpharetta, GA 30022. MEX's previous place of business was in Cobb County, Georgia.

11.     Turjo Wadud ("**Wadud**") is a resident of Fulton County, Georgia, residing at 808 Adler Court, NW, in Alpharetta, Georgia. Wadud can be served with process at that address.

12.     Wadud, as a Georgia resident, is subject to general jurisdiction in this Court. He is also subject to specific jurisdiction. Among other things, Wadud engaged in actions underlying the Trustee's claims in this District, including, without limitation, (i) breaching his Statutory Duties (as defined below) in this District; (ii) engaging in breaches of fiduciary duty and fraudulent transfers within

this District; (iii) causing and directing the improper movement of MEX's funds and assets from the District; and (iv) directing his conduct toward and causing damage in this District. Wadud also conspired with others within this District.

13.     The 317 Irrevocable Trust is a trust that was established to improperly try and hide and/or protect Wadud's assets. Wadud is the Trustee of the 317 Irrevocable Trust (the "**317 Trustee**") and its beneficiaries are Wadud, his wife, and his children. Upon information and belief, the 317 Irrevocable Trust was established in Fulton County, Georgia by Christopher A. Steele and the trust documents were drafted and signed in Fulton County. Georgia. Further, upon information and belief, the 317 Irrevocable Trust (i) owns or has interest in real property in Fulton County, Georgia and/or (ii) received membership interests and other assets from Fulton County, Georgia, including membership interests and assets that are the subject of this Complaint. Moreover, upon information and belief, Wadud met with Christopher Steele in this District to create the 317 Irrevocable Trust and to direct and/or cause its fraudulent receipt of assets from this District.

14.     The Bayt Irrevocable Trust is a trust that was established to improperly try and hide and/or protect Wadud's assets. Wadud is the Trustee of the Bayt Irrevocable Trust (the "**Bayt Trustee**") and, upon information and belief, the beneficiaries are Wadud and his family members. Upon information and belief, the Wadud Irrevocable Trust was established in Fulton County by Christopher A. Steele

and the trust documents were drafted in Fulton County, Georgia and signed in Fulton County, Georgia. Further, the Wadud Irrevocable Trust currently owns real estate in Fulton County and which are one of the subjects of this Complaint. Moreover, upon information and belief, Wadud met with Christopher Steele in this District to create the Bayt Irrevocable Trust and to direct and/or cause its fraudulent receipt of assets from this District.

15.    Lamar Frady ("**Frady**") is a resident of Cherokee County, Georgia, residing at 344 Hillside Drive, in Waleska, Georgia. Frady can be served with process at that address.

16.    Frady, as a Georgia resident, is subject to general jurisdiction in this Court. He is also subject to specific jurisdiction. Among other things, Frady engaged in actions underlying the Trustee's claims in this District, including, without limitation, (i) breaching his Statutory Duties (as defined below) in this District; (ii) engaging in breaches of fiduciary duty and fraudulent transfers within this District; (iii) causing and directing the improper movement of MEX's funds and assets from the District; and (iv) directing his conduct toward and causing damage in this District. Frady also conspired with others within this District.

17.    The LKF Irrevocable Trust is a trust that was established to improperly try and hide and/or protect Frady's assets. Frady is the Trustee of the LKF Irrevocable Trust (the "**LKF Trustee**") and, upon information and belief, the

beneficiaries are Frady and his family members. Upon information and belief, the LKF Irrevocable Trust was established in Fulton County by Christopher A. Steele and the trust documents were drafted in Fulton County, Georgia and signed in Fulton County, Georgia. Further, the LKF Irrevocable Trust has an equity interest in Time & Water, a Georgia limited liability company operating from Fulton County and whose actions are one of the subjects of this Complaint. Moreover, upon information and belief, Frady met with Christopher Steele in this District to create the LFK Irrevocable Trust and to direct and/or cause its fraudulent receipt of assets from this District.

18.    Rita Frady ("**R. Frady**") is a resident of Cherokee County, Georgia, residing at 344 Hillside Drive, in Waleska, Georgia. R. Frady can be served with process at that address.

19.    R. Frady, as a resident of Georgia, is subject to general jurisdiction in this Court. She is also subject to specific jurisdiction. Among other things, R. Frady (i) engaged in actions in this District relating to the creation of the LKF Irrevocable Trust and/or the unlawful and fraudulent transfer of assets to that Trust; (ii) participated in the unlawful and fraudulent transfer of assets from this District; (iii) directed her conduct toward this District; and (v) caused MEX harm in this District. R. Frady also conspired with others in this District to cause MEX harm as set forth throughout this Complaint.

20.    Habiba Wadud ("**Habiba**") is a resident of Fulton County, Georgia, residing at 808 Adler Court NW, Alpharetta, Georgia 30005. Habiba can be served with process at that address.

21.    Habiba, as a resident of Georgia, is subject to general jurisdiction in this Court. She is also subject to specific jurisdiction. Among other things, Habiba (i) engaged in actions in this District relating to the creation of the Bayt Irrevocable Trust and/or the unlawful and fraudulent transfer of assets to that Trust; (ii) participated in the unlawful and fraudulent transfer of assets from this District; (iii) directed her conduct toward this District; and (v) caused MEX harm in this District. Habiba also conspired with others in this District to cause MEX harm as set forth throughout this Complaint.

22.    John Scott ("**Scott**") is a resident of Georgia who, upon information and belief, currently resides at 830 Eden Green Court, Roswell, Georgia. Scott can be served with process at that address.

23.    Scott, as a resident of Georgia, is subject to general jurisdiction in this Court. He is also subject to specific jurisdiction. Among other things, he engaged in the acts constituting a breach of his Statutory Duties (defined below) while in this District, directed his conduct toward MEX (in this District), and caused harm in this District.

24.    Walter Vic Lacy ("**Lacy**") is a resident of Georgia who, upon information and belief, currently residents at 614 Wexford Court, Acworth, Georgia. Lacy can be served with process at that address.

25.    Lacy, as a resident of Georgia, is subject to general jurisdiction in this Court. He is also subject to specific jurisdiction. Among other things, he engaged in the acts constituting a breach of his Statutory Duties (defined below) while in this District, directed his conduct toward MEX (in this District), and caused harm in this District.

26.    Mehboob Ali Husain ("**Husain**") is a resident of Georgia who currently resides at 1010 Ellington Lane, Johns Creek, Georgia. Husain can be served with process at that address.

27.    Husain, as a resident of Georgia, is subject to general jurisdiction in this Court. He is also subject to specific jurisdiction. Among other things, he engaged in the acts underlying the Trustee's claims while in this District, directed his conduct toward MEX (in this District), and caused harm in this District.

28.    Illuminous Consulting, LLC ("**Illuminous**") is a Georgia limited liability company with its principal place of business listed with the Georgia Secretary of State as 3384 Peachtree Road, Suite 350, Atlanta, Georgia, 30326. Illuminous can be served through its registered agent, Neil Lansing, at 3355 Lenox

Road, Suite 100, Atlanta, Georgia 30326. Upon information and belief, Illuminous's sole member is Turjo Wadud or his trust the 317 Irrevocable Trust.

29.    Illuminous, as a Georgia limited liability company, is subject to general jurisdiction in this Court. It is also subject to specific jurisdiction. Among other things, as described herein, Illuminous, through its sole owner Wadud, engaged in conduct underlying and relating to the Trustee's claims in this District, including, but not limited to, engaging in the following conduct in and from this District: (i) causing or directing funds that MEX was entitled to receive to be transmitted to Illuminous; (ii) improperly receiving funds in Georgia that MEX had an interest in and should have received; (iii) transferring MEX funds that it improperly received to Wadud; (iv) purportedly providing services to MEX; and (v) harming MEX. Further, Illuminous was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

30.    InDepth Services Company ("**InDepth**") is a Georgia company with its principal place of business listed as PO Box 4925, Canton, Georgia 30114. InDepth can be served through its registered agent James Johnston, Jr., who is located at 900 Circle 75 Parkway, Suite 1735, Atlanta, Georgia 30339. Upon information and belief, InDepth's sole member is Lamar Frady or his trust the LKF Irrevocable Trust.

31.     InDepth, as a Georgia company, is subject to general jurisdiction in this Court. It is also subject to specific jurisdiction. Among other things, as described herein, InDepth, through Frady, engaged in conduct underlying and relating to the Trustee's claims in this District, including, but not limited to, engaging in the following conduct in and from this District: (i) causing or directing funds that MEX was entitled to receive to be transmitted to itself; (ii) improperly receiving funds that MEX had an interest in and should have received; (iii) conveying MEX funds it improperly received to Frady; (iv) purportedly providing services for MEX; and (v) harming MEX. Further, InDepth was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

32.     Time & Water is a Georgia limited liability company, with its principal place of business listed with the Georgia Secretary of State as 1870 The Exchange, Suite 200, Atlanta, Georgia 30339. Time & Water can be served through its registered agent, Michael Powers, at 1899 Powers Ferry Road, Suite 440, Atlanta, GA 30339.

33.     The original members of Time & Water were Wadud (50%) and Frady (50%), both of whom reside in Georgia.

34.     In late 2022 and early 2023, in a fraudulent attempt to hide and shield assets (i) Wadud purportedly transferred his interest in Time & Water to the 317

15

Irrevocable Trust (this occurred on December 31, 2022) and (ii) Frady purportedly transferred his interest in Time & Water to R. Frady (on November 15, 2022) who then transferred that interest to the LFK Irrevocable Trust (on January 1, 2023). These actions were, at least in part, directed and effectuated from this District with the assistance of Christopher Steele, an attorney located herein. The Assignment and Transfer Agreements purportedly transferring Wadud's and Frady's interest in Time & Water are governed by Georgia law.

35.    Time & Water, as a Georgia limited liability company, is subject to general jurisdiction in this Court. It is also subject to specific jurisdiction. Among other things, Time & Water has engaged and continues to regularly engage in business in person in this District, including conduct that underlies and relates to the Trustee's claim. For example, Time & Water (i) conducted business, through Frady and Lamar, in this District, including unlawful business underlying the Trustee's claims (*e.g.*, accepting and effectuating assignments of purchase and sale agreements from MEX); (ii) negotiated the purchase, sale, and lease of properties at issue in this case with MEX in this District; (iii) executed assignments and documents underlying the Trustee's claims in this District; (iv) received funds from MEX that were sent in Georgia; (v) Procured (as that term is defined below) Frady and Wadud to breach their fiduciary duty in this District; (vi) directed its conduct at Georgia; and (vii) caused MEX harm in Georgia. Further, Time & Water was a member of a conspiracy

that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

36.    4Court Holdings, LLC ("**4Court Holdings**"), which until October 5, 2020, was known as TLC Properties, LLC, is a Delaware limited liability company, with its principal place of business located at 1730 S. White Station Road, Suite 1, Memphis, Tennessee.

37.    The original members of 4Court Holdings were Wadud (33.3%), Frady (33.3%), and Smith (33.3%). On or about December 31, 2022, in a fraudulent attempt to hide and shield assets, Wadud purportedly transferred his interest in 4Court Holdings to the 317 Irrevocable Trust through an Assignment and Transfer Agreement. Christopher Steele, an attorney located in this District, signed the transfer documents as Transferee and, upon information and belief, did so while in this District. The Assignment and Transfer Agreement is governed by Georgia law.

38.    Wadud and Frady reside in Georgia and Smith resides in Tennessee. 4Court Holdings can be served through its registered agent, National Registered Agents, Inc.*, at 300 Montvue Road, Knoxville, TN 37919.

39.    4Court Holdings performed business relevant to and underlying the Trustee's claims in this District. Among other things, 4Court Holdings (i) negotiated and executed leases with MEX, with such leases (1) being negotiated by MEX while in this District; (2) being executed by MEX while in this District; and (3) containing

a Georgia forum selection clause (*e.g.*, the leases for 13001 SE 104th Street, Oklahoma City, Oklahoma; 16019 State Highway 9 E, Eufaula, Oklahoma; and 1419 The Blvd., Rayne, Louisiana); (ii) assigned properties to MEX with the assignments being negotiated and executed, at least in part, in and from MEX's offices in this District (*e.g.*, the properties located at 101 S. Blue Mound Road, Blue Mound, Texas; 1225 Oakland Blvd., Fort Worth, Texas; 9400 White Settlement Road, Fort Worth, Texas; 5600 N. Tarrant Parkway, Fort Worth, Texas; 5255 Davis Boulevard, Richland Hills, Texas; 632 Pine Hill Road, Blanchard, Louisiana; 6850 Buncombe Road, Shreveport, Louisiana; 700 Homer Road, Minden, Louisiana; 1300 McArthur Street, Mansfield, Louisiana; 2500 N. Milt Phillips Avenue, Seminole, Oklahoma; 1001 N. Harvey Road, Seminole, Oklahoma); (iii) sent documents to and received documents from MEX's office in this District, including documents relating to transactions at issue in this case; (iv) through Wadud, Frady, and/or David Rosenthal, engaged in business at issue in this case in this District; and (v) caused harm to MEX in this District. Further, 4Court Holdings was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

40.     Smith is a Member of, and the Manager of, 4Court Holdings, 4Court Consulting, 4Court Leasing, 4Court Solutions, and 4Court Imaging (together, the "**4Court Entities**"). Testifying as the corporate representative of the 4Court Entities,

Smith confirmed facts showing that each of the 4Court Entities is subject to jurisdiction in this Court. Among other things, he testified:

Q:    But [David Rosenthal] performed services for the 4Court entities, didn't he?

A:    Yes, only related to those consulting transactions.

Q:    And that was while he was at MEX's corporate headquarters in Georgia?

A:    Correct?

Q:    Okay. In the Atlanta area?

A:    Correct.

Q:    And you've been to that headquarters, right?

A:    I have.

Q:    It's in Alpharetta, correct?

A:    Correct.

Q:    Okay. Now, 4Court Consulting sent money to Mr. Rosenthal in Georgia for the work he performed for 4Court Consulting, didn't it?

A:    I believe so.

Q:    Okay. Now, while working for the 4Court entities from time to time, you met with Mr. Wadud or Mr. Frady or Mr. Rosenthal at MEX's corporate headquarters in Alpharetta; isn't that right?

A:    Correct.

Q:    And the 4Court entities negotiated contracts with Mountain Express, didn't they?

A:    You mean like leases?

Q:    Leases or verbal, perhaps verbal agreements as well as regarding the split of commissions?

A:    Correct.

Q:    And in some instances, those contracts were signed?

A:    Yes. I mean, like leases were signed, yes.

Q:    Okay. And when MEX was doing business with the 4Court entities, it was doing business from Georgia, was it not?

A:    Correct.

Q:    Okay. And when the 4Court entities sent invoices for payment to Mountain Express, those invoices were sent to MEX's headquarters in Alpharetta, correct?

A:    I mean, I believe so….

Q:    Okay. But when she [your bookkeeper] was sending those invoices, she was generally sending them to MEX in Georgia, correct?

A:    Correct, as far as I know.

….

Q:    Okay. Now, at least one of the properties that 4Court Consulting consulted with MEX on was located in Georgia, correct?

A:    Yes, I think it's that Fitzgerald property.

….

Q:    And you would agree with me that the 4Court entities sent numerous emails and documents to MEX's corporate headquarters in Georgia, correct?

A:    Correct.

Q:    And the 4Court entities had numerous phone calls with persons in MEX's corporate headquarters in Georgia, correct?

A:    Correct.

**Q:    And 4Court Consulting's only customer was MEX which was located in Georgia, correct?**

**A:    Correct.**

**Q:    And, for that reason, nearly all, if not all, of 4Court Consulting's business was with a Georgia-based company, correct?**

**A:    Correct.**

**Q:    Likewise, most of the other 4Court entities business was with MEX which was a Georgia-based company, correct?**

**A:    Correct.**

**Q:    Okay. And so its fair to say that the 4Court entities regularly conducted business in Georgia with a Georgia company?**

**A:    Correct.[2]**

41.    4Court Consulting, LLC ("**4Court Consulting**") is a Tennessee limited liability company with its principal place of business located at 1730 S. White Station Road, Suite 1, Memphis, TN 38117. According to the "Operating Agreement

---

[2] Throughout this Complaint, objections are omitted from block quotes from transcripts.

of 4Court Consulting LLC," the members of 4Court Consulting are Wadud (33.3%), Frady (33.3%), and Smith (33.4%). Wadud and Frady reside in Georgia and Smith resides in Tennessee. 4Court Consulting can be served through its registered agent, Smith, at 1730 S. White Station Road, Suite 1, Memphis, TN 38117.

42.    4Court Consulting performed business relating to the Trustee's claims in this District as shown by, among other things, the testimony in Paragraph 40 above which is fully incorporated herein by reference. Among other things, 4Court Consulting (i) executed and performed contracts with MEX, a Georgia company with its principal place of business in this District; (ii) received funds from MEX or for which MEX had an interest from Georgia (*e.g.*, in connection with MEX's August 1, 2022 purchase of properties in Harrison County, Mississippi, 4Court Consulting received $300,000 from an escrow account held by Fidelity National Title Insurance Company located in Atlanta, Georgia and in connection with MEX's August 1, 2022 purchase of properties in Holmes County and Pike County, Mississippi, received $300,000 from an escrow account held by Fidelity National Title Insurance Company located in Atlanta, Georgia); (iii) purported to provide services to MEX in Georgia; (iv) through Wadud, Frady, and/or David Rosenthal conducted business at issue in this case in Georgia, including, but not limited to, providing MEX with purported consulting services in this District; (v) aimed its conduct at this District; (vi) executed purported consulting agreements with MEX,

with such agreements being drafted and signed in this District; (vii) mailed invoices and other documents demanding payment to MEX's Fulton County offices (*e.g.*, a June 14, 2022, invoice for $400,000; a June 14, 2022, invoice for $300,000; a July 27, 2022, invoice for $565,000; a July 27, 2022, invoice for $900,000; a July 27, 2022, invoice for $300,000; and an August 29, 2022, invoice for $50,131) and the payments associated with those invoices are at issue in this case; and (viii) caused harm to MEX in this District. Further, 4Court Consulting was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

43.    4Court Imaging, LLC ("**4Court Imaging**") is a Delaware limited liability company with its principal place of business located at 1730 S. White Station Road, Suite 1, Memphis, TN 38117. According to the "Limited Liability Company Agreement of 4Court Imaging LLC," 4Court Imaging is "wholly-owned by the Member," which is 4Court Holdings. 4Court Holdings' members are identified above. 4Court Imaging can be served through its registered agent, National Registered Agents, Inc., at 1209 Orange Street, Wilmington, DE 19801.

44.    4Court Imaging performed business relating to the Trustee's claims in this District as shown by, among other things, the testimony in Paragraph 40 above which is fully incorporated herein by reference. Among other things, 4Court Imaging (i) executed and performed contracts with MEX, a Georgia company with

its principal place of business in this District; (ii) sent invoices demanding payment to MEX's Fulton County offices (*e.g.*, a June 23, 2021, invoice for $45,076; a July 18, 2021, invoice for $4,700; a November 8, 2021, invoice for $4,650; a November 8, 2021, invoice for $2,500; a November 8, 2021, invoice for $5,475; a November 8, 2021, invoice for $13,515; a February 7, 2022, invoice for $6,375; and a February 7, 2022, invoice for $100,007) including invoices and payments at issue in this case; (iii) through Wadud, Frady, and/or David Rosenthal engaged in business at issue in this case in this District; (v) conspired to siphon funds from MEX in this District (through Wadud and Frady); (vi) aimed its conduct at this District; and (vii) caused harm to MEX in this District. Further, 4Court Imaging was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

45.    4Court Leasing, LLC ("**4Court Leasing**") is a Delaware limited liability company that purportedly provides equipment leasing services. According to the "Limited Liability Company Agreement of 4Court Leasing LLC," 4Court Leasing is "wholly-owned by the Member," which is 4Court Holdings. 4Court Holdings' members are identified above.

46.    4Court Leasing performed business relating to the Trustee's claims in this District as shown by, among other things, the testimony in Paragraph 40 above which is fully incorporated herein by reference. Among other things, 4Court Leasing

(i) leased property to MEX and its affiliates, with such leases being negotiated and executed, at least in part, in this District; (ii) executed and performed contracts with MEX through which MEX leased property located in Georgia (*e.g.*, the leases relating to equipment at 597 Buford Drive, Lawrenceville, Georgia; 5616 Redan Road, Stone Mountain, Georgia; 5047 N. Henry Boulevard, Stockbridge, Georgia; and 1801 Sigman Road, NW, Conyers, Georgia); (iii) received funds from MEX; (iv) through Wadud, Frady, and/or David Rosenthal engaged in business at issue in this case in this District, including, without limitation, negotiating and executing purported equipment leases with MEX and receiving funds from MEX relating thereto; (v) conspired to siphon funds from MEX in this District (through Wadud and Frady); (vi) aimed its conduct at this District; and/or (vii) caused harm to MEX in this District. Further, 4Court Leasing was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

47.    4Court Solutions, LLC ("**4Court Solutions**") is a Delaware limited liability company whose principal place of business is located at 1730 S. White Station Road, Suite 1, Memphis, Tennessee. According to the "Limited Liability Company Agreement of 4Court Solutions LLC," 4Court Solutions is "wholly-owned by the Member," which is 4Court Holdings. 4Court Holdings' members are

identified above. 4Court Solutions can be served through its registered agent, Hunter Smith, at 1730 S. White Station Road, Suite 1, Memphis, TN 38117.

48.    4Court Solutions, through Wadud, Frady, and/or David Rosenthal, engaged in conduct underlying or relating to the Trustee's claims in this District, including, without limitation, causing or directing the improper transfer or conversion of MEX funds from this District. 4Court Solutions also (i) operated in this District through Wadud and Frady; (ii) sent invoices and other demands to MEX's Fulton County office (*e.g.*, a January 3, 2022, invoice for $2,437; a January 18, 2022, invoice for $1,674; a January 19, 2022, invoice for $2,801; a January 19, 2022, invoice for $11,349; a January 19, 2022, invoice for $102,317; a April 5, 2022, invoice for $4,200; and a June 28, 2022, invoice for $28,928); and (iii) was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District. 4Court Solutions is also subject to jurisdiction in this Court based on the testimony in Paragraph 40 above, which is incorporated herein by reference.

49.    Arash Investments Inc. ("**Arash**") is a Georgia corporation with its principal place of business located at 1010 Abingdon Lane, Johns Creek, GA 30022. Arash can be served through its registered agent, Husain, at 1010 Abingdon Lane, Johns Creek, GA 30022.

50.    Arash, as a Georgia corporation, is subject to general jurisdiction in this Court. It is also subject to specific jurisdiction. Among other things, it (i) conducted business underlying the Trustee's claims in this District through Husain; (ii) maintained its principal place of business in this District; (iii) aimed its conduct at this District; (iv) sent invoices and other demands for payment to MEX's Fulton County office; and (v) caused harm in this District.

51.    Bano Enterprises Inc. ("**Bano**") is a Georgia corporation with its principal place of business located at 1010 Abingdon Lane, Johns Creek, GA 30022. Bano can be served through its registered agent, Husain, at 1010 Abingdon Lane, Johns Creek, GA 30022.

52.    Bano, as a Georgia corporation, is subject to general jurisdiction in this Court. It is also subject to specific jurisdiction. Among other things, it (i) conducted business underlying the Trustee's claims in this District through Husain; (ii) has its principal place of business in this District; (iii) aimed its conduct at this District; (iv) sent invoices and other demands for payment to MEX's Fulton County office; and (v) caused harm in this District.

53.    AR Brinkley 2102 Hwy 49 LLC ("**AR Brinkley**") is a Delaware limited liability company with its principal place of business located at 1730 S. White Station Road, Suite 1, Memphis, TN 38117. AR Brinkley is wholly owned by 4Court Holdings, whose members are identified above. AR Brinkley can be served through

its registered agent, National Registered Agents, Inc., at 1209 Orange Street, Wilmington, DE 19801.

54.     AR Brinkley performed business relating to the Trustee's claims in this District as shown by Paragraph 40 above, which is incorporated herein by reference. Among other things, AR Brinkley (i) conducted business in this District through Frady and Wadud, including business at issue in this case relating to the purchase, sale, leasing, and assignment of properties (*e.g.*, an October 2020 Assignment and Purchase and Sale Agreement relating to a Purchase and Sale Agreement for property in Brinkley, Arkansas); (ii) used MEX's Fulton County offices as its office (*e.g.*, in a contract between AR Brinkley and Pilot Travel Centers, AR Brinkley used its notice address as "AR Brinkley 2102 HWY 49, LLC, c/o Mountain Express Oil Company, 5333 Bells Ferry Road, Suite 201, Acworth, GA"); (iii) leased property to MEX, with the negotiations and execution of the leases occurring, at least in part, in this District; (iv) Procured (as defined below) Frady and Wadud to breach their fiduciary duties in this District; (v) negotiated and obtained an assignment of MEX's rights in and under an April 17, 2020, purchase and sale agreement relating to property in Brinkley, Arkansas, with the assignment being negotiated and executed, at least in part, in this District; (vi) aimed its conduct at this District; (vii) sent invoices and other demands for payment to MEX's Fulton County office (*e.g.*, a December 12, 2022, invoice for $1,894); and (viii) caused harm in this District.

Moreover, AR Brinkley was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

55.    Adelphi, LLC ("**Adelphi**") is a Wyoming limited liability company with its principal place of business located at 3650 Mansell Road, Suite 250, Alpharetta, Georgia (according to its LLC Operating Agreement) or 900 Circle 75 Parkway, Suite 950, Atlanta, Georgia (according to its LLC Annual Report). According to the Wyoming Secretary of State's website, Adelphi was organized by Brian Burkhalter from 900 Circle 75 Parkway, Suite 950, Atlanta, GA 30339. Upon information and belief, it is the 100% owner of Adelphi Funding, LLC and Adelphi Property Management, LLC and its members are Wadud (50%) and Frady (50%), both of whom reside in Georgia. Adelphi regularly and consistently conducts in person business in this State.

56.    Adelphi, through Wadud and Frady, regularly engaged in conduct at issue in this case in person while in this District. Moreover, Adelphi (i) was formed by Wadud and Frady, with the assistance of attorney Brian Burkhalter (an Atlanta attorney), from and within this District; (ii) has filed Special Warranty Deeds listing its address as 3650 Mansell Road, Suite 250, Alpharetta, Georgia; (iii) is Managed by Wadud and Frady from and within this District;  and (iv) was a member of a

conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

57.    Adelphi Energy Group, LLC ("**Adelphi Energy**") is a Delaware limited liability company with its principal place of business located at 3490 Piedmont Road, Suite 600, Atlanta, GA 30305. According to filings with the Georgia Secretary of State, Adelphi Energy is registered to conduct business in this State and its Manager is Wadud who operates from 3355 Lenox Road, Suite 600, Atlanta, GA 30305 and/or 3490 Piedmont Road, Suite 450, Atlanta, Georgia. Adelphi Energy can be served through its registered agent, Neil Lansing, at 3355 Lenox Road, Suite 1000, Atlanta, GA 30326.

58.    Adelphi Energy, through Wadud and Frady, engaged in acts underlying the Trustee's claims in this District and regularly conducts business in person in this District. Among other things, in 2023, Adelphi Energy assisted Wadud, Frady, and Adelphi Transport in improperly and fraudulently transferring Wadud's and Frady's interest in Adelphi Transport to itself. That conduct occurred in this District. Further, after that purported transfer, Adelphi Energy purportedly operated Adelphi Transport, at least in part, in and from this District. Further, Adelphi Energy was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

59.    Adelphi Transport, LLC ("**Adelphi Transport**") is a Georgia limited liability company with its principal place of business located at 3490 Piedmont Road, Building 1, Suite 600, Atlanta, GA 30305. Adelphi Transport can be served through its registered agent, Elise Dotson, at 3490 Piedmont Road, Building 1, Suite 600, Atlanta, GA 30305.

60.    Adelphi Transport's original members were Wadud (50%) and Frady (50%), both of whom reside in Georgia.  In 2023, in an improper attempt to hide and/or shield assets, Frady purportedly "sold" and/or assigned his interest in Adelphi Transport to Adelphi Energy, another entity owned, in part and indirectly, by Frady. The Membership Interests and Intangibles Purchase Agreement memorializing this purported sale is governed by Georgia law and, upon information and belief, was drafted and/or executed in this District.

61.    Adelphi Transport: (i) through Frady and Wadud, conducted conduct at issue in this case in and from this District; (ii) purportedly provided services to MEX in and from this District; and (iii) received funds from MEX at issue in this case from this District. Further, Adelphi Transport was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

62.    Adelphi Field Services, LLC ("**Adelphi Field Services**") is a Wyoming limited liability company with its principal place of business located at 900 Circle

75 Parkway, Suite 950, Atlanta, GA 30339. Adelphi Field Services owns 57.5% of Adelphi Environmental Services, LLC and 66.67% of Spartan Security, LLC.

63.    Upon information and belief, Adelphi, LLC was the original owner of Adelphi Field Services. In 2023, in an improper attempt to hide and/or shield assets, Wadud and Frady, while in this District, caused Adelphi, LLC to purportedly sell its interest in Adelphi Field Services to Adelphi Energy. The Membership Interests and Intangibles Purchase Agreement memorializing this purported sale is governed by Georgia law and, upon information and belief, was drafted and/or executed in this District.

64.    Adelphi Field Services engaged in conduct at issue in this case in this District. Among other things, Adelphi Field Services (i) through Frady and Wadud, performed business at issue in this case in person while in this District; (ii) purported to provide services to MEX in this District; (iii) sent bills to and received funds from MEX in this District; (iv) agreed to and executed an Assignment and Assumption of Membership Interest in this District wherein Wadud and Frady each purported to assign his 33% interest in Spartan Security, LLC to Adelphi Field Services; and (v) purported to enter into contracts with MEX in this District. Further, Adelphi Field Services was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

65.    Adelphi Environmental Services, LLC ("**Adelphi Environmental**") was a Wyoming limited liability company with its principal place of business at 900 Circle 75 Parkway, Suite 950, Atlanta, GA 30339. Upon information and belief, Adelphi Environmental's original members were Adelphi Field Services, Brian Patterson 51, LLC, and Martin International Holdings, LLC. At some unknown point, Wadud obtained a membership interest in Adelphi Environmental.

66.    On or about December 31, 2022, in a fraudulent attempt to hide and shield assets, Wadud transferred his interest in Adelphi Environmental to the 317 Irrevocable Trust. Christopher Steele, an attorney located in this District, signed the transfer documents as Transferee and, upon information and belief, did so while in this District. The Assignment and Transfer Agreement memorializing the purported assigned is governed by Georgia law.

67.    Adelphi Environmental was not only based in and operated from this District, but also purportedly provided services to MEX in this District. It also (i) through Wadud and Frady conducted business at issue in this case in and from this District; (ii) executed a contract with MEX that was negotiated and executed, at least in part, in this District; (iii) performed services for MEX in this District; (iv) sent bills and invoices to MEX in this District; and (v) received funds from MEX, including funds at issue in this case. Further, Adelphi Environmental was a member

of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

68.    Golden Gallons, LLC ("**Golden Gallons**") is a Louisiana limited liability company with its principal place of business located at 2439 Manhattan Boulevard, Suite 401, Harvey, LA 70058. In October 2021, Time & Water obtained a 50% interest in Golden Gallons through a Membership Interest Purchase and Sale Agreement. Therefore, Wadud and Frady indirectly own 50% of Golden Gallons.

69.    Golden Gallons purportedly provided fuel hauling services for MEX and received funds from MEX, including funds that are at issue in this case. Golden Gallons, through Wadud and Frady, engaged in conduct at issue in this case in person in this District. Golden Gallons also negotiated contracts with MEX in Georgia, invoiced MEX in Georgia, and received funds from MEX in Georgia.

70.    LTE Capital, LLC ("**LTE Capital**") is a Delaware limited liability company with its principal place of business at 22255 Center Ridge Road, Suite 311, in Rocky River, OH. LTE Capital's members are Wadud (33%), Frady (33%), and Berytus Capital, LLC (33%). LTE Capital can be served through its registered agent VCorp Agent Services, Inc. at 108 W. 13th Street, Suite 100, Wilmington, DE 19801.

71.    LTE Capital engaged in conduct at issue in this case in this District. Among other things, LTE Capital (i) through Wadud and Frady, performed business relating to the Trustee's claims in person in this District; (ii) sent invoices and bills

to MEX in this District (*e.g.*, an October 31, 2022, invoice for $1,000); (iii) agreed to and executed leases with MEX with such leases being drafted and executed in this District (*e.g.*, the leases for 305 Lincoln Way East, Massillon, Ohio and 3365 Monroe Street, Toledo, Ohio); (iv) effectuated real property transactions with MEX with such transactions occurring, at least in part, in this District (*e.g.*, MEX sold the property at 220 East Main Street, Jacksonville, IN to LTE Capital, with such transaction documents being executed in this District and the funds flowing through Fidelity National Title Insurance Company located at 3301 Windy Ridge Parkway, Suite 300, Atlanta, Georgia); (v) received purported "fees" in connection with the closing of sale-leaseback transactions, including fees that are at issue in this case, with the direction to send such fees being sent from this District; and (vi) Procured Frady and Wadud to breach their fiduciary duties while in this District. LTE Capital also directed it conduct toward this District and caused harm to MEX in this District. Further, LTE Capital was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District.

72.    LTE Assets, LLC ("**LTE Assets**") is a Delaware limited liability company with its principal place of business at 22255 Center Ridge Road, Suite 311, in Rocky River, OH. LTE Assets can be served through its registered agent VCorp Agent Services, Inc. at 108 W. 13th Street, Suite 100, Wilmington, DE 19801.

73.     Wadud and Frady each have a 33% ownership interest in this entity, which was involved in some of the sale-leaseback transactions described herein. LTE Assets, through Wadud and Friday, engaged in conduct at issue in this case in this District. LTE Assets also Procured Frady and Wadud to breach their fiduciary duties in this District, directed it conduct toward this District, and caused harm to MEX in this District. Further, LTE Assets was a member of a conspiracy that took actions underlying the Trustee's claims in this District, was aimed at this District, and caused injury to MEX in this District. Finally, LTE Assets received funds at issue in this Complaint from MEX with Frady and Wadud, working for and on behalf of both MEX and LTE Assets, directing that the funds be sent while they were in this District.

74.     Red Mountain Fuels Transport, LLC ("**Red Mountain Fuels**") is a Texas limited liability company with its principal place of business at 10110 Harry Hines Blvd., Dallas, Texas 75220 and a mailing address of 5345 Bells Ferry Road, Suite 106, Acworth, GA 30102. It was a wholly owned subsidiary of Time & Water and is thus indirectly owned by Wadud and Frady. Upon information and belief, in August 2023, Time & Water purportedly sold its 50% interest in Red Mountain Fuels to Adelphi Energy, another Wadud and Frady entity. The Membership Interests and Intangibles Purchase Agreement memorializing this purported sale is governed by

35

Georgia law and, upon information and belief, was drafted and/or executed in this District.

75.    Red Mountain Fuels purportedly provided fuel hauling services to MEX and received funds from MEX, including funds at issue in this case. Red Mountain Fuels, through Wadud and Frady, engaged in conduct at issue in this case in person while in this District. Red Mountain Fuels also negotiated contracts with MEX in this District, invoiced MEX in this District, received MEX funds from this District, directed its conduct toward this District, and caused MEX harm in this District.

76.    Winston Property Ventures LLC ("**Winston Property Ventures**") is a Georgia limited liability company with its principal place of business at 1550 N. Brown Road, Suite 130, Lawrenceville, GA, 30043. Winston Property Ventures purportedly provided services for MEX through real estate and c-store acquisitions, gas station acquisitions, and supply contracts. Upon information and belief, it was formerly owned by MEX's dissolved subsidiary, Second Financials Management Systems, LLC. Winston Property Ventures performed business in this District, including business underlying or relating to the Trustee's claims. Among other things, Winston Property Ventures (i) engaged in business with MEX through various acquisitions; (ii) received funds from MEX; (iii) through Wadud and Frady,

engaged in business in this District; (iv) aimed its conduct at this District; and (v) caused harm to MEX in this District.

## III.    JURISDICTION AND VENUE

79.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves one or more claims brought under federal law.

80.    This Court has jurisdiction over this case under 28 U.S.C. § 1334 because the claims arise in, arise under, or relate to MEX's Bankruptcy Case.

81.    This Court has supplemental jurisdiction over the non-federal question claims under 28 U.S.C. § 1367.

82.    Venue is proper in this Court because, *inter alia*, (i) one or more Defendants reside in this District and is subject to personal jurisdiction herein; (ii) a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District; (iii) the unlawful conduct described herein was directed toward, and caused injury in, this District; and (iv) the Defendants acted as joint tortfeasors and conspirators and, consequently, they all may be sued in any county in which one of the joint tortfeasors/conspirators resides. *See* 28 U.S.C. § 1391.

## IV.    STATEMENT OF THE RELEVANT FACTS

### **MEX Prior to the 2018 Leveraged Buyout**

83.    In 2000, Barry and Gail Bierenbaum (the "**Bierenbaums**") formed MEX as a fuel and lubricant distributor.

84. In 2003, Wadud and Frady joined MEX as sales associates. In that role, they were responsible for, *inter alia*, marketing and selling fuel supply agreements to C-Stores and other fuel suppliers. Through those fuel supply agreements, C-Stores and other fuel suppliers committed to purchase their fuel from MEX.

85. By 2010, MEX was supplying fuel to approximately 180 C-Stores and fuel stations.

86. In 2010, the Bierenbaums sold MEX's assets to Empire Petroleum.

87. In 2013, MEX re-entered the fuel supply business by re-acquiring thirty-three (33) fuel supply locations from Empire Petroleum.

88. From 2013 until 2018, the Bierenbaums tried to grow MEX's business, primarily by increasing the number of C-Stores and other fuel suppliers that purchased fuel from MEX.

89. From 2013 until MEX declared bankruptcy in March 2023, MEX, when marketing and selling fuel supply agreements, represented that C-Stores should enter into such agreements with MEX because of the unique skills and qualifications MEX could provide, including, but not limited to, access to fuel when other jobbers were unable to obtain fuel; on-time deliveries; sales and marketing assistance and expertise; business guidance; training; and branding with major oil companies like Exxon. Thus, MEX's fuel supply agreements were personal service contracts through which MEX provided unique skills and qualifications that C-Stores could

not obtain from other jobbers. Indeed, MEX's former outside counsel, James

Johnston, testified in his Rule 2004 examination that MEX's fuel supply contracts

were service contracts:

> Q:    Did MEX provide C-stores with unique skills or services, like training or guidance, that would cause C-stores to select MEX over other jobbers?
>
> A:    Yes.
>
> ....
>
> **Q:    Is it fair to say that MEX offered a lot of services in connection  with its fuel supply contracts?**
>
> **A:    It's fair to say it, yes.**
>
> **Q:    And were those important components of the fuel supply contracts?**
>
> **A:    I believe it was....**
>
> Q.    Is it your understanding that the dealers stayed with Mountain Express because it provided all these services that it couldn't get from other jobbers?
>
> A:    That's true….
>
> Q:    Is it your understanding that MEX marketed itself as being particularly skilled and qualified to serve as a jobber because it can help C-stores with these various items?
>
> A:    Yes.
>
> Q:    And MEX tried to distinguish itself from other jobbers by saying it was uniquely qualified given its knowledge and experience in the field, correct?
>
> A:    That was one of the ingredients, yes.

## The 2018 Leveraged Buyout

90.    In 2018, the Bierenbaums initiated a leveraged buyout ("**LBO**") of their

ownership interest in MEX. The terms of LBO were set forth in an October 25, 2018,

Stock Redemption Plan and Agreement (the "**Redemption Agreement**").

91.    Through the Redemption Agreement, the Bierenbaums agreed to sell their 2,400 shares in MEX (representing 98.4615% of the Company)[3] to MEX for $99,500,000.00.

92.    In connection with the LBO, Frady, Husain, and Wadud received bonuses in the following amounts:

| Recipient | Date | Amount |
|-----------|------|--------|
| Frady | 10/26/18 | $1,600,000.00 |
| Husain | 10/26/18 | $2,600,000.00 |
| Wadud | 10/26/18 | $1,000,000.00 |

(collectively, the "**LBO Bonuses**").  MEX received no consideration for the LBO Bonuses and could not afford to pay them given that the value of MEX's liabilities exceeded the value of its assets at the time these bonuses were paid.  Any purported obligations to pay the LBO Bonuses were fraudulent in nature as MEX received no consideration, or inadequate consideration, for any such purported obligations.

93.    In early 2020, the Bierenbaums sought to accelerate MEX's purchase of their shares in the Company. Specifically, the Bierenbaums wanted to fully effectuate the LBO and sell all their interests in the Company to MEX during March of 2020. At the time the Bierenbaums wanted to accelerate the completion of the LBO, they still owned 1,850 shares of MEX, meaning that the remaining

---

[3] Through transactions not relevant here, the Bierenbaums later obtained 100% ownership in MEX, which was then sold to MEX under the LBO.

consideration to be paid at the closing of the LBO was $55,370,696.54.

94.    In February and March 2020, MEX requested that IberiaBank arrange approximately $160 million in senior credit facilities, including a $130 million term loan and two $15 million revolving lines of credit (one for fuel purchases and the other for general working capital needs). The $130 million term loan was purportedly to be used to refinance approximately $73 million in existing debt and "to finance $55.4 million of the Management Buyout of Barry and Gail Bierenbaum's ownership" in MEX.

95.    In March of 2020, the LBO was fully effectuated.

96.    Upon completion of the LBO in March 2020, Frady and Wadud each owned 50% of MEX.

97.    After the LBO was completed, Frady and Wadud became co-Chief Executive Officers ("**Co-CEOs**") of MEX.

98.    Husain resigned as Chief Operating Officer of MEX on November 3, 2019.  However, he retained a small amount of stock in MEX (the "**Husain Shares**").

99.    As MEX's Co-CEOs, Frady and Wadud were each responsible for overseeing and managing MEX's business and operations, including, but not limited to: (i) creating, implementing, and maintaining adequate, appropriate, and accurate internal controls; (ii) ensuring the Company's financial and accounting data was

timely and accurately captured, reported, and reviewed; (iii) monitoring the Company's financial performance; (iv) reviewing and, where warranted, adjusting the Company's business plans, practices, and strategies; (v) negotiating, authorizing, approving, and/or executing material contracts; and (vi) ensuring that the Company was complying with all of its contractual and financial obligations, including, without limitation, all leases and obligations to any lender or creditor. Frady and Wadud also had a duty not to place their own individual interests over MEX's interests.

100.   As Co-CEOs, Frady and Wadud also had duties and responsibilities relating to MEX's growth and its acquisition, sale, and leasing of C-Stores, including, but not limited to, duties relating to identifying potential C-Stores to acquire, conducting and/or reviewing due diligence, overseeing, or managing zoning, environmental and other issues relating to the purchase, sale, or leasing of C-Stores, and/or negotiating sale or lease terms.

101.   In connection with and after the LBO, Frady and Wadud received millions of dollars from MEX as purported dividends, distributions, and other compensation.

102.   MEX's financial statements reflect the following payments to Frady and Wadud:

| Year | Stockholder/Member Distributions | Compensation/Bonus |
|------|----------------------------------|--------------------|
| 2020 | $11.7 million | $4 million |
| 2021 | $12.4 million | |

103. Additionally, in 2020, Husain received $45,920 in distributions from MEX (together, with the payments outlined in Paragraph 102 and all other distributions or dividends paid to Frady, Husain, and Wadud, the "**Improper Shareholder Payments**").

104. The millions of dollars that Frady and Wadud received from MEX as Improper Shareholder Payments do **_not_** account for the millions of dollars in funds they siphoned from the Company through the conflicted and self-interested transactions, fraudulent transfers, and other unlawful actions described throughout this Complaint.

### **MEX's Business After the LBO**

105. Prior to the LBO, MEX's business was focused more on fuel distribution (*i.e.*, entering into fuel supply agreements with major fuel suppliers such as Exxon and Shell and then re-selling and distributing that fuel to independent C-Stores and other retail fuel suppliers) than retail operations.[4]

106. As discussed in detail below, after the LBO was completed and Wadud

---

[4] Prior to the LBO, MEX controlled some C-stores, but typically did not operate them. Instead, it often "dealered them out," *i.e.*, leased/subleased them to another entity to operate.

and Frady became Co-CEOs, they decided to expand MEX's retail C-Store business by causing MEX to lease hundreds of C-Stores and then attempting to operate them.

107.    MEX maintained two business segments: (1) the "**Fuel Distribution Business**," which consisted of selling and distributing the fuel it procured from fuel suppliers through fuel supply agreements and (2) the "**Retail Business**," which consisted of operating (i) fuel centers and associated C-Stores (the "**Fuel Centers**") and (ii) travel centers ("**Travel Centers**").

108.    MEX provided fuel to different types of Fuel Centers and Travel Centers as follows:

"**MEX Operated Sites**": These refer to Fuel Centers and Travel Centers that were leased to and operated by MEX.

"**Network Dealer Sites**": These refer to Fuel Centers and Travel Centers that MEX leased, but thereafter subleased to third parties to operate. The third parties that operate the Network Dealer Sites are referred to as "**Network Dealers**."

"**Controlled Sites**": These refer to the MEX Operated Sites and Network Dealer Sites collectively. They are "controlled" by MEX since it was the primary lessee.

"**Non-Controlled Sites**": These refer to sites for which MEX held no real property interest, *i.e.*, it was neither the owner nor lessee.

109.    The diagram below generally depicts MEX's business segments[5]:

---

[5] The diagram references a "MEX RE Entity." MEX was the parent of various subsidiaries, including, without limitation, MEX RE Holdings, LLC, which typically served as the tenant under MEX's leases.



110.   As of the Petition Date, when MEX filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, MEX serviced 855 locations across 27 states. Of those 855 locations, 550 were Controlled Sites and 305 were Non-Controlled Sites.

111.   As of the Petition Date, MEX's equity interests were as follows: Frady owned 48.5%, Wadud owned 48.5%, and West Hill Ranch Investors, LLC ("**West Hill Ranch**") owned 3%.[6]

### **MEX's Oil Company and Fuel Supply Agreements**

112.   As stated above, MEX operated two business segments, one of which

---

[6] West Hill Ranch, which owned and operated C-Stores, was acquired by MEX and, in connection therewith, it received a 3% ownership interest in the Company.

was a Fuel Distribution Business.

113.   A component of MEX's Fuel Distribution Business was its execution and fulfillment of two types of contracts referred to herein as "**Oil Company Agreements**" and "**Fuel Supply Agreements**."

114.   As a fuel distributor, MEX needed to obtain a constant and reliable source of fuel to distribute and sell to its customers. Indeed, as stated above, MEX marketed itself as providing unique services because of its purported ability to obtain fuel when it was in short supply. To accomplish that, MEX executed contracts with major fuel suppliers such as Exxon or Shell (the "**Fuel Suppliers**"). Those contracts required the Fuel Suppliers to make long-term contractual commitments to provide MEX with fuel in exchange for MEX agreeing to meet stringent minimum purchase requirements. These are the Oil Company Agreements referenced above.

115.   To try to ensure that it satisfied its stringent minimum purchase, MEX entered into long-term agreements with Fuel Centers and Travel Centers that required those entities to purchase their fuel from MEX. Those contracts are the Fuel Supply Agreements referenced above.

116.   MEX's Fuel Supply Agreements were personal service agreements through which MEX, among other things, offered C-Stores the ability to obtain fuel when it was in short supply, provided sales and marketing services, provided guidance and training, and allowed C-Stores to obtain branding with and from major

oil companies. These services (and others) differentiated MEX from other jobbers. Indeed, MEX's former outside counsel, James Johnston, testified in his Rule 2004 examination that MEX's services were an "important component" of its fuel supply contracts with C-Stores and was how MEX differentiated itself from other jobbers.

117.   MEX not only needed to ensure that it had an adequate supply of fuel, but also that it could timely transport that fuel to the Fuel Centers and Travel Centers who were parties to the Fuel Supply Agreements. To accomplish that, MEX used trucking companies to transport fuel.

118.   One company MEX used to transport fuel was Adelphi Transport, which is owned by Frady (50%) and Wadud (50%).

## MEX's Retail Business Expansion

119.   Prior to the LBO, MEX operated primarily as a fuel wholesaler or "jobber," *i.e.*, it purchased fuel from Fuel Suppliers and then re-sold and distributed fuel to Fuel Centers and Travel Centers.

120.   Once Frady and Wadud became CEOs of MEX, they elected to grow MEX's Retail Business. MEX also continued to operate its Fuel Distribution Business.

121.   Most of MEX's Retail Business expansion occurred through sale-leaseback transactions wherein (i) MEX would acquire a Fuel Center/Travel Center (including the real property); (ii) when warranted, rebrand the Fuel Center/Travel

Center so it bought and sold fuel from one of the Fuel Suppliers through which it had an Oil Company Agreement; (iii) sell the real property to another entity (as discussed below, often Blue Owl); and (iv) then immediately lease the real property back to operate the Fuel Center/Travel Center. These transactions are referred to herein as "**Sale-Leaseback Transactions**."

122.    Once a Sale-Leaseback Transaction was completed and MEX obtained a lease for a Fuel Center/Travel Center, it either operated it directly, *i.e.*, it was an MEX Operated Site (*supra* ¶ 108) or sub-leased the location to a third-party dealer to operate, *i.e.*, it was a Network Dealer Site (*supra* ¶ 108).

123. Visually,    the    process    is    generally    depicted    as    follows:



124.    As of the Petition Date, roughly 64% of the Controlled Sites were Network Dealer Sites and 36% were MEX Operated Sites.

125.    Prior to Frady and Wadud becoming MEX's Co-CEOs, MEX operated roughly 150 C-Stores.

126.    Between 2020 and 2023, Frady and Waded expanded MEX's Retail Business by more than 300% such that by 2023 MEX was controlling roughly 550 C-Stores.

<u>**MEX's Retail Business Was Expanded Primarily Through Sale-Leaseback Transactions With Blue Owl**</u>

127.    From 2021 until 2023, MEX expanded its Retail Business through Sale-Leaseback Transactions. Most, but not all, of those transactions were with Blue Owl.

128.    Specifically, on June 30, 2021, MEX and Blue Owl executed a Program Agreement pursuant to which Blue Owl agreed to finance up to *one billion dollars* of MEX's acquisition of Fuel Centers and Travel Centers through Sale-Leaseback Transactions.

129.    The Program Agreement required MEX or its designee to execute a Master Lease Agreement ("**MLA**") with Blue Owl for each Fuel Center/Travel Center that it leased.

130.    As a condition of executing the Program Agreement, Blue Owl required that it have the power and authority to appoint a person to MEX's Board of Directors.

131.    On December 31, 2021, per the Program Agreement, Blue Owl appointed Jared Sheiker, a Blue Owl Vice President and Principal, to MEX's Board.

132.   From 2021 until the Petition Date, MEX and Blue Owl engaged in roughly 60 Sale-Leaseback Transactions involving over 286 locations with an aggregate purchase price of over $825 million (each a "**Blue Owl Sale-Leaseback**").

### Frady and Wadud Failed to Conduct Adequate Due Diligence

133.   Frady and Wadud were personally involved with, had knowledge of, and approved the Sale-Leaseback Transactions, including the Blue Owl Sale-Leasebacks.

134.   For example, Wadud testified that (i) he was "in charge" of the Sale-Leaseback Transactions and (ii) his duties included reviewing the financials from C-Stores that MEX was acquiring as part of the Sale-Leaseback Transactions. He also testified that he was "ultimately responsible for the CFO's work."

135.   Frady, in turn, testified that (i) his duties included, but were not limited to, "dealing with development on the – the front side of – of an acquisition, gathering information as it pertained to the acquisition itself" and (ii) he was "in charge" of integrating the individual C-Store financial data into a centralized system so it could be reviewed, monitored, and analyzed (though, as discussed below, such integration never occurred). He also stated in a text to Wadud that he "take[s] full responsibility" for MEX's inability to integrate individual C-Store detail into any centralized, useable form (as discussed in more detail below).

136.   Further, Frady and Wadud, as MEX officers and directors, had a duty to conduct adequate and appropriate due diligence on the Fuel Centers and Travel Centers MEX acquired before committing MEX to hundreds of millions of dollars in Sale-Leaseback Transactions involving those properties.

137.   Yet Frady and Wadud each failed to establish, implement, or maintain adequate and appropriate processes and controls for analyzing, reviewing, and conducting due diligence on the Fuel Centers and Travel Centers underlying the Sale-Leaseback Transactions.

138.   For example, in many cases, the Fuel Centers and Travel Centers being acquired did not have adequate financial records or reporting to permit MEX to accurately ascertain their revenues, expenses, profitability, or value. Nor did they have adequate financials to allow MEX to ascertain whether the Fuel Centers/Travel Centers' revenues were sufficient to cover the lease's monthly rental rate and triple net obligations along with all other operating expenses (let alone determine whether after paying all expenses the Fuel Center/Travel Center would earn sufficient profit). In fact, in some cases, MEX acquired Fuel Centers and Travel Centers that had no historical financials at all.

139.   Moreover, in his Rule 2004 examination, Wadud conceded that MEX did not retain a valuation or appraisal professional to value or appraise the Fuel Centers and Travel Centers that MEX was acquiring. Instead, Wadud claims to have

relied on his own opinion of the Fuel Center/Travel Center's value even though he has no formal training in or license for real estate or business valuation.

### Frady and Wadud Used Sale-Leaseback Transactions to Line Their Own Pockets

140.    Frady and Wadud, aided and abetted by others as discussed herein, siphoned millions of dollars from MEX through the payment of purported "fees" to entities they own in connection with Sale-Leaseback Transactions.

141.    InDepth is Frady's alter ego and is indistinguishable from Frady himself. Among other things, InDepth has (a) no office; (b) no Board of Directors; (c) no employees (other than Frady); (d) no assets; (e) no contracts; (f) no email address; and (g) conducts no business other than any purported business performed by Frady himself.

142.    Illuminous is Wadud's alter ego and is indistinguishable from Wadud himself. Among other things, Illuminous has (a) no office; (b) no Board of Directors; (c) no employees (other than Wadud); (d) no assets; (e) no contracts; (f) no email address; (g) does not provide Wadud with a K-1; and (h) conducts no business other than any purported business performed by Wadud himself.

143.    As Co-CEOs, Frady and Wadud's duties included, without limitation, identifying and analyzing potential Fuel Centers and Travel Centers that MEX could

acquire and leaseback through Sale-Leaseback Transactions.[7]

144.    Thus, when Frady and Wadud performed tasks relating to identifying, analyzing, conducting due diligence on, negotiating the terms of, or closing on Fuel Centers and Travel Centers in connection with Sale-Leaseback Transactions, they were acting in their capacities as officers and employees of MEX. Indeed, Wadud testified:

> Q:    Okay. And what services did [Illuminous] provide in exchange for those – or what value did [Illuminous] provide in exchange for those –
> Q:    You can answer.
> A:    It was – again, you know, based on our sourcing the deals, acquiring it, and making sure the company is growing.
> **Q:    Okay. Weren't you supposed to do that as CEO of the company?**
> **A:    That is correct.**

145.    Likewise, James Johnston, MEX's former counsel who represented MEX in connection with many Sale-Leaseback Transactions, testified:

> Q:    …based on your personal observations, Mr. Wadud and Mr. Frady **in their roles as co-CEOs** were negotiating the terms under which MEX would purchase, sell or lease the properties, correct?
> A:    That's my understanding.
> Q:    And Mr. Frady and Mr. Wadud, **as MEX's co-CEOs**, were also involved in conducting due diligence for MEX, correct?
> Q:    Or overseeing the process?
> A:    I think that's fair to say.

146.    Nonetheless, Frady and Wadud claimed that, while identifying,

---

[7] The Trustee does not concede that MEX should have been entering into Sale-Leaseback Transactions in the first place.

analyzing, conducting due diligence on, negotiating the terms of, or closing on Fuel Centers and Travel Centers for Sale-Leaseback Transactions, they were not acting as officers and employees of MEX, but rather for and on behalf of their own separate companies, *e.g.*, InDepth, Illuminous, and/or 4Court Consulting.

147.   Likewise, as officers and directors of MEX, Frady and Wadud were responsible for assisting MEX in obtaining new Fuel Supply Agreements. Yet they claimed that when they were performing tasks to source new Fuel Supply Agreements for MEX, they were working for and on behalf of their side companies like InDepth and Illuminous.

148.   As further evidence that Frady and Wadud performed services in connection with Sale-Leaseback Transactions in their capacities as MEX officers and directors (and not for Illuminous or InDepth), Sheiker, a MEX board member, testified while he was on MEX's board, he had never heard of Illuminous or InDepth:

Q:   Okay. While you were on the board of MEX, you never heard of Illuminous or InDepth?
A:   I did not.

149.   Presumably, if MEX had retained separate companies to assist MEX in its hundreds of millions of dollars in Sale-Leaseback transactions, Sheiker, a Board member, would have at least heard those companies' names.

150.   Based on their dubious claims that when working on Sale-Leaseback Transactions they were working for InDepth, Illuminous, and 4Court Consulting

54

(and not MEX), Frady and Wadud caused substantial fees to be paid to their own companies at the closing of Sale-Leaseback Transactions and Fuel Supply Agreements.

151.  For example:

i.   in connection with a September 2021 Sale-Leaseback Transaction, InDepth and Illuminous each received $875,000.

ii.  in connection with an October 2021 Sale-Leaseback Transaction, InDepth and Illuminous each received $875,000.

iii. in connection with a November 2021 Sale-Leaseback Transaction, InDepth and Illuminous each received $250,000.

iv.  in connection with a November 2021 Sale-Leaseback Transaction, InDepth and Illuminous each received $125,000.

v.   in connection with a February 2022 Sale-Leaseback Transaction, InDepth and Illuminous each received $150,000.

vi.  in connection with a March 2022 Sale-Leaseback Transaction, InDepth and Illuminous each received $50,000.

vii. in connection with a September 2022 Sale-Leaseback Transaction, InDepth and Illuminous each received $14,571.43.

viii. in connection with an October 2022 Sale-Leaseback Transaction, InDepth and Illuminous each received payments of $170,797.42.

ix.  in connection with another October 2022 Sale-Leaseback Transaction, InDepth and Illuminous each received $244,714.29.

x.   in connection with another October 2022 Sale-Leaseback Transaction, InDepth and Illuminous each received payments of $7,800.

In each of the above cases, MEX owned, or had an interest in, and should have received the funds that were improperly wired to Illuminous and InDepth.

152. In addition to the 2021 and 2022 Sale-Leaseback Transactions referenced above, InDepth and Illuminous received payments in connection with 2018, 2019, and 2020 Sale-Leaseback Transactions as well. For example:

     i.     In connection with a July 2018 sale of properties in Georgia, South Carolina, and Mississippi (*e.g.*, the property at 5195 Town Lake Parkway, Woodstock, GA) from MEX to Vault, InDepth received a payment of $345,000 and Illuminous received a payment of $42,860.

     ii.     in connection with a November 20, 2018, sale of Arkansas properties from MEX to Taylor, InDepth received a payment of $103,750.80.

     iii.     in connection with a November 29, 2018, sale of properties in Arkansas and Louisiana from MEX to Taylor, InDepth received a payment of $203,294.20 and Illuminous received a payment of $8,633.54.

     iv.     in connection with a February 28, 2019, sale of properties from MEX to Georgia 19 Pack LLC, InDepth received a payment of $397,092.32.

     v.     in connection with a March 29, 2019, sale of properties from MEX to Georgia 19 Pack, LLC, InDepth received a payment of $142,481.10.

     vi.     in connection with a September 26, 2019 sale of properties in Arkansas (*e.g.*, 1311 E. Main, El Dorado, AR) to 42 ARLA Stores, LP, InDepth received a payment of $320,438.95 and Illuminous received a payment of $482,288.

In each of the above cases, MEX owned or had an interest in, and should have received, the funds that were improperly wired to Illuminous and InDepth.

153.   Throughout this Complaint, all funds transferred to or for the benefit of InDepth and/or Illuminous whether from Sale-Leaseback Transactions, fuel supply transactions, or otherwise, are referred to as the "**InDepth and Illuminous Transfers.**" The Trustee seeks to avoid and recover those transfers, with such recovery based on different statutes (*e.g.* Bankruptcy Code Section 548, Bankruptcy Code Section 544, and O.C.G.A. Section 18-2-74) depending upon their dates.

154.   Further, as shown in Paragraphs 163 and 164 below, 4Court Consulting, owned by Frady (33%), Wadud (33%), and Smith (33%), directly or indirectly, received over Seven Million Dollars ($7,000,000) as purported "fees" in connection with Sale-Leaseback Transactions and other transactions.

155.   Andrew Ackerman, who served as MEX's commercial real estate broker on many Sale-Leaseback Transactions (including many where InDepth and Illuminous received purported "fees") testified that he was unaware of what work, if any, InDepth or Illuminous performed that warranted them receiving millions of dollars in purported "fees." For example, Ackerman testified:

> Q:    And if you turn to the next page, do you see where InDepth
>       Services got a fee of $320,438, it's toward the bottom?
> A:    Yes.
> Q:    Can you tell me anything that InDepth Services Company did to
>       earn $320,438?
> A:    No.

Q:    And do you see Illuminous Consulting got $482,288?
A:    I do see that.
Q:    And are you aware of anything that Illuminous Consulting did to earn $482,288?
A:    No.
Q:    And you had personal involvement in this transaction, right?
A:    I did, yes.

156.    The funneling of funds at closing to Illuminous, InDepth, and other entities (*e.g.*, 4Court Consulting and LTE Capital as described below) harmed MEX. Indeed, had the funds not been paid to Frady's and Wadud's side companies, they would have been paid to MEX who had an interest in and a right to receive the funds. Thus, the Sale-Leaseback Fee Transfers (as defined below) to Illuminous, InDepth, and other entities directly, and to Frady and Wadud indirectly, caused MEX to lose millions of dollars it owned or was otherwise entitled to and should have received.

157.    Witness testimony confirms this harm to MEX. For example, Wadud testified:

Q:    Right. But wouldn't you agree with me that the money, when the transaction closed before it was paid to Illuminous and InDepth, was Mountain Express money?
Q:    You invoiced Mountain Express, right?
A:    That's right.
Q:    **So, it was Mountain Express money that was paid out to Illuminous and InDepth, correct?**
A:    **That is correct, yeah**.
2/

158.    Similarly, Sheiker, a MEX Board member, testified that the funds transmitted to Illuminous and InDepth "came out of the net proceeds that Mountain

Express received from the transaction[s]." And, David Rosenthal, another MEX employee, testified:

> Q:   So in other words, if Illuminous or InDepth did not receive those amounts, they would have adhered to the benefit of Mountain Express, correct?
> Q:   It would have been paid to Mountain Express, right?
> A:   Yes, those proceeds would have gone to Mountain Express.

159.  Likewise, based on their dubious claims that when sourcing new Fuel Supply Agreements for MEX they were working for InDepth and Illuminous (and not MEX), Frady and Wadud, upon information and belief, caused MEX to pay their own companies fees upon the execution of new Fuel Supply Agreements.

160.  Wadud admitted that he never asked an independent professional to evaluate whether MEX's payments to Illuminous were fair to the Company:

> Q:   Now, the Illuminous arrangement, did you ever hire any independent professionals to evaluate whether that was fair to the company? And "by the company" I mean Mountain Express.
> A:   No, I did not.

161.  Given that InDepth and Illuminous were and are the alter egos of Frady and Wadud, respectively, through the InDepth and Illuminous Transfers (and other payments referenced herein), Frady and Wadud siphoned millions of dollars from Sale-Leaseback Transactions to themselves.

162.  Frady and Wadud siphoned funds from MEX through other entities as well, including 4Court Holdings, 4Court Consulting, 4Court Leasing, and LTE Capital.

163.    For example, Frady and Wadud each owned 33% of a company known as LTE Capital (the remainder was owned, directly or indirectly, by Elias Kassouf).

164.    Frady and Wadud claimed that, in some instances, LTE Capital (instead of Illuminous and InDepth) sourced or conducted diligence on properties that were part of Sale-Leaseback transactions. Based on that claim, Frady and Wadud caused or directed funds to be sent to LTE Capital at the closing of some Sale-Leaseback Transactions. For example, in connection with a MEX subsidiary acquiring five properties in Indiana on or around October 31, 2022, LTE Capital received a purported "Consulting Fee" of $1 million (collectively with all other transfers to or for the benefit of LTE Capital, the **"LTE Capital Sale-Leaseback Fees"**).[8] The LTE Capital Sale-Leaseback Fees to LTE Capital harmed MEX in the same manner that it was harmed by the InDepth and Illuminous Transfers.

165.    While MEX was harmed by the LTE Capital Sale-Leaseback Fees to LTE Capital, Frady and Wadud profited. Indeed, Wadud testified that LTE Capital "profit[ted] from a sale-leaseback transaction" involving MEX.

166.    Frady and Wadud similarly caused MEX to pay purported "fees" to another one of their side companies - 4Court Consulting - in connection with Sale-Leaseback Transactions. As with Illuminous, InDepth, and LTE Capital, the

---

[8] The properties were located at 1026 2nd Avenue, Sibley, IA; 1201 18th Street, Spirit Lake, IA; 602 Okoboji Avenue, Milford, IA; 4318 Highway Blvd., Spencer, IA; and 2401 Main Street, Emmelsburg, IA.

purported "fees" paid to 4Court Consulting were for services that (i) Frady and Wadud were required to perform, and did perform, as officers, directors, and employees of MEX or (ii) Frady and Wadud caused MEX employees, like David Rosenthal, to perform. For example, during his Rule 2004 examination, Smith testified:

> Q:    And when you were working for 4Court Consulting, here were times when Fr. Frady and Mr. Wadud would cause David Rosenthal, a MEX employee, to run projections on a 4Court Consulting property; correct?
>
> A:    I believe so.
>
> Q:    And when you were working for 4Court Consulting, there were times when Mr. Frady and Mr. Wadud would use Mr. Rosenthal's projections – I think it's Rosenthal.
>
> A:    Rosenthal.
>
> Q:    Excuse me. His [Mr. Rosenthal] projections to inform their decision whether to purchase a 4Court Consulting Property; correct?
>
> A:    Correct.
>
> Q:    Okay. And when you were working for 4Court Consulting, there were times when Mr. Frady and Mr. Wadud would use Mr. Rosenthal's projections to help them decide how much to pay for a 4Court Consulting Property; correct?
>
> A:    Correct.

167.  Because Frady, Wadud, and other MEX employees (*e.g.*, Rosenthal) were performing much, if not all, of the purported consulting work, there was no legitimate or proper basis for paying the purported "fees" to 4Court Consulting). Even if 4Court Consulting provided MEX with some services, the purported "fees" paid to 4Court Consulting were materially above market value, *i.e.*, MEX did not receive reasonably equivalent value (if any value at all).

168.   While the Trustee's investigation continues, the Trustee has identified over $7 million in purported "fees" MEX paid to 4Court Consulting (collectively, with all amounts transferred to or for the benefit of 4Court Consulting, the "**4Court Consulting Sale-Leaseback Fees**"), including the following:

| Date | Property | Purported "Fee"[9] |
|------|----------|--------------------|
| 5/11/2022 | Seminole, OK | $ 168,913.35 |
| 5/11/2022 | Eufala, OK | $ 269,990.00 |
| 5/11/2022 | McAlester, OK (650 S. Main) | $ 79,995.00 |
| 5/11/2022 | McAlester, OK (1820 S. Main) | $ 77,990.00 |
| 5/11/2022 | McAlester, OK (1922 S. Main) | $ 121,490.00 |
| 5/11/2022 | McAlester, OK (2500 N. Milt Phillips) | $ 168,913.35 |
| 5/11/2022 | McAlester, OK (1400 E. Carl Albert) | $ 231,490.00 |
| 6/14/2022 | Jackson, MS (1046, 1034 & 1038 Woodrow Wilson Ave) | $ 400,000.00 |
| 6/14/2022 | Magnolia, MS (7086 US 51 & 1021 Dudley) | $ 300,000.00 |
| 6/14/2022 | Gulfport, MS (18447 Hwy 49 & 16303 Hwy 53) | $ 300,000.00 |
| 7/27/2022 | Gretna, LA (1000 Franklin) | $ 565,000.00 |
| 7/27/2022 | Jackson & Clinton, LA | $ 350,000.00 |
| 7/27/2022 | OK 5 Pack | $ 300,000.00 |
| 7/27/2022 | Jackson, MS (5491 Watkins) | $ 100,000.00 |
| 7/27/2022 | AR 4 Pack (Pocahontas, Oak Grove, Heber Springs, Gepp) | $ 350,000.00 |
| 7/27/2022 | AR 4 Pack (Greenbrier, Naylor, Vilonia, McRae) | $ 400,000.00 |
| 8/1/2022 | Sauder & Gulfport, MS | $ 300,000.00 |
| 8/1/2022 | Goodman & Magnolia, MS | $ 300,000.00 |
| 8/15/2022 | MN/WI/IA (Moe's Mart) | $ 900,000.00 |
| 8/15/2022 | Greenville, MS | $ 50,000.00 |
| 8/15/2022 | OK/AR 5 Pack (Moe's Mart) | $ 300,000.00 |
| 9/1/2022 | McAlester, OK (420 W. Carl Albert) | $ 103,500.00 |

---

[9] The Trustee is continuing to investigate these fees and reserves the right to amend the positions in this table if later obtained facts so warrant.

| | | | |
|---|---|---|---|
| 8/29/2022 | RAM Oil | $ | 50,131.55 |
| 9/20/2022 | 3103 MS-16 E, Carthage, MS | $ | 75,000.00 |
| 9/20/2022 | 5452 US 62, Green Forest, AR | $ | 350,000.00 |
| 9/20/2022 | 4775 & 5308 Clinton Blvd, Jackson, MS & 214 W Presley, McComb | $ | 500,000.00 |
| 9/20/2022 | Fitzgerald, GA | $ | 50,000.00 |
| 9/20/2022 | St Martinville (1700 S Main & 1549 Old Spanish), New Iberia, LA | $ | 500,000.00 |
| 9/20/2022 | 12515 Three River, Gulfport, MS & 24281 MS53, Saucier, MS | $ | 500,000.00 |

169.   The 4Court Consulting Sale-Leaseback Fees, along with the LTE Capital Sale-Leaseback Fees and the InDepth and Illuminous Transfers (together, the "**Sale-Leaseback Fee Transfers**") were improper. Among other things, the funds were transmitted to Frady's and Wadud's side companies without MEX receiving any value, let alone reasonably equivalent value, because the purported "consulting" work was (i) performed by Frady and Wadud, if at all, in their roles as MEX officers, directors, and employees and/or (ii) performed by MEX employees such as David Rosenthal. Further, even assuming that Frady's and Wadud's side companies performed services for MEX outside of Frady's and Wadud's roles as officers and directors, the amount paid to those side companies was far in excess of fair market value for the purported services, and MEX did not receive reasonably equivalent value for the purported services either.

170.   Moreover, MEX did not have a contract with 4Court Consulting that required the payment of the 4Court Consulting Sale-Leaseback Fees and thus MEX had no obligation to pay the funds. Any contractual obligations that MEX may have

had with InDepth, Illuminous, LTE Capital, or 4Court Consulting were fraudulent obligations (the "**Contractual Obligations**"). Additionally, Frady and Wadud failed to take the required and appropriate steps to have independent persons or entities evaluate the Sale-Leaseback Fee Transfers and Contractual Obligations to ensure they were at market value or otherwise fair to MEX.

171.   Whenever MEX wired or otherwise provided funds to 4Court Consulting (or any other 4Court entity), Frady and Wadud personally benefitted therefrom. On this point, Frady testified:

Q:    When you say 4Court would do this, you and Mr. Wadud were majority
       owners of 4Court, correct?
A:    We weren't the managing partners.
Q:    Okay. But you were majority owners, correct?
A:    We got benefit from it.
Q:    Okay. You got benefit from the $500,000; correct?
A:    Yeah, sure.[10]

172.   Frady and Wadud not only caused MEX to send 4Court Consulting millions of dollars it was not entitled to receive and should not have received, it also caused MEX to use its own resources to operate 4Court Consulting's business.

173.   For example, on April 28, 2022, Smith emailed Carrie Kennedy at

---

[10] The $500,000 refers to a purported "fee" that was transmitted to 4Court Consulting on March 2, 2022, in connection with a Sale-Leaseback Transaction involving properties at 632 Pine Hill Road, Blanchard, LA; 6850 Bluncombe Road, Shreveport, LA; 1300 McArthur Street, Mansfield, LA; 700 Homer Road, Minden, LA; and 3326 Hearne Ave., Shreveport, LA. The $500,000 were funds that should have been transmitted to MEX.

MEX and asked her to assist 4Court Consulting with fuel supply and consulting agreements. Ms. Kennedy performed that work for the benefit of 4Court Consulting. Upon information and belief, MEX neither invoiced 4Court Consulting for the services it provided nor received payment for those services. Instead, MEX used its own resources at its own cost to assist Frady's and Wadud's side company 4Court Consulting.

## Frady and Wadud Use 4Court Leasing to Line Their Own Pockets

174.   Frady and Wadud also engaged in self-dealing and conflicting transactions with respect to another one of their side companies called 4Court Leasing.

175.   4Court Leasing purportedly leased fuel pumps and other equipment to MEX. Because Frady and Wadud owned both MEX and 4Court Leasing, they were conflicted in any transactions involving the two companies. Yet, rather than have an independent third party negotiate the terms of the purported leases, Frady and Wadud negotiated the terms for both MEX and 4Court Leasing. Frady and Wadud failed to have an independent third party review the terms of the leases to ensure that they were fair to MEX and to ensure that Frady and Wadud did not charge MEX above market rates to siphon funds from MEX to their side company 4Court Leasing.

176.   After MEX declared bankruptcy, it was revealed that 4Court Leasing (through Frady and Wadud) had been charging MEX above market rents on dozens,

if not hundreds, of properties. Specifically, in an April 18, 2023, email, Sean Hardin of Patriot Capital disclosed that 4Court Leasing had been charging MEX a premium on its leases that was "outside market." This premium appears to have totaled not less than $1,310,120.97. MEX's excess payments to 4Court Leasing are referred to herein as the "**4Court Leasing Above Market Payments**".

177.   Given the number of leases and the amount of the "additional rent" associated therewith, Frady and Wadud, in breach of their fiduciary duties and Statutory Duties (defined below), caused MEX to pay their side company 4Court Leasing a substantial amount of money through the 4Court Leasing Above Market Payments. MEX did not receive reasonably equivalent value for those payments.

178.   Frady's and Wadud's conduct with respect to 4Court Leasing Above Market Payments harmed MEX in the same manner that MEX was harmed with respect to the Sale-Leaseback Fee Transfers to InDepth, Illuminous, LTE Capital and 4Court Consulting.

179.   While the Trustee is continuing her investigation, it appears that Frady and Wadud through InDepth, Illuminous, LTE Capital, 4Court Consulting, 4Court Leasing and other entities, received over fifteen million dollars ($15,000,000.00) in purported "fees" through the Sale-Leaseback Fee Transfers and the 4Court Leasing Above Market Payments. Indeed, during his Rule 2004 examination, Frady testified that while he served as MEX's Co-CEO, just one of his side companies (InDepth)

received roughly Five Million Dollars ($5,000,000.00) in purported "fees" in connection with Sale-Leaseback Transactions.

180.   MEX did not have a contract with InDepth, Illuminous, LTE Capital, or 4Court Holdings. Upon information and belief, in at least some cases, MEX did not have a contract with 4Court Consulting.

181.   Thus, even assuming *arguendo* that Frady and Wadud were performing work for Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Holdings in connection with the Sale-Leaseback Transactions (they were not), MEX had no contractual obligation to pay them any purported "fees."

182.   Because Illuminous, InDepth, LTE Capital, 4Court Consulting (in some cases), and 4Court Holdings had no contract with MEX, there was no agreement as to the amount of purported "fees" MEX was allegedly required to pay those entities for the work Frady and Wadud claimed they performed on those entities' behalf.

183.   Instead, Frady and Wadud determined how much MEX (and others) would pay Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Holdings in connection with each Sale-Leaseback Transaction. This is undisputed: Frady testified that he and Wadud did not "negotiate with anybody" regarding the amount of fees paid to InDepth, Illuminous, and their other related companies at closing.

184.   Likewise, Smith, testifying as the corporate representative for the 4Court Entities (including 4Court Consulting), made the astonishing admission that **MEX determined how much 4Court Consulting would charge MEX for consulting fees**, *i.e.*, **Wadud and Frady decided how much MEX would pay their side company for purported consulting services**:

> Q:   Okay. There's a $400,000 consulting fee.
> A:   Correct.
> Q:   How was that consulting fee arrived at?
> A:   It was determined by Mountain Express.
> …
> **Q:   Just so the record is clear. There are invoices that were issued by 4Court Consulting. It's your testimony that Mountain Express, who they were billed to, Mountain Express was the one who told 4Court Consulting what to put on the invoice?**
> **A:   Yeah, they set the fee. They set the consulting fee.**

185.   Thus, while serving as officers and directors of MEX, Frady and Wadud determined how much MEX would pay the companies **they** owned, a paradigmatic example of a conflicted and self-interested transaction.

186.   The Sale-Leaseback Fee Transfers to Illuminous, InDepth, LTE Capital, 4Court Consulting, 4Court Holdings and other companies, along with the 4Court Leasing Above Market Payments, harmed MEX in several ways.

187.   For one, MEX was not obligated to pay, and should not have paid, any purported "fees" to Illuminous, InDepth, LTE Capital, 4Court Consulting, 4Court Holding or any other entity for any actions taken by Frady or Wadud in connection with Sale-Leaseback Transactions or any other transactions given that they were

obligated to take those actions and did take those actions as MEX officers and/or employees and/or they caused MEX employees (*e.g.*, Rosenthal) to perform the work. And, even assuming *arguendo* there was some obligation to pay the side companies, the amount paid was well above fair market value for the services purportedly provided and thus MEX did not receive reasonably equivalent value.

188.   Further, under the MLAs, MEX's monthly lease rate was calculated using a formula based upon the price at which Blue Owl acquired the property from MEX. Upon information and belief, because Frady and Wadud insisted that they (through Illuminous, InDepth, LTE Capital, and 4Court Consulting) receive payments in connection with the Sale-Leaseback Transactions, the purchase prices for the property were artificially inflated to include the purported "fees" to Illuminous, InDepth, LTE Capital, and 4Court Consulting. That inflated price harmed MEX because it caused MEX to pay higher monthly lease rates that it otherwise would or should have.

189.   Moreover, the 4Court Leasing Above Market Payments were, in effect, transfers of funds from MEX to 4Court Leasing without any, let alone reasonably equivalent, value.[11]

190.   Frady and Wadud used the Sale-Leaseback Transactions to benefit

_____

[11] For clarity, the 4Court Leasing Above Market Payments refer to the portion of the payments that were above market rates.

themselves in other ways.

191.  For example, prior to acquiring real property for Sale-Leaseback Transactions, MEX sometimes conducted Phase I environmental site assessments. Further, for those Fuel Centers and Travel Centers operated by MEX after a Sale-Leaseback Transaction, MEX was responsible for testing or monthly visual inspections to meet various state and federal regulatory requirements (together, the Phase I assessments, testing, and visual inspections are the "**Environmental Services**").

192.  MEX entered into a Services Agreement with Adelphi Environmental pursuant to which Adelphi Environmental agreed to provide MEX with Environmental Services.[12]

193.  Because Frady and Wadud maintained, directly or indirectly, an ownership interest in Adelphi Environmental (through their ownership in Adelphi Field Services, which owned 57.5% of Adelphi Environmental), they had a conflict of interest when determining whether MEX should execute a contract with Adelphi Environmental, and if so, the terms of that contract (particularly the fees that Adelphi Environmental would be paid).

---

[12] In some cases, MEX used an independent third party, MVI Field Services, to perform Environmental Services.

194.   Nonetheless, Frady and Wadud participated in, decided, and approved MEX's decision to execute the Services Agreement with Adelphi Environmental and the amount that Adelphi Environmental would be paid under that agreement.

195.   Frady and Wadud caused MEX to pay Adelphi Environmental at least $168,478.67 between March 17, 2022, and March 17, 2023. Upon information and belief, some portion of those payments were payments that were above market rates and thus MEX did not receive reasonably equivalent value for the full amount of funds that were paid to Adelphi Environmental.

196.   At one point in time, MEX owned a company known as Spartan Tank Management LLC ("**Spartan Tank**").

197.   Spartan Tank also provided MEX with Environmental Services.

198.   Frady and Wadud caused MEX to pay Spartan Tank at least $2,659,000 between March 17, 2020, and March 17, 2023.

199.   Spartan Tank dissolved on September 8, 2023.

200.   Upon information and belief, prior to Spartan Tank's formal dissolution, Frady and Wadud caused MEX to transfer some of Spartan Tank's assets (which may include the $2,659,000 transferred to Spartan Tank or assets acquired using those funds) to their side company, Adelphi Environmental (the "**Spartan Tank Transfers**"). Upon information and belief, Adelphi Environmental

71

did not pay MEX fair market value or reasonably equivalent value (if anything) for the Spartan Tank Transfers it received from MEX.

201.  When engaging in the conflicted and self-interested transactions, Frady and Wadud were acting adversely to MEX's interests. Thus, Frady and Wadud favored their own personal interests and the interests of their side companies over the interests of MEX.

## Husain Benefits at MEX's Expense

202.  Husain, through Arash and Bano, also received hundreds of thousands of dollars in purported consulting fees in connection with MEX's real estate transactions.

203.  A summary of these transactions is as follows:

a) On July 31, 2018, MEX paid Bano $100,598.00 from the proceeds of MEX's sale of 14 properties in Georgia;

b) On November 29, 2018, MEX paid Arash and Bano a total of $112,815.07 from the proceeds of MEX's sale of 8 properties in Arkansas and Louisiana;

c) On February 28, 2019, MEX paid Arash and Bano a total of $92,381.44 from the proceeds of MEX's sale of 19 properties in Georgia; and

d) On September 25, 2019, MEX paid Husain, individually and through Arash and Bano, a total of $107,988.55 in connection with MEX's purchase of 10 properties in Arkansas and Louisiana.

(collectively, and together with all other fees paid to Husain, Arash, and Bano, the "**Husain Fee Transfers**").

204.   When questioned in his Rule 2004 Exam about the consideration provided by Husain for the Husain Fee Transfers, he was unable to provide specific details about the basis for these payments and indicated that he did not have, or did not know if he had, documents supporting the reasons for such transfers.

## Husain Cashes Out His Worthless MEX Stock

205.   Once Husain resigned from MEX, he sought to sell the Husain Shares back to MEX.

206.   In his Employment Agreement dated October 15, 2018, Husain agreed that upon termination of his employment, the Bierenbaums would have the right to repurchase his stock for $100,000.

207.   According to MEX's audited 2018 financial statements, the value of MEX's liabilities exceeded the value of its assets by nearly $10.5 million at this time.

208.   Accordingly, MEX's stock was not worth $100,000, but was instead valueless.

209.   The Bierenbaums later assigned their right to repurchase Husain's stock to MEX.

210.   On or about February 20, 2020, MEX and Husain entered into a certain Stock Redemption Agreement pursuant to which MEX agreed to redeem and

purchase Husain's stock for $1,000,000 (the "**Husain Redemption Obligation**").

211.   This dramatic increase in valuation of the Husain Shares was not justified.

212.   MEX and Husain did not have independent third parties determine a fair market price for the Husain Shares.

213.   The Husein Redemption Obligation was fraudulent in nature as MEX did not receive reasonably equivalent value for this obligation and MEX was insolvent at the time.

214.   On March 11, 2020, MEX paid Husain $250,000 of the Husain Redemption Obligation.

215.   On April 1, 2022, MEX paid $382,500 of the Husain Redemption Obligation.

216.   On July 1, 2022, MEX paid $383,456 to satisfy the remainder of the Husain Redemption Obligation (collectively, with the March 11, 2020, and April 1, 2022 payments, the "**Husain Redemption Transfers**").

217.   The Husain Redemption Transfers were fraudulent in nature as, without limitation, MEX did not receive reasonably equivalent value for them and MEX was insolvent at the time they were made.

## Frady and Wadud Engage in Other Conflicted, Self-Dealing Transactions to Siphon Profits to Themselves

218.   Frady and Wadud, alone and sometimes with others, formed a number of companies that (i) provided a pretext for Frady and Wadud to improperly siphon funds from MEX to themselves or companies they owned; (ii) usurped MEX's corporate opportunities; (iii) were formed, maintained, or operated using fraudulently, unlawfully, or improperly transferred MEX funds; (iv) received funds, contractual rights, and contracts that were fraudulently transferred from MEX; and (v) obtained or utilized MEX's proprietary information and trade secrets to their own advantage. Examples of such conduct are described above with respect to, among other things, Frady and Wadud using Sale-Leaseback Transactions to siphon funds from MEX to their side companies InDepth, Illuminous, 4Court Holdings, 4Court Consulting, and LTE Capital and using leases with 4Court Leasing to siphon funds to that company through the 4Court Leasing Above Market Payments. A few additional examples are provided below.[13]

219.   One clear example of how Frady and Wadud used real property transactions to siphon millions of dollars to themselves involves a March 2022 transaction involving the Minden Property (defined in Paragraph 2 above). An overview of that transaction is as follows:

- On or around March 31, 2022, Frady and Wadud caused MEX to close on an acquisition of WebsterP for $6.5 million. WebsterP's only assets were two properties in Minden, LA (2193 and 2918 Highway 532).

---

[13] These examples are non-exhaustive.

- On or about that same date, Frady and Wadud caused and directed WebsterP (then MEX) to sell one of the two properties (2193 Highway 532) to Time & Water (**a separate company they owned 50/50**) for only $500,000, *i.e.*, materially less than MEX had just paid for that property.

- Also on March 31, 2022, Frady and Wadud caused and directed Time & Water to lease the property back to WebsterP (*i.e.*, MEX) for $240,000 per year, *i.e.*, a single year's rent was almost half of what Time & Water purportedly paid for the property. Thus, within roughly two years, Time & Water would have received sufficient rent from MEX to fully pay for the property, thereby giving Frady and Wadud ownership of 2193 Highway 532 for free.

220. Frady and Wadud did not have independent third parties (i) determine a fair market price for WebsterP (*i.e.*, MEX) to sell the Minden Property to their own company Time & Water; (ii) negotiate the price Time & Water would pay for the Minden Property; (iii) negotiate the lease rate WebsterP would lease the Minden Property back from Time & Water; or (iv) otherwise determine whether WebsterP's transactions with Time & Water were fair to MEX.

221. The $500,000 sales price for the Minden Property was not reflective of fair market value as evidenced by the fact that (i) MEX paid millions more for the property on the very same day, *i.e.*, when MEX acquired WebsterP, whose sole assets were 2193 and 2918 Highway 532, it paid $6.5 million; (ii) in the Fall of 2021, MEX contemplated purchasing the Minden Property directly (without purchasing WebsterP) and, in conjunction therewith, MEX was prepared to offer at least double what Time & Water paid MEX for the property months later; and (iii) in 2023, Time

& Water itself valued the Minden Property as being worth more than Three Million Five Hundred Thousand Dollars ($3,500,000).

222.   Frady and Wadud unfairly and improperly deprived MEX of the value of the Minden Property by effectuating a sale of that property from WebsterP (*i.e.*, MEX) to their own company Time & Water for materially less than its fair market value, *i.e.*, MEX did not receive reasonably equivalent value. Frady and Wadud also usurped MEX's opportunity.

223.   A second example involves a property at 4005 Fern Avenue, Shreveport, Louisiana (the "**Shreveport Property**"). An overview of Frady's and Wadud's improper conduct with respect to the Shreveport Property is as follows:

- On February 5, 2021, MEX signed a contract to purchase the Shreveport Property from Madison Park Associates for $325,000.

- On February 8, 2021, Frady and Wadud, as MEX's Co-CEOs, caused and directed MEX to assign that contract to their side company Time & Water.

- After Time & Water closed on the Shreveport, Frady and Wadud caused and directed MEX to lease the property from Time & Water.

- Less than three months after Time & Water acquired the Shreveport Property, it sold the property to AMG Realty for $753,000.

Thus, if Frady and Wadud had complied with their fiduciary duty and Statutory Duties (defined below) by not improperly assigning the purchase of the Shreveport Property to their side company Time & Water, MEX (not Time & Water) would have made the $428,000 profit from the sale of the Shreveport Property.

Moreover, Frady and Wadud caused MEX to pay Time & Water rent that it would not have had to pay if MEX purchased the property. Frady and Wadud also usurped MEX's opportunity.

224.    A third example involves a property at 59 Victoria Road, Victoria, MS (the "**Victoria Property**"). An overview of Frady's and Wadud's improper conduct with respect to the Victoria Property is as follows:

- On February 5, 2021, MEX agreed to purchase the Victoria Property from AMS Market for $1,550,000.

- On March 11, 2021, MEX agreed to sell the Victoria Property to Time & Water for $1.95 million.

- On April 21, 2021, AMS Market sold the Victoria Property to Time & Water (and not MEX) because MEX, at Frady's and Wadud's direction, assigned MEX's purchase rights to Time & Water.

- On April 21, 2021, Frady and Wadud, as MEX's Co-CEOs, caused and directed MEX to lease the Victoria Property from Time & Water for $144,000/year.

- On October 28, 2021, Time & Water sold the Victoria Property to AMG OIL VI for $2,050,000.

Thus, if Frady and Wadud had complied with their fiduciary and Statutory Duties (as defined below) by not improperly assigning the purchase of the Victoria Property to their side company Time & Water, MEX (not Time & Water) would have made the $500,000 profit from the sale of the Victoria Property. Moreover, Frady and Wadud caused MEX to pay Time & Water rent that it would not have had

to pay if MEX purchased the property. Frady and Wadud also usurped MEX's opportunity.

225.   Another example of how Frady and Wadud (and others) improperly converted MEX's assets involves the property located at 3440 W.K. Garriott Owen Road, Enid, OK (the "**Enid Property**"). An overview of that improper transaction is as follows:

- On May 14, 2021, MEX signed a lease with a company called ANDBAR (owned partly by the Bierenbaums) for 20 years at a lease rate of $76,500 per year. Exhibit H to that lease allows MEX to purchase the Enid Property for $1,050,000.

- After MEX learned that it could sell the Enid Property to a third party for well more than $1,050,000, MEX planned on exercising its right to purchase Enid for $1,050,000.

- Later, however, Frady and Wadud elected to take the built-in-profits for themselves and thus caused and directed the exercise right to be assigned to their side company Time & Water. Thus, on October 20, 2021, MEX assigned its right to purchase Enid for $1,050,000 to Time & Water for $200,000, which is well below the option rights' fair market value.

- Time & Water acquired the Enid Property from ANDBAR for $1,050,000 (plus the $200,000 it paid to MEX).

- On October 28, 2021, Frady and Wadud caused MEX to sign a lease with Time & Water for $116,800/year, which is $40,000 more per year than MEX was paying under its lease with ANDBAR.

- In July 2022, Time & Water sold the Enid Property for $1,671,428.

Thus, had Frady and Wadud honored their fiduciary duty and Statutory Duties, MEX would have kept and exercised its right to purchase the Enid Property

for $1,050,000 and (i) not paid rent from at least the Summer of 2021 until July 2022 and (ii) sold the Enid Property for $1,671,428, earning a $621,428 profit. But, because Frady and Wadud breached their fiduciary duty and Statutory Duties (as defined below) by assigning the purchase right to Time & Water, MEX ended up (i) paying a materially high rental rate from at least the Summer of 2021 until at least July 2022 and (ii) ended up earning only $200,000 in profit instead of $621,428 in profit. Frady and Wadud also usurped MEX's opportunity.

226.    Another example involves the Harlingen Property (defined in Paragraph 3 above). An overview of how Wadud and Frady breached their fiduciary duty and Statutory Duties (as defined below) to MEX with respect to the Harlingen Property is as follows:

- On September 3, 2020, MEX executed a contract to purchase the Harlingen Property for $799,000.

- On November 1, 2020, before closing, MEX received an offer for the Harlingen Property for $1.55 million.

- Recognizing the amount of profit that could be obtained by buying the Harlingen Property for $799,000, Wadud and Frady decided to siphon that profit from MEX, and to usurp MEX's corporate opportunity, by causing MEX to assign the contract to purchase the Harlingen Property to Time & Water. Thus, on November 16, 2020, Wadud and Frady caused and directed MEX to assign its rights to acquire the Harlingen Property for $799,000 to Time & Water.

- On December 29, 2020, Time & Water acquired the Harlingen Property for $799,000.

- Also on December 29, 2020, Time & Water immediately re-sold the Harlingen Property to MEX Texas, LLC (which is unaffiliated with MEX) for $1.468 million.

- On December 29, 2020, Wadud and Lamar caused and directed MEX to execute a lease with MEX Texas, LLC for $105,000/year.

Thus, had Frady and Wadud honored their fiduciary duty and Statutory Duties (defined below), MEX would have purchased the Harlingen Property for $799,000 and sold it for $1.468 million, earning $669,000 in profit. Instead, Wadud and Frady, through Time & Water, usurped MEX's opportunity and took that profit for themselves.

227. The property at 901 West Michigan Street, Orlando, Florida (the "**Orlando Property**") provides another example of Frady and Wadud breaching their fiduciary duty and Statutory Duties by usurping MEX's corporate opportunities for themselves. An overview of their improper conduct is as follows:

- On December 11, 2020, West Hill Ranch executed a contract to buy the Orlando Property for $3 million.

- The intention was for West Hill Ranch to assign the contract to MEX.

- However, when Frady and Wadud learned that there was a substantial profit to be had, they caused West Hill Ranch and MEX to agree to have West Hill Ranch assign the contract to purchase the Orlando Property to Time & Water. That assignment was executed on December 16, 2020.

- On December 18, 2020, only two days later, Time & Water signed a contract to sell the Orlando Property to Justin Fitzhugh for $3.7 million.

81

- On December 30, 2020, Time & Water sold the Orlando Property to Justin Fitzhugh for $3.7 million, taking a roughly $700,000 profit.

Thus, had Frady and Wadud honored their fiduciary duties and Statutory Duties, MEX would have purchased the Orlando Property for $3 million and sold it for $3.7 million, earning $700,000 in profit. Instead, Wadud and Frady, through Time & Water, usurped MEX's opportunity and took that profit for themselves.

228.   As another example, in February 2022, Frady and Wadud caused MEX to sell property located in Plainfield, Connecticut (2 Prospect Street) (hereafter, the "**Plainfield Property**") to Time & Water for $25,000. That price was materially below the Plainfield Property's fair market value, which the County valued at $471,760 for tax year 2023.

229.   Frady and Wadud unfairly and improperly deprived MEX of the value of the Plainfield Property by effectuating a sale of that property from MEX to their own company Time & Water for materially less than its fair market value.

230.   As another example, on or about June 29, 2021, Frady and Wadud caused MEX to sell property located in 3996 Ice Way, Fort Wayne, IN (the "**Fort Wayne Property**") to Time & Water for $200,000. That price was materially below the Fort Wayne Property's fair market value, as evidenced by the fact that MEX purchased the property that same month for $849,111.

231.   MEX's former counsel, James Johnston, testified as follows with respect to the Fort Wayne Property:

Q:   And if MEX had held the Ice Way property that it purchased in June of 2021, rather than sold it to Time and Water, it would have made roughly $400,000 instead of losing almost $650,000, correct?

A:   It would have made the money instead of Time and Water.

232.   Frady and Wadud unfairly and improperly deprived MEX of the value of the Fort Wayne Property by effectuating a sale of that property from MEX to their own company Time & Water for materially less than its fair market value.

233.   Frady and Wadud also unfairly and improperly deprived MEX of contracts, contractual rights, and value in connection with Kansas properties (the "**Kansas Properties**") it was going to acquire from one of Mr. Bierenbaum's companies known as ANDBAR. An overview of the facts relating to this transaction is as follows:

-   On March 21, 2022, ANDBAR agreed to sell the Kansas Properties to MEX for $1.53 million.

-   Frady and Wadud caused and directed that MEX's purchase rights be assigned and transferred to a company called AR Brinkley, which is owned by Time & Water (*i.e.*, Frady and Wadud) and 4Court (owned by Frady, Wadud, and Smith).

-   Ultimately, when AR Brinkley sold the Kansas Properties, it earned a profit of over $2 million. That profit should have gone to MEX.

234.   As a final example, on or about September 16, 2021, MEX executed a contract to purchase a property located at 1622 North 23rd Street, McAllen, Texas (the "**McAllen Property**") from AllNet Capital. However, rather than have MEX close on the transaction, Frady and Wadud caused and directed that Time & Water

close on the property. Thus, on December 9, 2021, Time & Water acquired the McAllen Property for $950,000 and immediately leased it to MEX. Time & Water later sold the McAllen Property to Blue Owl for $1,625,571, providing Time & Water with roughly $675,000 in illicit profits, *i.e.*, profits that should have gone to MEX.

235.   Frady and Wadud's conduct with respect to the Shreveport Property, the Victoria Property, the Enid Property, 2193 Highway 532, the Plainfield Property, the Harlingen, the Fort Wayne Property, the Kansas Properties, the Orlando Property, the McAllen Property and the other transactions discussed herein, was intentional, willful, and in bad faith.

236.   Throughout this Complaint, the (i) the below market sale of the Minden Property, Plainfield Property, and Fort Wayne Property to Time & Water; (ii) the assignment of valuable contract rights from MEX to Time & Water for the Shreveport Property, Victoria Property, Enid Property, Harlingen Property, Orlando Property; (iii) above market rent payments made to Time & Water in conjunction with the Minden Property, Shreveport Property, Victoria Property, Enid Property, and McAllen Property; (iv) the profits obtained by Time & Water from the sale of the Shreveport Property, Victoria Property, Enid Property, Harlingen Property, Orlando Property, Plainfield Property, Fort Wayne Property, and McAllen Property; and (iv) the other transactions between MEX and Time & Water described in

Paragraphs 200 through 216 above are the "**Time & Water Transfers.**" The Time & Water Transfers were transfers of MEX's property/assets/funds to or for the benefit of Time & Water (and indirectly to benefit Frady and Wadud) without MEX receiving reasonably equivalent value.

237.    Similarly, the unwarranted profit received by AR Brinkley for the sale of the Kansas Properties (together with any other payment made to or for the benefit of AR Brinkley, the "**AR Brinkley Transfers**"), constitutes transfers of MEX's property to or for the benefit of AR Brinkley not made in exchange for reasonably equivalent value.

238.    There are numerous other instances where Frady and Wadud used side companies they owned, directly or indirectly, to siphon funds or assets from MEX, including, but not limited to:

(i)    Frady and Wadud each have a direct or indirect ownership in Golden Gallons and Red Mountain Fuel Transport, each of which purportedly provided fuel hauling services to MEX and received funds from MEX for that purported service. Frady and Wadud did not engage in arms-length negotiations when determining the fees MEX paid Golden Gallons and Red Mountain Fuels Transport. Instead, Frady and Wadud improperly determined how much MEX would pay their own companies.  Upon information and

belief, Frady and Wadud caused MEX to pay above market rates to Golden Gallons and Red Mountain Fuels Transport.

(iii)  Frady and Wadud each own 50% of Adelphi Transport, either directly or indirectly. According to the Georgia Department of Transportation, Adelphi has operated from 5345 Bells Ferry Road in Acworth, Georgia, which is a former MEX office building. Further, Dustin Martin, who previously served as MEX's Chief Operating Officer, serves as an Executive Vice President for Adelphi Transport. Its registered agent is James T. Johnson, the same person who serves as the registered agent for Frady and Wadud's other businesses. Adelphi Transport provides trucking and other services for the fuel industry. Frady and Wadud caused MEX to pay Adelphi Transport at least $763,447.91 between March 18, 2022, and March 17, 2023 (collectively, the "**Adelphi Transport Transfers**"). Because Frady and Wadud have an ownership interest in Adelphi Transport, any transactions between MEX and Adelphi Transport were self-interested and conflicted. Yet, Frady and Wadud did not have an independent person or entity negotiate the terms of any transaction between MEX and Adelphi Transport or review or approve the transactions between MEX and Adelphi Transport to ensure that they were fair to MEX. Upon information and belief, the rates MEX paid to Adelphi Transport were above market rates.

239.    Throughout this Complaint, Frady's and Wadud's side companies that either siphoned funds from MEX or used funds improperly transferred or otherwise obtained from MEX for its formation or operations are referred to as the "**Related Entity Defendants.**" The Related Entity Defendants include: InDepth; Illuminous; Adelphi Environmental; Adelphi Transport; 4Court Holdings; 4Court Solutions; 4Court Consulting; 4Court Imaging; 4Court Leasing; Time & Water; AR Brinkley; Golden Gallons; LTE Capital; LTE Assets; Red Mountain Fuels Transport; and Winston Property Ventures LLC.

240.    While the Trustee's investigation continues, as of the date of this Complaint, the Trustee has discovered that, in addition to the payments, wires and transfers referenced throughout this Complaint, MEX wired or otherwise transmitted additional funds to 4Court Holdings, 4Court Imaging, 4Court Consulting, 4Court Leasing, 4Court Solutions, Red Mountain Fuels, Golden Gallons, LTE Capital, Adelphi Environmental, Adelphi Transport, Time & Water, LTE Assets, and Winston Property Ventures during the period between March 18, 2019, and the Chapter 11 Petition Date (*i.e.*, March 17, 2023).  A detailed listing of the payments from MEX's bank accounts to these transferees is attached hereto as composite **Exhibit A**.

241.    Further investigation is needed to determine the extent to which the Related Entity Defendants and other entities owned, directly or indirectly, in whole

87

or in part, by Frady or Wadud were created or operated with, funded by, or siphoned funds from MEX.

242.    Frady and Wadud caused MEX to transfer the above amounts (collectively, with all additional payments, wires, and transfers made to or for the benefit of the Related Entity Defendants, the "**Related Entity Transfers**") to the Related Entity Defendants for no consideration, insufficient consideration, or without receiving reasonably equivalent value.  The Related Entity Transfers were used as a way for Frady and Wadud to profit personally through the entities they owned and to the detriment of MEX.

243.    Any obligations that MEX purportedly owed the Related Entity Defendants were fraudulent obligations (the "**Obligations**").

244.    Frady and Wadud caused MEX to make the Related Entity Transfers to the Related Entity Defendants instead of allowing MEX to pay its arm's length creditors.

245.    Frady and Wadud went another step further and, in an attempt to hide the money they received from the Related Entity Transfers and other transfers (such as the Time & Water Transfers, AR Brinkley Transfers, and Spartan Tank Transfers) from MEX's creditors, Frady and Wadud transferred their interest in certain of the Related Entity Defendants to their wholly owned trusts.

246. For example, less than three months before MEX filed bankruptcy, Wadud transferred to 317 Irrevocable Trust, the beneficiaries of which are himself and his family, his interest in the following entities:

i.     On or around December 31, 2022, Wadud caused 4Court Holdings to transfer Wadud's 33% membership interest in 4Court Holdings to 317 Irrevocable Trust.

ii.    On or around December 31, 2022, Wadud caused Adelphi Environmental to transfer Wadud's indirect interest in Adelphi Environmental (based on his 50% ownership in Adelphi Field Services, which owned 57.5% of Adelphi Environmental) to 317 Irrevocable Trust.

iii.   On or around December 31, 2022, Wadud caused Time & Water to transfer his 50% membership interest in Time & Water to 317 Irrevocable Trust.

(collectively, the "**Wadud Interest Transfers**").

247. Frady also transferred his interest in Time & Water to his trust, LKF Irrevocable Trust, the beneficiaries of which are himself and his family. On or around November 15, 2022, Frady caused Time & Water to transfer his 50% membership interest in Time & Water to his wife, Rita Frady. Subsequently, on or around January 1, 2023, Rita Frady caused Time & Water to transfer her interest in

Time & Water to LKF Irrevocable Trust (the "**Frady Interest Transfers**", together with the Wadud Interest Transfers, the "**Interest Transfers**").

248.    Neither the 317 Irrevocable Trust nor the LKF Irrevocable Trust provided any services or value to MEX. Rather, they were set up specifically to try to hide and protect Wadud's and Frady's assets from a judgment, including a judgment for avoidable and fraudulent transfers of MEX's funds to 4Court Holdings, Adelphi Environmental, Time & Water, and other Related Entity Defendants.

249.    For example, not only was Wadud hiding the Related Entity Transfers made directly to 4Court Holdings, but the Wadud Interest Transfers also constitute subsequent transfers of funds made to other Related Entity Defendants given that 4Court Holdings was the 100% owner of 4Court Imaging, 4Court Solutions, and AR Brinkley who were the recipients of certain Related Entity Transfers, One-Year Transfers (as defined below) and the AR Brinkley Transfers.

250.    In addition to hiding transfers of MEX's funds made directly to Time & Water, the Interest Transfers also constitute subsequent transfers to other Related Entity Defendants, as Time & Water held an interest in Hamdan Freight, Golden Gallons and Red Mountain Fuel who were the recipients of certain Related Entity Transfers and One-Year Transfers (as defined below).

251.    Therefore, Wadud and Frady caused MEX funds to be transferred to certain Related Entity Defendants, who subsequently transferred Wadud's and

Frady's interest to 317 Irrevocable Trust, Rita Frady and LKF Irrevocable Trust.

252.   One or more creditors held claims against MEX at or prior to the time of the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Time & Water Transfers, the AR Brinkley Transfers, the Related Entity Transfers, and the Interest Transfers including, without limitation, AFN ABSPROP001, LLC, ARG MESMOAR001, LLC, ARG MEVNAAL001, LLC, ARG ME19PCK001, LLC, Spirit SPE Portfolio CA C-Stores, LLC, State of Alabama, Department of Revenue, the Oklahoma Tax Commission, and the Georgia Department of Revenue (collectively, the "**Predicate Creditors**").

253.   Moreover, certain creditors of MEX are government entities that are not subject to the limitations period set forth in the Bankruptcy Code or in O.C.G.A. § 18-2-79 (the "**Government Predicate Creditors**"). These Government Predicate Creditors include, but are not limited to, the following:

(i)    The State of Alabama, Department of Revenue, is exempt from the statute of limitations.    This creditor holds a claim against MEX for $440,904.75.   Alabama law embraces the doctrine of *nullum tempus*. *See Board of School Comm. v. Architects Group*, 752 So. 2d 489 (Ala. 1999) (holding that *nullum tempus* does not apply to a county as a political subdivision of the state but <u>does</u> apply to the state) (citing *State v. Estate of*

*Crocker*, 38 Ala. App. 306, 308-09, 83 So.2d 261, 262 (1955)); *see also Cox v. Board of Trustees of the University of Alabama*, 161 Ala. 639, 656, 49 So. 814, 820 (1909).

(ii)    The Oklahoma Tax Commission is exempt from the statute of limitations, as Oklahoma law also embraces the doctrine of *nullum tempus*. *See State ex rel. Schones v. Town of Canute*, 858 P.2d 436 (Okla. 1993).  This creditor holds a claim against MEX for $4,370.26.

254.    The Predicate Creditors were not provided with notice of the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Time & Water Transfers, the AR Brinkley Transfers, the Related Entity Transfers, and subsequent Interest Transfers, or the Contractual Obligations and Obligations before their occurrence.

255. Frady and Wadud caused and effectuated additional fraudulent, preferential, or improper transfers of MEX's assets to themselves or certain of the Related Entity Defendants within one (1) year prior to the Petition Date (the "**One-Year Transfers**"), including, but not limited to, the following:

| ENTITY | AMOUNT RECEIVED 1 YEAR PRIOR TO BANKRUPTCY FILING |
|---|---|
| 4Court Holdings | $1,622,473.94 |
| 4Court Imaging | $568,551.83 |
| 4Court Solutions | $1,257,445.89 |
| Adelphi Environmental | $735,643.67 |

| | |
|---|---|
| Adelphi Transport | $1,011,355.92 |
| Golden Gallons | $652,583.77 |
| LTE Assets | $225,000.00 |
| LTE Capital | $35,000.00 |
| Red Mountain Fuels | $658,813.05 |
| Time & Water | $399,430.58 |
| Winston Property Ventures | $37,512.00 |
| Illuminous | $612,883.64 |
| InDepth | $612,883.64 |
| Lamar Frady (credit card reimbursement) | $193,275.24 |
| Turjo Wadud (credit card reimbursement) | $354,109.32 |
| **TOTAL** | **$8,187,639.23** |

A listing of each of the One-Year Transfers, excluding those to Illuminous and Indepth, is attached hereto as composite **Exhibit B**.

### Frady and Wadud Failed to Establish, Implement, or Maintain Internal Controls for the Retail Business

256.   MEX's rapid expansion into the Retail Business was material to the Company. Among other things, the expansion involved MEX committing to long-term leases and other financial obligations that would cost MEX millions of dollars.

257.   Given the materiality of MEX's Retail Business and the expansion thereof, Frady and Wadud each had a duty to establish, implement, and maintain internal controls over the Retail Business and its expansion. That included, among other things, establishing, implementing, and maintaining internal controls to manage, oversee, and monitor the financial performance of each C-Store MEX

acquired and then leased back (*i.e.*, each MEX Operated Site) as well as the Retail Business as a whole.

258.  Frady and Wadud also had a duty to evaluate the performance and profitability of the Retail Business to ascertain whether it was performing well and whether continued rapid expansion into the Retail Business (including continued participation in Sale-Leaseback Transactions) was economically viable and sustainable.

259.  In fact, in his Rule 2004 examination, Wadud conceded that he knew that as one of MEX's co-CEOs, he had a duty to establish internal controls for the Retail Business:

> Q:    Okay. Did you have any idea that you, as CEO, needed to establish internal controls relating to the retail function?
> A:    Yes, I did.

260.  Frady and Wadud each breached his duty to establish, implement, and maintain internal controls with respect to each of the MEX Operated Sites as well as the Retail Business as a whole.

261.  That failure is confirmed by witness testimony. For example, in his Rule 2004 examination, MEX Board member Sheiker testified that Frady and Wadud failed to establish internal controls:

> Q.    Is it fair to say that while you were a MEX board member, Turjo and Lamar failed to cause MEX to establish sufficient internal controls over the retail business?
> A.    I think it's fair.

94

262.  For one, since MEX's Sale-Leaseback Transactions resulted in lease rates that were based on a cap rate (*i.e.*, a percentage of the purchase price), to ascertain whether a Sale-Leaseback Transaction would be profitable to MEX, MEX needed to obtain and analyze the financials of potential C-Store acquisitions to ensure they generated sufficient revenue to cover (i) the lease rate; (ii) the triple net obligations; and (iii) other operating expenses, and still allow MEX to obtain a reasonable return. Yet, Frady and Wadud each failed to cause MEX to develop, implement, and follow internal controls to accurately assess whether potential Sale-Leaseback Transactions would be profitable to MEX. In fact, in some cases, MEX engaged in Sale-Leaseback Transactions with little to no financial information about the C-Store being acquired.

263.  Further, Frady and Wadud each failed to integrate financial and other data from MEX Operated Sites into a centralized accounting system where it could be consolidated, managed, reviewed, or analyzed. Instead, financials for MEX Operated Sites were, in many cases, not even created at all.

264.  Even when financials for MEX Operated Sites were created, they were often kept at the individual C-Store level without the data being routinely transmitted to MEX's corporate/retail headquarters.[14] Wadud conceded this point in his Rule

---

[14] Wadud testified that, beginning in 2022, MEX's purported "retail headquarters" was in New Orleans. According to Wadud, the retail headquarters moved in

2004 examination:

> Q:  Okay. You can call it "integration," but you weren't getting the data relating to the performance of the retail division, correct?
>
> A:  That's exactly what I said, yes.
>
> …
>
> Q:  Were there problems with the retail prior to that time?
>
> A:  We were really new into retail so we were trying to figure it out at that time.
>
> Q:  It wasn't integrated at that time?
>
> A:  It was not integrated at that time.
>
> **Q:  It never became integrated, did it?**
>
> **A:  No, not fully?**
>
> **….**
>
> Q:  …I think you testified that the retail operations never became fully integrated with Mountain Express; is that correct?
>
> A:  Not to the point where I wanted it, no.
>
> **Q:  Okay. So that's a "no," it never became fully integrated?**
>
> **A:  That's correct**.

265.    Likewise, in his Rule 2004 examination, Sheiker testified that Frady and Wadud failed to integrate individual C-Store data into a centralized system:

> Q:  Okay. Isn't it true that MEX did not integrate the individual C-store data into a centralized system?
>
> A:  Based on my understanding, that's true.

266.    As a result, the financials from individual MEX Operated Sites were never integrated into a centralized system where they could be properly reviewed and analyzed to determine, among other things, whether the Retail Business was performing well, whether continued expansion of the Retail Business was viable (let

---

connection with MEX's acquisition of Brothers Food Mart, which operated roughly 35 C-Stores in and around New Orleans.

alone profitable), and any changes that needed to be made to ensure that MEX was able to meet its credit obligations and remain a viable and ongoing business.

267.   In his Rule 2004 examination, Sheiker conceded "[t]here were clearly deficiencies in the reporting of the business as a whole" and further testified:

> Q:    Okay. As a – as a board member, were you satisfied with the work that Turjo and Lamar did to cause MEX to monitor the financial performance of the individual C-stores that it leased from [Blue Owl]?
> A:    No.

268.   The failure to establish, implement and maintain internal controls for the MEX Operated Sites individually and Retail Business as a whole is directly attributable to Frady and Wadud, each of whom had a fiduciary duty and Statutory Duties (as defined below) to ensure that such controls were in place.

269.   In fact, Frady testified that one of his duties at MEX "was to implement the retail business into the company and to manage the financial reporting up from the individual store locations to headquarters." Frady also testified that "part of [his] job" was "to manage reporting up from the individual store locations to headquarters."

270.   Because Frady and Wadud each failed to establish, implement, and maintain internal controls for the MEX Operated Sites, MEX had no commercially viable means of reviewing, analyzing, and evaluating the financial performance of MEX Operated Sites individually or the Retail Business as a whole.

271.   For that reason, other than perhaps isolated instances, Frady and Wadud did not know how individual MEX Operated Sites were performing, including failing to know whether they were even profitable or could be economically sustained in the long run.

272.   Moreover, because Frady and Wadud failed to integrate financials from the MEX Operated Sites into a centralized accounting system, they did not know whether the Retail Business was profitable or economically sustainable.

273.   Although Frady and Wadud lacked financial data to analyze and determine whether the Retail Business was even profitable, and without knowing whether continuing the rapid expansion into the Retail Business was economically viable, they continued to (i) cause MEX to engage in hundreds of millions of dollars in Sale-Leaseback Transactions and (ii) commit MEX to lengthy C-Store leases without knowing whether MEX could honor those leases in the long term (or worse, with the knowledge that MEX could not honor those leases without indefinitely continuing to engage in Sale-Leaseback Transactions).

274.   Indeed, Wadud admitted that MEX continued to engage in Sale-Leaseback Transactions even though MEX was not receiving financials for the MEX Operated Sites:

Q:    But you knew as you continued to do transactions with [Blue Owl] that you weren't receiving store-level information and it wasn't feeding to the back office, correct?

A:    That is correct.

275.   Frady and Wadud were willing to cause, and did cause, MEX to engage in hundreds of millions of dollars in Sale-Leaseback Transactions without knowing the financial impact on the Company and whether they were even sustainable in the long term for at least two reasons. First, Frady and Wadud wanted to obtain the millions of dollars in purported "fees" and other benefits they and their companies obtained as a result thereof. Second, Frady and Wadud knew that if they did not continue to engage in Sale-Leaseback Transactions and obtain the purported "gains" at closing, MEX would not be able to satisfy the lease and other obligations MEX committed itself to through earlier Sale-Leaseback Transactions and other transactions. MEX would also not be able to satisfy the terms of its loans used to effectuate the LBO.

276.  Frady's and Wadud's failure to create, implement, and maintain internal controls is also demonstrated through an August 2022 letter sent by counsel for West Hill Ranch (3% owners of MEX), who wrote:

> [West Hill Ranch] is substantially concerned by the actions taken (and not taken) by each of you with respect to Mountain Express Oil Company ("MEX") or the "Company") actions that imminently threaten the viability of the business and our clients' interest therein.
> …
> Our client believes that, if managed properly, the Company has great strategic and economic value. However, our client has grave concerns about how the business is being managed and that absent embarking on a process to sell the Company, there could be a material destruction of value. **Unfortunately, our client believes that you have not made satisfactory progress in developing anything close to adequate**

**financial reporting, controls, or internal KPIs [key performance indicators] for a Company of your size, which would be necessary to effectively manage the business or market it to a third-party buyer. This evidenced itself recently in a transaction that would have resulted in significant liquidity to the Company and its shareholders, but did not move beyond initial diligence because (as you have described to our client), you did not have sufficiently rigorous internal reporting capabilities that a sophisticated counterparty would require in order to evaluate consummating a transaction such as the one envisioned.**

**We insist that FTI (or a qualified alternative of national standing) be immediately engaged in order to remediate internal reporting issues so that the Company is in a position to transaction with sophisticated counterparties and monetize its value.**

277.    In that same letter, West Hill Ranch's counsel stated that Frady and Wadud were using Sale-Leaseback Transactions to siphon funds from MEX. On that issue, the letter states:

Lastly, **our client believes that Mr. Frady and Mr. Wadud routinely take personal commissions or gains out of real estate transactions with Company activities**. In addition, our client understands that Mr. Frady and Mr. Wadud carved out "hauling assets" from acquisitions and now own them personally, outside the Company.

278.    West Hill Ranch's letter did not stop Frady's and Wadud's improper conduct. In fact, far from ceasing Sale-Leaseback Transactions after the August 2, 2022, letter from West Hill Ranch's counsel, Frady and Wadud caused MEX to close on another $175 million in Sale-Leaseback Transactions between August 2, 2022, and October 17, 2022.

## **MEX's CFO/Consultant Confirms the Trustee's Claims**

279.   In August 2022, MEX offered Gina Zamarelli the job of Chief Financial Officer ("**CFO**"). Ms. Zamarelli was well qualified for the position.  Among other things, she (i) has an accounting degree; (ii) worked for over a decade as an auditor for banks and other financial institutions; (iii) worked for an inventory financing firm where she oversaw a credit portfolio and managed credit approvals; (iv) served as President of Crossroads Financial Group, which involved managing and approving credit to borrowers and analyzing the type of collateral they had to secure loans; and (v) owns and operates her own financial consulting firm.

280.   With respect to her knowledge and background, Ms. Zamarelli testified in her Rule 2004 examination that she has (i) "substantial knowledge and experience" with "establishing and implementing internal controls"; (ii) "knowledge and experience in reviewing internal controls to determine whether they're adequate"; (iii) "assist[ed] companies in trying to manage their way through periods of financial distress"; and (iv) over twenty years of "experience in identifying operational deficiencies of a company."

281.   Within roughly two weeks of starting her job as MEX's CFO, Ms. Zamarelli discovered that MEX was "mismanaged" and its "financial and accounting records were a complete mess." Based on those discoveries, Ms. Zamarelli was no longer willing to serve as MEX's CFO because, among other

things, she was unwilling to sign MEX's financial statements because they were "inaccurate" and "false." Thus, Ms. Zamarelli asked MEX to retain her as an outside consultant rather than as the Company's CFO. MEX agreed.

282.   Ms. Zamarelli served as an outside consultant to MEX from September 2022 until January 2023. During that time, she uncovered a litany of material deficiencies, internal control failures, and other issues at the Company, which she testified about during her Rule 2004 examination.

283.   Among other things, Ms. Zamarelli testified:

Q:    Based on your review of documents and discussions with Mr. Wadud, did you conclude that he knew that MEX's accounting department did not have accurate information?

A:    Yes.

Q:    Based on your review of documents and discussions with Mr. Frady, did you conclude that he knew that MEX's accounting department did not have accurate information?

A:    Yes.

….

Q:    Based on your review of documents and discussions with Mr. Wadud, did you conclude that he knew that MEX lacked adequate internal controls?

A:    Yes.

Q:    Based on your review of documents and discussions with Mr. Frady, did you conclude that he knew that MEX lacked adequate internal controls?

A:    Yes.

Q:    And based on your work at MEX, did you conclude that Mr. Wadud and Mr. Frady refused to take the actions necessary to establish internal controls at MEX?

A:    Yes.

….

Q:     And you concluded, based on your review of MEX's documents, that the financial covenants [they provided to banks] were false, correct?

A:     Yes.

Q:     And based on your review of documents and conversations with Mr. Frady and Mr. Wadud, you concluded that they knew that MEX's financial covenants were false, correct?

A:     Yes.

….

Q:     And based on what you personally saw, MEX did not conduct sufficient or adequate due diligence with respect to the properties it acquired for sale-leaseback transactions, correct?

A:     That's correct.

Q:     And that resulted in MEX sometimes acquiring properties that were in disarray?

A:     Yes.

Q:     And would you agree with me that MEX's board of directors had a duty to make sure that the properties that MEX was acquiring in connection with sale-leaseback transactions were bought at a fair market price?

A:     Yes.

Q:     And MEX's board failed in that duty, didn't it?

A:     Yes.

….

Q:     And when MEX engaged in those sale-leaseback transactions, money was being syphoned off to Mr. Frady and Mr. Wadud's side companies, correct?

A:     With each of those closings, yes.

Q:     So while MEX was in financial distress, its owners were taking money to their companies, correct?

A:     On any of the closing statements I saw, there was always a line item for that yeah.

….

Q:     Mr. Wadud and Mr. Frady were taking money that MEX could have otherwise received at a closing from a sale-leaseback transaction, correct?

A:     Correct.

Q:     And had MEX received those funds, it would have helped MEX given its cash strap[ped] position, correct?

A:     Correct.

Q:    And rather than help MEX resolve its cash flow problem, Mr. Frady and Mr. Wadud instead took the money for themselves, correct?

A:    Correct.

….

Q:    And it was the responsibility of Mr. Frady, Mr. Wadud, and Mr. Sheiker to make sure that there were systems and controls in pace to allow MEX to analyze and oversee the retail business, correct?

A:    Correct.

Q:    And they failed in that duty, didn't they?

A:    Yes.

….

Q:    And do you believe that Mr. Wadud, Mr. Frady, and Mr. Sheiker did not comply with their duties as MEX directors?

A:    Yes.

…

Q:    Is it fair to say that MEX's financial and accounting records were a complete mess?

A:    Yes.

...

Q:    So Mr. Frady and Mr. Wadud both knew that MEX's accounting had material deficiencies and did nothing about it, correct?

A:    uh-hum. Yes.

….

Q:    Is it fair to say that Mr. Wadud did not perform his duties as MEX co-CEO with a degree of care that an ordinarily prudent person in his position would use under similar circumstances?

A:    Yes.

Q:    And it fair to say that Mr. Frady did not perform his duties as MEX co-CEO with a degree of care that an ordinarily prudent person in his position would use under similar circumstances?

A:    Yes.

284.    This testimony further confirms the Trustee's claims.

## Frady and Wadud Caused MEX to Pay for their Own Personal Expenses

285.    Frady and Wadud also breached their fiduciary duties and Statutory

Duties to MEX by improperly causing MEX to pay for their own personal expenses that were unrelated to MEX, including, but not limited to, expenses relating to personal property, travel, and work for their side companies.

286. For example, MEX's former counsel, James Johnston, testified that MEX paid attorneys' fees for work he performed for Frady and Wadud's side companies:

> Q: And if you look at January 26th, do you see where you charged MEX for work you did relating to Time and Water?
>
> A: I see that, yes.
>
> ….
>
> Q: So let me go back. You billed MEX for preparing an amendment to the articles of incorporation for Time and Water and for preparing Time and Water's operating agreement, correct?
>
> A: Apparently so, yeah.
>
> Q: And you did that work at Mr. Wadud or Mr. Frady's direction?
>
> A: Uh-hum (affirmative).
>
> ….
>
> Q: Do you see there's a number of expenses that you billed to MEX?
>
> A: Right.
>
> Q: And a lot of those expenses relate to Time and Water and not MEX, correct?
>
> A: The – you're right, in that's what this says.
>
> Q: You billed MEX at Mr. Wadud's and Mr. Frady's direction?
>
> A: Yes….
>
> ….
>
> Q: And ultimately whatever work you performed for Adelphi Transport, as shown on Exhibit 53, you billed to MEX and MEX paid for, correct?
>
> A: Yeah. All during this, this was something that was done at the order of Mountain Express. To the order – from the orders from, yeah.

**Blue Owl Stops Financing Sale-Leaseback Transactions**

287.  By no later than October 2022, MEX informed Blue Owl that it intended to cease its rapid growth into the Retail Business and return to focusing on its core Fuel Distribution business, *i.e.*, MEX informed Blue Owl that it would materially reduce, if not altogether stop, the Sale-Leaseback Transactions.

288.  At that same time, MEX began to exit the Retail Business, including converting 104 MEX Operated Sites to Network Dealer Sites, *i.e.*, from sites that MEX itself operated to sites that were subleased to third parties to operate.

289.  Thus, by October 2022, Blue Owl was fully aware of and had notice that MEX was (i) no longer pursuing its strategy of rapidly growing its Retail Business and (ii) actively seeking to sublease the properties it had already leased to third-party dealers, *i.e.*, to transform them into Network Dealer Sites.

290.  Armed with the knowledge that, among other things, (i) Frady and Wadud failed to establish internal controls; (ii) Frady and Wadud were siphoning funds to their side companies; (iii) MEX was no longer pursuing Sale-Leaseback Transactions; and (iv) MEX was facing cash flow concerns, Blue Owl elected to stop financing MEX's Sale-Leaseback Transactions.

291.  In early 2023, Blue Owl sent MEX three notices of default (the "**Notices of Default**") that, collectively, pertained to 74 MEX Leased Properties.

292.   The Notices of Default alleged defaults relating to Post-Closing Work, non-operational C-Stores, and lack of financial reporting.

293.   The Notices of gave MEX thirty days to cure the defaults. Blue Owl Stated that if the defaults were not cured within thirty days, it would terminate the Amended and Restated MLAs and force MEX to transfer the operation of the Fuel Centers and Travel Centers to an operator of Blue Owl's choosing.

### MEX's Credit Agreement with the Lenders

294.   MEX was the borrower under a March 12, 2020, Credit Agreement.

295.   The lenders to the Credit Agreement were First Horizon Bank, Synovus, Hancock Whitney Bank, Cadence Bank, South State Bank, Bank of Hope, Pinnacle Financial Partners, and United Community Bank (individually a "**Lender**" and together the "**Lenders**"). In addition to serving as a Lender, First Horizon Bank[15] also served as the administrative agent (the "**Agent**") for the Credit Agreement.

296.   The Credit Agreement provided for loans to MEX of up to $205 million in aggregate principal.

297.   Prior to the Petition Date, MEX, along with the guarantors of the Credit Agreement (the "**Guarantors**"),[16] provided the Lenders with a security interest in

---

[15] Formerly known as IBERIABANK, a division of First Horizon Bank.

[16] The Guarantors include: Mountain Express Baking and Coffee Co.; Mountain Express Ethanol Company; Alabama Terminal Property, LLC; Spartan; Mountain

and continuing lien on substantially all their assets and property and all proceeds, products, accessories, rents, and profits thereon.

298.   On December 21, 2022, the Agent notified MEX and the Guarantors that certain defaults had occurred under the Credit Agreement, including, but not limited to, defaults arising out of MEX's failure to timely provide financial statements to First Horizon and MEX's failure to satisfy certain conditions of the Credit Agreement at the time borrowing requests were made thereunder.

299.   As of the Petition Date, MEX owed the Lenders $176,269,790.32 under the Credit Agreement.

300.   After filing for Chapter 11, MEX sought and obtained debtor-in-possession ("**DIP**") financing from the Lenders of $37.85 million.

301.   As of the date of this Complaint, MEX owes the Agent in excess of $250,000,000.00 under the Credit Agreement and DIP.

302.   In addition to the Agent's claim against MEX's bankruptcy estates, administrative, priority, and general unsecured claims exceed $300 million.

### MEX's Inability to Effectuate a Bankruptcy Sale

---

Express Company Southeast, LLC; MEX North Alabama, LLC; Mississippi MEX Company, LLC; B&T Petroleum LLC; Texas MEX Limited Company, LLC; Star Mountain Express, LLC; and West Hill Ranch Group, LLC. Each of the Guarantors is a wholly-owned subsidiary of MEX.

303.   On March 20, 2023, MEX began the process of marketing itself for sale. This sale process would ultimately prove unsuccessful due to, among other things, MEX's absence of internal controls and financial records and issues relating to the lack of marketability of the fuel supply contracts.

304.   On or around April 12, 2023, MEX requested additional time and financing to engage in and complete the sales process due, at least in part, to its lack of financial data for its Retail Business.

305.   Wadud and Frady knew, or had reason to know, that the lack of internal controls at MEX and issues relating to the lack of marketability and/or assignability of the fuel supply contracts would make a sale next to impossible. Despite this, they proceeded down an expensive and ultimately futile sale path.

306.   During the sale process, Wadud "teamed up" with a bidder named Citax to buy the assets of MEX. Citax ultimately proved to not be a legitimate bidder.[17] Wadud caused the bankruptcy estates to incur additional needless expenses due to his involvement with this illegitimate bidder.

307.   MEX's bankruptcy estates incurred tens of millions of dollars in professional fees in the bankruptcy process. Wadud and Frady failed to take any

---

[17] A basic investigation by Wadud, Frady, MEX, and MEX's professionals would have shown that Citax was fraudulent.  Instead, the Agent's counsel's own research, which was shared with MEX's professionals, demonstrated that Citax and its principal had a history of fraudulent activity.

action to reign in professional fees which spiraled out of control.

308.   On August 2, 2023, a purported auction of MEX's assets occurred in New York City.

309.   While MEX maintained its fuel distribution business until and after it declared bankruptcy, that proved to be unsaleable even at deeply depressed prices. Given, among other things, MEX's failure to establish internal controls for its Retail Business (including, but not limited to, its failure to integrate financials for the MEX Operated Sites), the lack of sufficient interest in MEX's fuel supply agreements, and the lack of assignability of some of those contracts, there was little investor interest in acquiring MEX.

310.   No active bidding occurred at the auction. Instead, potential bidders were segregated at the insistence of MEX's bankruptcy counsel.

311.   On August 3, 2023, MEX announced that a company known as GPM was the purported successful bidder at the "auction."

312.   Ultimately, no sale to GPM was consummated.

313.   GPM withdrew from the sale process because it could not get comfortable with, among other things, MEX's internal controls and financial condition.

314.   Rather than concede the obvious reality that MEX's bankruptcy estates held valuable claims and causes of action (some of which have been settled by the

Trustee for recoveries in excess of $30 million), MEX, at the insistence of Wadud and Frady, opposed the appointment of a Chapter 11 trustee and incurred significant professional fees in doing so because they knew, or had reason to know, that a disinterested trustee would investigate their conduct and bring litigation against them and their entities.

315.    Ultimately, the Bankruptcy Court appointed Janet Northrup as Chapter 11 trustee.

316.    On August 24, 2023, MEX's Chapter 11 proceeding was converted to a Chapter 7, and Janet Northrup was appointed as Chapter 7 Trustee.

### Wadud Acquires Property Using Funds Illicitly Obtained From MEX and Engages in Fraudulent Transfers When Litigation Was Imminent

317.    Using cash illicitly obtained from MEX (as detailed above), Wadud purchased a large parcel of real estate located at 4317 East Conway Drive, Atlanta, Georgia 30327 (the "**Buckhead Property**") for $1,600,000 on May 3, 2021.

318.    Wadud caused the Buckhead Property to be titled in Wadud and Habiba's names.

319.    Wadud caused the existing residence on the Buckhead Property to be demolished and began constructing a luxury home on the Buckhead Property.

320.    The Plaintiff made demand on Wadud in December 2023.

321.    Wadud was aware that the Plaintiff's statute of limitations for many of the claims set forth in this Complaint expires on March 18, 2025.

322.   On February 13, 2025, Wadud transferred his interest in the Buckhead Property to Habiba.[18]

323.   Thereafter, on that same day, Habiba transferred her interest in the Buckhead Property to the Bayt Irrevocable Trust. That trust is holding the property for the benefit of Wadud and Habiba, who are the beneficiaries thereof.

324.   Wadud is the Trustee of the Bayt Irrevocable Trust.

325.   Wadud also owned real estate located at 808 Adler Court NW, Alpharetta, Georgia 30005 (the "**Alpharetta Property**").

326.   On February 10, 2025, Wadud transferred his interest in the Alpharetta Property to Habiba.[19]

327.   On that same day, Habiba then transferred her interest in the Alpharetta Property to the Bayt Irrevocable Trust. That trust is holding the property for the benefit of Wadud and Habiba, who are the beneficiaries thereof.

328.   Wadud and Habiba did not receive any value for their transfers of the Alpharetta Property and the Buckhead Property, *i.e.* no consideration was given for these transfers.

329.   Wadud and Habiba remain in control of the Alpharetta Property and the

---

[18] The deed conveying the Buckhead Property purports to have been executed on January 31, 2023.  However, it was not recorded until February 13, 2025.

[19] The deed conveying the Alpharetta Property purports to have been executed on January 31, 2023.  However, it was not recorded until February 10, 2025.

Buckhead Property.

330.   Construction of Wadud's luxury residence on the Buckhead Property continues as of the date of the filing of this Complaint, despite his previous false testimony in his Rule 2004 Exam that construction had ceased.

331.   Wadud is funding that construction using funds illicitly obtained from MEX, including through fraudulent transfers.

332.   Accordingly, the Trustee has a property interest in the Buckhead Property and in all improvements thereto.

333.   Wadud and Habiba knowingly and intentionally transferred the Buckhead Property and the Alpharetta Property to the Bayt Irrevocable Trust in bad faith and with the intention of (i) trying to defraud and avoid paying their creditors and (i) trying to avoid those properties being subject to levy or other collection action as a result of any judgment obtained through this lawsuit.

## **MEX Was Insolvent at all Times Relevant to this Complaint**

334.   Historically, MEX was very thinly capitalized as, without limitation, no significant equity contributions were ever made by its shareholders.

335.   According to MEX's audited 2018 financial statements, as of December 31, 2018, MEX had assets of $87,006,857 and liabilities of $97,499,451. Accordingly, MEX was balance-sheet insolvent by nearly $10.5 million on that date.

336.   MEX's financial condition worsened after 2018.

337. According to MEX's audited 2019 financial statements, as of December 31, 2019, it had assets of $96,616,944 and liabilities of $95,359,428.10.[20]

338. However, to effectuate the remainder of the LBO, the Bierenbaums, as MEX's controlling shareholders, caused MEX to close a new credit facility which increased its long-term debt by nearly $70 million, resulting in MEX's clear insolvency at the time of the March 2020 completion of the LBO. That insolvency was worsened by the Sale-Leaseback Transactions that created what were in effect long-term "loan" obligations of seven to nine-and-a-half percent that MEX could not cover through its normal business operations and thus created a scenario where, absent some material, undefined, and unplanned change in MEX's business, MEX had to continue to engage in new Sale-Leaseback Transactions so that the purported "gains" could be used to pay off lease obligations from previous Sale-Leaseback Transactions (though, the "gains" were paid through lease payments and, ultimately, the Sale-Leaseback Transactions cost MEX far more than it gained).

339. In March 2020, MEX's existing revenue stream was insufficient to cover its expenses, particularly after excluding the phantom revenues from Sale-Leaseback Transactions.

---

[20] MEX's asset values were inflated including, without limitation, the value of MEX's fuel supply contracts, which proved to be nearly valueless during MEX's bankruptcy. Moreover, the balance sheet liabilities did not fully capture MEX's long term lease obligations, among other liabilities.

340.   Even if the phantom revenues from Sale-Leaseback Transactions are considered, MEX still did not have sufficient revenues to cover its ongoing expenses, particularly after accounting for the increased expenses from the Term Loan and the lease and triple net obligations caused by the Sale-Leaseback Transactions.

341.   The Sale Leaseback Transactions with Blue Owl and other parties after the LBO worsened MEX's insolvency following the LBO.

342.   MEX's insolvency was further demonstrated by the result of the bankruptcy sale process, when MEX was unable to sell its assets to any bidders at any price even after incurring over $37 million in additional indebtedness.

### COUNT ONE – BREACH OF FIDUCIARY DUTY
### (AGAINST FRADY AND WADUD)

343.   The Trustee incorporates the allegations in Paragraphs 1-8, 11-19, 94-97, 104-201, and 218 through 342 as if fully set forth herein.

344.   From March 2020 until MEX ceased operations in 2023, Frady and Wadud served as MEX officers and directors.

345.   As officers or directors of MEX, Frady and Wadud each owed MEX fiduciary duties.

346.   Frady and Wadud each breached his fiduciary duty to MEX, causing MEX harm.

347.   Frady and Wadud also each breached his Statutory Duties (as defined below) to MEX, causing MEX harm. All the allegations, facts, and evidence relating

115

to Frady's and Wadud's breaches of their fiduciary duty apply equally to their breaches of their Statutory Duties.

## Breaches Associated with the Sale-Leaseback Transactions

348. Frady and Wadud each breached his fiduciary duties in connection with the Sale-Leaseback Transactions by, among other things, (i) failing to cause MEX to perform commercially reasonable, adequate, or proper diligence with respect to the properties MEX acquired, sold, and leased back (the "**Sale-Leaseback Property" and "Sale-Leaseback Properties**"),[21] including, but not limited to, causing MEX to engage in Sale-Leaseback Transactions without receiving and/or properly analyzing the Sale-Leaseback Properties' financials and failing to cause MEX to have proper valuations or appraisals performed on the Sale-Leaseback Properties; (ii) causing, authorizing and/or approving MEX to, pay, directly or indirectly, purported "fees" to companies owned, in whole or in part, by Frady and Wadud (*e.g.* Illuminous, InDepth, 4Court Consulting, and LTE Capital) for purported services in connection with Sale-Leaseback Transactions even though Frady and Wadud were required to perform those services as officers, directors, or employees of MEX and/or caused MEX employees (*e.g.*, David Rosenthal) to perform such services; (iii) causing, authorizing and/or approving MEX to pay

---

[21] The Sale-Leaseback Properties refers to the real property as well as the business operating therefrom.

purported "fees" to companies owned, in whole or in part, by Frady and Wadud (*e.g.*, Adelphi Environmental Services) for purported services in connection with Sale-Leaseback Transactions without having an independent third party evaluate the fairness of the transaction to MEX; (iv) continuing to conduct Sale-Leaseback Transactions when they knew that MEX had not integrated the individual C-Store financial data into MEX's centralized systems and thus had no commercially viable means of ascertaining whether the Sale-Leaseback Transactions, individual C-Stores, or Retail Business were profitable or viable in the long term; (v) putting their own personal interests above MEX's interests by engaging in Sale-Leaseback Transactions because, among other things, the transactions benefitted themselves and their side companies regardless of the harm they caused MEX; (vi) engaging in self-interested and conflicted transactions with entities they owned, in whole or in part, without engaging an independent party to analyze or ensure that such transactions were fair to MEX; (vii) failing to establish, implement, and maintain internal controls governing the Sale-Leaseback Transactions, individual C-Stores, and Retail Business; (viii) failing to have an independent party review the prices MEX paid for properties used in Sale-Leaseback Transactions to ensure they were at or below fair market value; (ix) failing to have an independent party review the prices MEX sold the properties used in Sale-Leaseback Transactions to ensure that the sales prices were at or above fair market value; (x) failing to have an independent

party review the lease terms (including lease rate) through which MEX leased the properties underlying Sale-Leaseback Transactions to ensure that the lease terms were at or better then market lease rates; (xi) usurping and diverting MEX's corporate opportunities to their own side businesses; and (xii) causing, facilitating, and allowing MEX to pay "outside market" rates for equipment leases with Frady's and Wadud's side company 4Court Leasing.

349.   Frady and Wadud also each breached his fiduciary duty to MEX by causing MEX to continue to engage in Sale-Leaseback Transactions even though such transactions, in the long run, cost MEX materially more than it gained, *i.e.*, any purported "gains" MEX obtained from the property sales were materially eclipsed by the costs over time, including, but not limited to, the costs associated with the triple net lease obligations and operating expenses. Frady and Wadud continued to engage in Sale-Leaseback Transactions (i) to siphon funds from MEX and (ii) so MEX could use the purported proceeds from the new Sale-Leaseback Transactions to (temporarily) cover the lease and other obligations created by earlier Sale-Leaseback Transactions as well as other obligations such as the loan obligations associated with the LBO.

350.   A non-exhaustive outline of the facts evidencing these and other breaches of fiduciary duty by Frady and Wadud are discussed in detail in Paragraphs 104 through 201 and 218 through 342 above, which are incorporated as if fully set

forth herein.

351.    As stated above, Frady and Wadud, directly or through companies they directly or indirectly owned (*e.g.*, InDepth, Illuminous, 4Court Consulting, and LTE Capital), improperly received over Fifteen Million Dollars ($15,000,000.00) in purported "fees" in connection with the Sale-Leaseback Transactions and other transactions. Those entities were not entitled to receive those purported "fees." Rather, the purported "fees" were a means for Frady and Wadud to improperly siphon funds from MEX.

352.    The payments to companies owned directly or indirectly by Frady and Wadud in connection with the closing of Sale-Leaseback Transactions harmed MEX in several ways.

353.    For one, MEX, as seller of the Sale-Leaseback Properties, should have received the proceeds from the sale at closing. Yet, millions of dollars of those proceeds were siphoned off and instead transmitted to Frady's and Wadud's side companies. Witness testimony confirms this harm to MEX. For example, Sheiker testified that the funds transmitted to Illuminous and InDepth "came out of the net proceeds that Mountain Express received from the transaction[s]."

354.    Similarly, David Rosenthal, another MEX employee, testified:

Q:    So in other words, if Illuminous or InDepth did not receive those amounts, they would have adhered to the benefit of Mountain Express, correct?

Q:    It would have been paid to Mountain Express, right?

119

A:    Yes, those proceeds would have gone to Mountain Express.

355.   In addition, or in the alternative, if Frady and Wadud had not demanded purported "fees" for their side companies, MEX could have reduced the sales price for the Sale-Leaseback Properties by the amount of fees paid to Frady's and Wadud's side companies, which would have reduced MEX's monthly lease rate under the Program Management Agreement and MLAs with Blue Owl and other landlords. Indeed, as stated herein, MEX's monthly lease rate was determined using a cap rate (typically seven to nine percent) applied to the price that Blue Owl (and others) paid for the Sale-Leaseback Property. Thus, by way of hypothetical example, consider two different sales of the same property at a seven percent cap rate:

> Option One: MEX sells a property to Blue Owl for $1 million with no purported "fees" being transmitted to Frady's and Wadud's side companies at closing.

> Option Two: MEX sells a property to Blue Owl for $1.3 million so that $300,000 in purported "fees" could be transmitted to Frady's and Wadud's side companies like Illuminous and InDepth.

Had MEX closed under Option One, MEX's annual rent would be $70,000/year. Under Option Two, where the sales price is increased so Frady and Wadud could siphon funds to themselves, MEX's annual rent would be $91,000/year. This example, which does not account for the additional harm as rents increased by 2% per year, shows how the transmission of funds to Frady's and Wadud's side companies caused MEX further harm over time. Notably, because the

funds from the higher sales price were not transmitted to MEX, MEX received no benefit from the higher sales price. Those benefits went to Frady and Wadud through their side companies.

## Failure to Establish Controls for Retail Business

356.   While Frady and Wadud served as officers and directors of MEX, they each breached their fiduciary duties by, among other things, (i) failing to establish, implement and maintain internal controls for MEX's Retail Business; (ii) failing to create, maintain, and review sufficient, accurate, or reliable accounting and financial data for individual C-Stores or the Retail Business; (iii) continuing to cause, allow, and/or authorize MEX to engage in Sale-Leaseback Transactions without making any commercially reasonable efforts to ascertain their financial impact on MEX; and (iv) continuing to cause, allow, or authorize MEX to engage in Sale-Leaseback Transactions that placed MEX in a perilous position because, over time, those transactions cost MEX materially more than it gained at closing.

357.   In or around June of 2021, MEX began engaging in Sale-Leaseback Transactions with Blue Owl.

358.   By the end of 2021, MEX had engaged in approximately 23 Sale-Leaseback Transactions with Blue Owl, with collective transaction prices of approximately $664 million.

359.   As discussed above, the Sale-Leaseback Transactions resulted in MEX

leasing the Sale-Leaseback Properties from Blue Owl and either (i) operating them directly (*i.e.*, MEX Operated Sites) or (ii) subleasing them to a Network Dealer to operate (*i.e.*, Network Operated Sites).

360.   Given the size and materiality of MEX's Retail Business, Frady and Wadud, as MEX officers and directors, each had a fiduciary duty to ensure that financial information relating to each of the C-Stores was timely and accurately created and transmitted to MEX's corporate/retail headquarters so that MEX could, *inter alia*, analyze the costs, expenses, revenues, income, and profitability associated with each C-Store individually and the Retail Business as a whole.

361.   Yet, MEX failed to establish, implement, and maintain the internal controls necessary to allow MEX to timely and reliably monitor the financial performance of the individual C-Stores and the Retail Business as a whole.

362.   In his Rule 2004 examination, Sheiker admitted that Frady and Wadud failed to establish internal controls:

> Q.    Is it fair to say that while you were a MEX board member, Turjo and Lamar failed to cause MEX to establish sufficient internal controls over the retail business?
> A.    I think it's fair.

363.   Likewise, Chase Begor, an individual who obtained a small interest in MEX through its acquisition of West Hill Ranch and was knowledgeable of MEX's business, testified:

Q:    Okay. Based on your personal knowledge and observations, is it fair to stay that Turjo and Lamar failed to establish internal controls with respect to the retail side of the business?

A:    Yes.

Q:    Okay. Based on your personal knowledge and observations, is it fair to say that Turjo and Lamar failed to ensure that MEX had sufficient internal controls relating to the retail side of the business?

A:    Yes.

Q:    Is it fair to say that Turjo and Lamar failed to integrate the financials relating to the retail side of the business such that MEX could accurately determine how the retail business was performing?

A:    Yes.

Q:    Based on your personal knowledge and observations, is it fair to say that Turjo and Lamar failed to cause MEX to properly integrate the individual C-Stores' financial data into a centralized database so that MEX could analyze the profitability of the retail business as a whole?

A:    Yes.

…

Q:    Based on your personal knowledge and observations, is it fair to say that Turjo and Lamar failed to take adequate steps to ensure that, over the long term, MEX could satisfy its lease rental payments?

A:    Yes.

364.  Likewise, Ms. Zamarelli testified that Frady and Wadud "failed to ensure that MEX had sufficient internal controls," that "MEX's financial and accounting records were a complete mess," and that Frady and Wadud "utterly failed in their responsibility as officers and directors to make sure that MEX had accurate financial and accounting record."

365.  By the end of 2021, although MEX had engaged in roughly $664

million in Sale-Leaseback Transactions, it still had not established or implemented internal controls through which individual C-Store financial information was transmitted to MEX's corporate/retail headquarters or otherwise integrated into a centralized accounting system.

366.   Although Frady and Wadud each failed to establish or implement any controls or other mechanisms through which it could review or monitor the Retail Business, they continued to cause MEX to engage in Sale-Leaseback Transactions throughout 2022 because, among other things, it personally benefited them and MEX used the purported "gains" for new Sale-Leaseback Transactions to (temporarily) cover existing debt and lease obligations. Frady and Wadud continued to cause MEX to engage in Sale-Leaseback Transactions even though, over time, they were detrimental to MEX and unsustainable.

367.   In 2022, MEX engaged in over Two Hundred Million Dollars ($200,000,000.00) in additional Sale-Leaseback Transactions, mostly with Blue Owl.

368.   Frady and Wadud continued to cause, facilitate, and approve MEX engaging in hundreds of millions of dollars in Sale-Leaseback Transactions in 2022 even though they had not been able to integrate the C- Store financial data into MEX's overall financials. On this point, Wadud testified:

Q:    …I think you testified that the retail operations never became fully integrated with Mountain Express; is that correct?

A:    Not to the point where I wanted it, no.

**Q:    Okay. So that's a "no," it never became fully integrated?**

**A:    That's correct**.

369.    During MEX's bankruptcy it was discovered that, from June 2022 to December 2022, there were at least 172,000 C-Store transactions that were never transmitted to MEX's headquarters or otherwise integrated into MEX's centralized financials or accounting.

370.    Frady and Wadud each caused MEX to engage in hundreds of millions of dollars in Sale-Leaseback Transactions in 2022 without knowing whether such transactions were in MEX's best interests or sustainable in the long term because, among other things, (i) the transactions benefitted them individually and (ii) they continued a situation where they needed to use the purported "gains" from the sales of properties in new Sale-Leaseback Transactions to pay, among other things, the lease and other obligations created by earlier Sale-Leaseback Transactions and existing loan obligations.

371.    Frady and Wadud are each directly responsible for MEX's failure to establish, implement and maintain internal controls for the C-Stores and Retail Business because they had a fiduciary duty to ensure that such controls were in place, particularly before continuing to commit MEX to at least tens of millions of dollars in lease and other obligations.

372.    Frady's and Wadud's duties to establish, implement, and maintain

internal controls is undisputed. For example, Frady testified that one of his duties at MEX "was to implement the retail business into the company and to manage the financial reporting up from the individual store locations to headquarters." Frady also testified that "part of [his] job" was "to manage reporting up from the individual store locations to headquarters."

373.  Frady's and Wadud failure to establish, implement and maintain internal controls for the Retail Business further harmed MEX because it contributed to MEX's inability to effectuate a sale of itself during the Chapter 11 bankruptcy.

374.  One of the reasons why MEX was unable to effectuate a sale of itself during the Chapter 11 bankruptcy was its inability to provide potential purchasers with sufficient and reliable data regarding individual C-Stores or the Retail Business as a whole. There were also issues with the fuel supply contracts, including, but not limited to, some of them were not assignable (because, among other things, they are personal service contracts and, therefore, they could not be assigned absent a contractual term permitted assignment), MEX was bankrupt and thus not operating the C-Stores and selling fuel (rendering the fuel supply contracts for those stores worthless), and/or some of the non-MEX tenants were poor operators and/or lacked adequate financials.

## **Additional Breaches of Fiduciary Duty**

375.  On or about December 16, 2020, Frady and Wadud caused MEX to

"sell" two notes with KPMM (one with a principal amount of $4,428,272 and the other with a principal amount of $2,072,727) to Taylor Mercantile.

376. MEX did not receive fair or adequate consideration for that sale. Indeed, although the principal amount of the Notes was $6,501,454, MEX "sold" them to Taylor Mercantile for $5,900,000.

377. A few months later, in May 2021, Taylor Mercantile "sold" the second note (with the principal amount of $2,072,272) back to Frady and Wadud's side company Time & Water. Upon information and belief, the principal balance owed at the time of this second sale was $518,181.

378. In August of 2021, upon information and belief, Mr. Bierenbaum sent the $518,181 back to Frady along with the interest as evidenced by an August email stating that Frady's $518,181 is "where you personally bought the last part of the KPMM note from Barry. At the end of the following month it was wired back to you with a little interest."

379. As a result of the KPMM notes transactions, MEX lost, among other things, at least $500,000 that it should have received from KPMM.

380. Frady and Wadud further breached their fiduciary duties by forming and operating side businesses through which they (i) engaged in conflicted or self-interested transactions with MEX; (ii) improperly siphoned funds from MEX; and/or (iii) misappropriated MEX's confidential and proprietary information for their own

benefit.

381.    Further, as MEX officers and directors, Frady and Wadud had a fiduciary duty not to disclose or use MEX's confidential and proprietary information other than for the benefit of MEX. Thus, among other things, Frady and Wadud were not permitted to disclose or misappropriate MEX's confidential and proprietary business to benefit their side business and, in turn, themselves.

382.    Yet, Frady and Wadud used MEX's confidential and proprietary information in connection with, and to further, their side businesses.

383.    For example, Frady and Wadud used MEX's confidential and proprietary customer information so that (i) Time & Water could usurp and benefit from MEX's corporate opportunities including corporate opportunities relating to the property and Sale-Leaseback Transactions described herein and (ii) to benefit their side businesses such as Adelphi Transport, Golden Gallons, and/or Red Mountain Fuels.

384.    Frady and Wadud also breached their fiduciary duties by, *inter alia*, (i) submitting reimbursement requests for alleged business expenses that were, in fact, personal expenses; (ii) causing MEX to reimburse or otherwise compensate them for expenses that personally benefited them and not MEX; (iii) failing to segregate trust fund tax amounts from general revenues, which failure continued after the Petition

Date; and (iv) failing to timely account for, accrue, and pay millions of dollars in fuel taxes.

385.   As just a few examples of the breaches described in the immediately preceding paragraph, Frady and Wadud improperly caused MEX to pay (i) American Express charges relating to personal, non-MEX business items such as personal vacations and furniture; (ii) American Express charges for Frady's and Wadud's side companies such as Adelphi Transport; (iii) at least $1500 per month for a Land Rover that was registered to Illuminous in Montana and (iv) legal fees to James Johnson for legal work performed for Frady's and Wadud's side businesses and investments such as work for Time & Water, Adelphi Funding, and investments in Benson Capital. Further,

386.   As to (iv) in Paragraph 384 (*i.e.*, the failure to timely account for, accrue, and pay millions of dollars in fuel taxes), in June 2023, FTI concluded that MEX had failed to pay roughly $22 million in pre-petition fuel taxes and approximately $8.3 million in post-petition fuel taxes.

387.   In addition to the breaches of fiduciary duty for MEX's failure to pay the unpaid post-petition fuel taxes, after the Petition Date, Wadud and Frady breached their fiduciary duties by, without limitation: (i) causing the Debtors to conduct an exorbitantly expensive post-petition sale process that was ultimately futile as the complete absence of internal controls and other factors resulted in

potential buyers declining to proceed with the sale (and Wadud and Frady knew, or should have known, that the Debtors could not produce adequate financial information for potential buyers); (ii) causing their side entities to continue doing business with the Debtors post-petition while the Debtors were not receiving adequate value for the services allegedly provided; and (iii) causing the bankruptcy estates to incur additional administrative expenses in the form of professional fees when it was clear that the Debtors' major creditor constituents did not support their proposed path forward.

388.    Each of the breaches of fiduciary duty listed above, and others, caused MEX harm. Through this action, the Trustee seeks to recover the damages that MEX suffered from Frady and Wadud breaching their fiduciary duties.

### COUNT TWO: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (AGAINST 4COURT HOLDINGS, 4COURT CONSULTING, 4COURT LEASING, TIME & WATER, ILLUMINOUS, INDEPTH, A/R BRINKLEY, R. FRADY, AND HABIBA)

389.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-97, 104-201, and 218 through 342 above as if fully set forth herein.

390.    From March 2020 until at least the Petition Date, Frady and Wadud, as MEX officers and directors, owed MEX a fiduciary duty.

391.    Because 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, and A/R Brinkley were owned, in whole or in part,

directly or indirectly, by Frady and/or Wadud, those entities knew that Frady and Wadud were officers or directors of MEX and thus knew that Frady and Wadud owed MEX a fiduciary duty.

392.   Habiba, as Wadud's wife and an active participant in the operations of MEX as well as the operations of the entities such as 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, Indepth, and A/R Brinkley, which were owned, in whole or in part, directly or indirectly, by Wadud, knew that Frady and Wadud were officers and directors of MEX and thus knew that Frady and Wadud owed MEX a fiduciary duty. R. Frady, as Frady's wife, also knew that Frady and Wadud were officers and directors of MEX and owed MEX a fiduciary duty.

393.   4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba did not have a direct economic interest in the fiduciary duties that Frady and Wadud individually owed to MEX. Nor were they a party to Frady's and Wadud's fiduciary duties to MEX.

394.   For that and other reasons, 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba were a stranger to the fiduciary relationship between MEX (on the one hand) and Frady and Wadud (on the other).

395.   Through improper action and/or wrongful conduct, 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R

131

Brinkley, R. Frady, and Habiba facilitated, directed, assisted, encouraged, and procured (individually and together "Procured") Frady and Wadud to breach their fiduciaries duty to MEX.

396.    Among other things, 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba Procured Frady and Wadud to breach their fiduciary duties to MEX as follows:

(i)    4Court Consulting Procured Frady and Wadud to cause and direct MEX to transmit to 4Court Consulting purported "fees" in connection with the Sale-Leaseback Transactions and other transactions that 4Court Consulting was (a) not entitled to receive and/or (b) were above fair market value or reasonably equivalent value for the alleged work (if any) that it performed. In most, if not all cases, 4Court Consulting's purported "work" consisted primarily, if not exclusively, of work (i) that Frady and Wadud performed in their roles as MEX's officers, directors, and employees or (ii) work that Frady and Wadud caused MEX employees (*e.g.*, David Rosenthal) to perform. Thus, 4Court Consulting's purported work was not work or services for which 4Court Consulting was entitled to a purported "fee." At a minimum, 4Court Consulting Procured Wadud and Frady to transmit purported consulting fees that were well above market and not for reasonably equivalent value (if any

value at all). The Trustee incorporates Paragraphs 166 to 168 as if fully set forth herein.

(ii)     4Court Leasing Procured Frady and Wadud to cause MEX to pay excessive and above market lease rates for fuel pumps and other equipment *i.e.*, the 4Court Leasing Above Market Payments. For this Paragraph, the Trustee incorporates Paragraphs 175 and 178 as if fully set forth herein.

(iii)    4Court Holdings (as the sole member of and manager of 4Court Consulting and 4Court Leasing) Procured the breaches described above among others. They also Procured Frady and Wadud to breach their fiduciary duties in connection with Sale-Leaseback Transactions and other transactions between MEX and 4Court Holdings, including, without limitation, breaches of fiduciary duty relating to causing MEX to pay above market rents or fees and failing to have the transactions reviewed by an independent third party.

(iv)    Time & Water Procured Frady & Wadud to cause MEX to transfer contracts, contractual rights, real properties, and other assets to Time & Water for less than fair market value and/or not reasonably equivalent value so that Time & Water (and not MEX) could obtain profits therefrom. Such conduct occurred in connection with at least the following properties: Minden Property, Shreveport Property, Victoria Property, Enid Property, Harlingen

Property, Orlando Property, and Plainfield Property. For this Paragraph, the Trustee incorporates Paragraphs 218 through 251 as if fully set forth herein.

(v)    Illuminous and InDepth Procured Frady and Wadud to cause MEX to pay them purported "fees" in connection with the Sale-Leaseback Transactions and other transactions that Illuminous and Indepth were (a) not entitled to receive and/or (b) were above fair market value or reasonably equivalent value for the alleged work (if any) that they performed. As noted above, in most, if not all cases, Illuminous's and Indepth's purported "work" was nothing more than the work that Frady and Wadud performed in their roles as MEX's officers, directors, and employees.

(vi)    4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, Indepth, A/R Brinkley, and Habiba Procured Frady and Wadud to authorize, approve, and implement conflicted, self-dealing transactions with them (and without any, let alone adequate, review or vetting by an independent third party) as described throughout this Complaint.

(vii) A/R Brinkley, working with and through its members and Manager, Procured Frady and Wadud to transfer and assign MEX's right to purchase the Kansas Properties to A/R Brinkley so that it, instead of MEX, could obtain the profits from those properties.

(v)    R. Frady and Habiba Procured Frady and Wadud to try and hide the fruits of their breaches of fiduciary duty by coordinating with them to transfer or otherwise move illicitly obtained funds to their family trusts. Paragraphs 246-551 and 317-33 show this improper Procurement and they are incorporated herein by reference.

397.   4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba Procured the breaches referenced throughout this Complaint and others because they benefited from those breaches, including by receiving assets at below market value and receiving funds to which they were not entitled.

398.   4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba Procured Frady and Wadud to breach their fiduciary duties to MEX purposefully, with malice, and with the intent to injure MEX.

399.   By Procuring the breaches of fiduciary duty discussed above, 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba aided and abetted in Frady's and Wadud's breach of fiduciary duty to MEX.

400.   The breaches of fiduciary duty underlying this claim relate to breaches that caused MEX harm. Among other things, the breaches caused MEX to (i)

improperly transfer funds to 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, and InDepth; (ii) lose corporate opportunities that were usurped by Frady and Wadud to their side companies like Time & Water; (iii) transfer contracts, contractual rights, and assets to 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, and A/R Brinkley for less than reasonably equivalent or fair market value; (iv) enter into leases at unfavorable terms that strained MEX's resources and further drove it into insolvency; and (v) move funds obtained through breaches of fiduciary duty to family trusts.

401.    4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba did not have any privilege or other lawful basis for Procuring the breaches of fiduciary duty described herein.

402.    By Procuring Frady and Wadud to breach their fiduciary duties to MEX, 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba each proximately damaged MEX.

403.    Through this action, the Trustee seeks to recover from 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba the damage caused by the Frady and Wadud breaches of fiduciary duty, which 4Court Holdings, 4Court Consulting, 4Court

Leasing, Time & Water, Illuminous, InDepth, A/R Brinkley, R. Frady, and Habiba Procured.

## COUNT THREE: CONVERSION
## (AGAINST FRADY, WADUD, INDEPTH, ILLUMINOUS, 4COURT CONSULTING, 4COURT LEASING, AND LTE CAPITAL)

404.   The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-97, 104-201, and 218 through 342 above as if fully set forth herein.

405.   This Count relates solely to the specific, identifiable funds that were transmitted to InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and LTE Capital directly, and Frady and Wadud indirectly and as alter egos, in connection with the closing of Sale-Leaseback Transactions and the leasing of fuel pumps and other equipment.

406.   In connection with the Sale-Leaseback Transactions, Frady and Wadud caused millions of dollars to be siphoned from MEX to their companies InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and LTE Capital.

407.   In connection with the purported leasing of fuel pumps and other equipment, Frady and Wadud caused MEX to pay an "outside market" fee that was nothing more than a disguised means of converting MEX's funds.

408.   MEX owns title to or has the right to possess the funds that were transmitted to InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and LTE

Capital in connection with the closing of Sale-Leaseback Transactions and the leasing of fuel pumps and other equipment.

409.   The funds transmitted to InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and LTE Capital are now in their possession or in the possession of their alter egos, *i.e.*, Frady and Wadud.

410.   InDepth, Illuminous, 4Court Consulting, 4Court Leasing, LTE Capital, Frady, and Wadud exercise the right of ownership over, or assumed dominion over, the funds transmitted to InDepth, Illuminous, and LTE Capital in connection with the Sale-Leaseback Transactions. Frady and Wadud exercise the right of ownership over, or assumed dominion over, the funds transmitted to 4Court Consulting and 4Court Leasing.

411.   MEX has demanded the return of the funds transmitted to InDepth, Illuminous, 4Court Consulting, and LTE Capital in connection with the Sale-Leaseback Transactions.

412.   MEX has demanded the return of the at least $1.3 million in "outside market" purported fees transmitted to 4Court Leasing.

413.   InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and LTE Capital and their owners and alter egos, Frady and Wadud have refused to return those funds.

414.   Through this Complaint, the Trustee hereby reiterates the demand that

InDepth, Illuminous, 4Court Consulting, 4Court Leasing, LTE Capital, Frady, and Wadud return (i) the purported "fees" received in connection with Sale-Leaseback Transactions and (ii) the "outside market" purported fees transmitted to 4Court Leasing.

415.  The funds transmitted to InDepth, Illuminous, 4Court Consulting, LTE Capital, Frady, and Wadud in connection with the Sale-Leaseback Transactions are specific, separate, identifiable funds. Indeed, among other things, the specific amounts are identified in the closing statements associated with the Sale-Leaseback Transactions.

416.  The "outside market" purported fees transmitted to 4Court Leasing are specific, separate, identifiable funds.

417.  MEX has been harmed by InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and LTE Capital's failure, directly and through their owners and alter egos Frady and Wadud, to return the funds they received.

418.  Through this Complaint, the Trustee seeks to recover (i) all the purported "fees" provided to InDepth, Illuminous, 4Court Consulting, LTE Capital, Frady, and Wadud in connection with Sale-Leaseback Transactions and (ii) the at least $1.3 million in "outside market" purported fees paid to 4Court Leasing.

**COUNT FOUR: MONEY HAD AND RECEIVED
(AGAINST FRADY, WADUD, INDEPTH, ILLUMINOUS,
<u>4COURT CONSULTING, 4COURT LEASING, AND LTE CAPITAL)</u>**

419.   The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-97, 104-201, and 218 through 342 above as if fully set forth herein.

420.   As discussed in Count Three above, Frady and Wadud, directly or through their alter egos InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and LTE Capital, received millions of dollars in purported "fees" in connection with the closing of Sale-Leaseback Transactions and the leasing of fuel pumps and other equipment.

421.   Frady and Wadud also received millions of dollars from MEX through purported stockholder distributions, bonuses, dividends, credit card payments, and other forms of compensation.

422.   InDepth, Illuminous, 4Court Consulting, LTE Capital, Frady, and Wadud should not be permitted to keep the funds they received from MEX, directly or indirectly, in connection with Sale-Leaseback Transactions in equity or in good conscience.

423.   4Court Leasing, Frady and Wadud should not be permitted to keep the at least $1.3 million in "outside market" purported fees they received in connection with the leasing of fuel pumps and other equipment in equity or good conscience because such "fees" were nothing more than a disguised means of converting MEX's funds.

424.   Frady and Wadud should not be permitted to keep the purported

stockholder distributions, bonuses, dividends, and other forms of compensation they received from MEX in equity or in good conscience.

425.  Among other things, they arise out of, relate to, or are the result of conflicted or self-interested transactions, fraudulent transfers, efforts to hinder or defraud MEX's creditors or MEX, or were otherwise improper.

426.  The Trustee has demanded that InDepth, Illuminous, 4Court Consulting, 4Court Leasing, LTE Capital, Frady, and Wadud repay the funds they improperly received.

427.  InDepth, Illuminous, 4Court Consulting, 4Court Leasing, LTE Capital, Frady, and Wadud have refused to return the funds, which has harmed MEX.

428.  Through this Complaint, the Trustee repeats the demand that InDepth, Illuminous, 4Court Holdings, 4Court Consulting, 4Court Leasing, LTE Capital, Frady, and Wadud repay the funds that were transmitted to them (i) in connection with Sale-Leaseback Transactions; (ii) as purported distributions or other compensation (for Frady and Wadud) and (iii) as purported "outside market" fees charged in connection with leases (for 4Court Leasing, Frady, and Wadud).

**COUNT FIVE: Georgia Racketeer Influenced and Corrupt Practices Act O.C.G.A. § 16-14-1, *et. seq.*
(Against Wadud, Frady, Illuminous, InDepth, Time & Water, 4Court Holdings, 4Court Consulting, and 4Court Leasing)**

429.  The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-97, 104-201, and 218 through 342 above as if fully set forth herein.

430.   Wadud, Frady, Illuminous, InDepth, Time & Water, 4Court Holdings, 4Court Consulting, and 4Court Leasing (together, the "**RICO Defendants**"), through a pattern of racketeering activity and money derived therefrom, acquired or maintained, directly or indirectly, an interest in or control of an enterprise that siphoned, funneled, and improperly transferred or converted funds and other assets from MEX in violation of O.C.G.A. § 16-14-4(a) and (b).

431.   The association in fact of the RICO Defendants (along with their employees and agents) for the purpose of defrauding MEX or otherwise improperly and unlawfully obtaining MEX's funds was an enterprise under Georgia law.

432.   The RICO Defendants were and are associated with the enterprise that defrauded MEX or otherwise improperly and unlawfully obtained its funds and assets.

433.   As described throughout this Complaint, the RICO Defendants were knowingly complicit in defrauding MEX and otherwise improperly and unlawfully obtaining (i) MEX's funds; (ii) funds that MEX had an interest in or was otherwise entitled to receive; and (iii) MEX's contracts, contractual rights, real property, and other assets. The RICO Defendants were also knowingly complicit in causing, directing, and/or Procuring (as defined above) fraudulent transfers in violation of Georgia's Uniform Fraudulent Transfer Act.

434.   For example, Frady, Wadud, Illuminous, InDepth, 4Court Holdings, and 4Court Consulting conspired to steal, and did steal, millions of dollars from MEX in connection with and through Sale-Leaseback Transactions as described above and as described further in this Count below. Those thefts occurred through, among other things, the interstate wire transmission of millions of dollars of funds to Illuminous, InDepth, 4Court Holdings, and 4Court Consulting at or in connection with the closing of Sale-Leaseback Transactions. As described throughout this Complaint, MEX had an interest in and was entitled to receive those funds, which were diverted to side companies owned, in whole or in part, by Frady and Wadud.

435.   Moreover, Frady, Wadud, and Time & Water conspired to deprive MEX of its contracts, contractual rights, property, and other assets in connection with transactions whereby contracts, contractual rights, and properties were diverted from MEX to Time & Water so that Time & Water (and not MEX) could obtain the profits therefrom. This conduct occurred with respect to transactions involving at least the following properties: Minden Property, Shreveport Property, Victoria Property, Enid Property, Harlingen Property, Orlando Property, Plainfield Property, Fort Way Property, and McAllen Property.

436.   Frady, Wadud, and 4Court Leasing also conspired to deprive and did deprive MEX of its assets by, among other things, causing MEX to pay 4Court Leasing purported excessive purported "additional rent" for fuel pumps and other

equipment. As shown above, 4Court Leasing was charging MEX "additional rent" that was "outside market." That purported "additional rent" was not rent at all. Rather, it was a means to try to disguise the fact that Frady and Wadud were using 4Court Leasing as a vehicle to steal MEX's funds.

437.   In addition to the RICO Defendants, there are various persons and entities who are employed by or associated with the RICO Defendants who participated, directly or indirectly, in the enterprise's scheme. These individuals and entities performed multiple predicate acts within the scope of their employment or agency with the RICO Defendants.

438.   The RICO Defendants, along with their employees and agents, engaged in at least a dozen acts of racketeering activity in furtherance of their scheme, which occurred over a period of years from at least 2020 until the Petition Date. The RICO Defendants conspired to conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity through a pattern of wire fraud in violation of 18 U.S.C. § 1343.[22]

439.   The RICO Defendants engaged in wire fraud by, among other things, (i) knowingly devising or participating in a scheme to defraud MEX; (ii) willingly intending to defraud MEX; and (iii) using interstate wires, including, but not limited

---

[22] Wire fraud is a "racketeering activity" under 18 U.S.C. § 1961 and, in turn, constitutes "racketeering activity" under O.C.G.A. § 16-14-3(5)(C).

to, interstate emails and interstate wire transfers of funds, in furtherance of their scheme.

440.  For example, when Frady, Wadud, Time & Water, 4Court Holdings, 4Court Consulting, Illuminous and InDepth participated in a Sale-Leaseback Transaction, they used interstate emails and interstate wires to, among other things, (i) demand that proceeds MEX had an interest in receiving and was entitled to receive through the sale of properties be diverted from MEX and instead be wired to Frady's and Wadud's side companies (*e.g.*, Illuminous, InDepth, 4Court Holdings, and 4Court Consulting); (ii) provide instructions on where and how to wire MEX's funds to Frady's and Wadud's side companies (*e.g.*, Illuminous, InDepth, 4Court Holdings, and 4Court Consulting); (iii) cause proceeds that MEX had an interest in receiving and was entitled to receive be transmitted through interstate wires to Frady and Wadud's side companies (*e.g.*, Illuminous, InDepth, 4Court Holdings, and 4Court Consulting); and (iv) cause MEX's funds to then be wired or transferred from Illuminous, InDepth, 4Court Holdings, and 4Court Consulting to Frady  and/or Wadud.

441.  A non-exhaustive list of examples of the RICO Defendants engaging in wire fraud are as follows:

-    In December 2020, Frady, Wadud, and Time & Water used interstate wires with respect to the sale of the Orlando Property. Among other things, upon information and belief, funds were wired from Calloway

Title & Insurance in Florida to Time & Water's Cadence Bank account located in Georgia.

- In April 2021, Frady, Wadud, and Time & Water used interstate wires with respect to the Victoria Property. Among other things, they caused funds to be wired from Georgia to First National Banker's Bank in Ridgeland, Mississippi.

- In August 2021, Frady, Wadud and Time & Water used interstate wires with respect to the Enid Property. Among other things, they caused funds to be wired from Georgia to Customers Bank in Pennsylvania.

-. In connection with a September 2021 Sale-Leaseback Transaction, Frady, Wadud, Indepth, and Illuminous conspired to cause $1.75 million in proceeds that MEX had an interest in receiving and was entitled to receive to instead be sent to InDepth and Illuminous. This transaction involved the use of interstate emails (to provide instructions and directions for wiring MEX's funds) and interstate wires (for the actual transmission of funds).

-. In connection with an October 2021 Sale-Leaseback Transaction, Frady, Wadud, Indepth, and Illuminous conspired to cause $1.75 million in proceeds that MEX had an interest in receiving and was entitled to receive to instead be sent to InDepth and Illuminous. This transaction involved the use of interstate emails (to provide instructions and directions for wiring MEX's funds) and interstate wires (for the actual transmission of funds).

-. In connection with a November 2021 Sale-Leaseback Transaction, Frady, Wadud, Indepth, and Illuminous conspired to cause $500,000 in proceeds that MEX had an interest in receiving and was entitled to receive to instead be sent to InDepth and Illuminous. This transaction involved the use of interstate emails (to provide instructions and directions for wiring MEX's funds) and interstate wires (for the actual transmission of funds).

-. In connection with a November 2021 Sale-Leaseback Transaction, Frady, Wadud, Indepth, and Illuminous conspired to cause $250,000 in proceeds that MEX had an interest in receiving and was entitled to receive to instead be sent to InDepth and Illuminous. This transaction

involved the use of interstate emails (to provide instructions and directions for wiring MEX's funds) and interstate wires (for the actual transmission of funds).

-.    In connection with a March 2022 Sale-Leaseback Transaction, Frady, Wadud, Indepth, and Illuminous conspired to cause $100,000 in proceeds that MEX had an interest in receiving and was entitled to receive to instead be sent to InDepth and Illuminous. This transaction involved the use of interstate emails (to provide instructions and directions for wiring MEX's funds) and interstate wires (for the actual transmission of funds).

-.    In connection with a May 2022 Sale-Leaseback Transaction, Frady, Wadud, Indepth, and Illuminous conspired to cause $300,000 in proceeds that MEX had an interest in receiving and was entitled to receive to instead be sent to InDepth and Illuminous. This transaction involved the use of interstate emails (to provide instructions and directions for wiring MEX's funds) and interstate wires (for the actual transmission of funds).

-.    In connection with two October 2022 Sale-Leaseback Transactions, Frady, Wadud, Indepth, and Illuminous conspired to cause $831,022 in proceeds that MEX had an interest in receiving and was entitled to receive to instead be sent to InDepth and Illuminous. This transaction involved the use of interstate emails (to provide instructions and directions for wiring MEX's funds) and interstate wires (for the actual transmission of funds).

-     In August of 2022, Time & Water received funds via interstate wire from Blue Owl in connection with the closing of the Enid Property. As discussed above, Frady, Wadud, and Time & Water's conduct with respect to the Enid Property was unlawful and involved the conversion/theft of MEX's contractual rights and the profits associated therewith. *See* Paragraph ___.

442.    For those Sale-Leaseback Transactions involving Blue Owl, wires to Indepth, Illuminous, and/or Time & Water were typically, if not always, interstate wires. For example, in many cases, when purchasing properties, Blue Owl caused

147

and/or directed funds to be wired to or from its PNC Bank, N.A. account in Pittsburgh, Pennsylvania to MEX's accounts in Georgia or Louisiana and/or to Time & Water's account in Georgia, Louisiana, or New York.

443.   Frady, Wadud, and 4Court Consulting further engaged in interstate wire fraud in connection with some, if not all, of the following transactions:

| Date | Property | Purported "Fee" [23] |
|------|----------|----------------------|
| 5/11/2022 | Seminole, OK | $  168,913.35 |
| 5/11/2022 | Eufala, OK | $  269,990.00 |
| 5/11/2022 | McAlester, OK (650 S. Main) | $   79,995.00 |
| 5/11/2022 | McAlester, OK (1820 S. Main) | $   77,990.00 |
| 5/11/2022 | McAlester, OK (1922 S. Main) | $  121,490.00 |
| 5/11/2022 | McAlester, OK (2500 N. Milt Phillips) | $  168,913.35 |
| 5/11/2022 | McAlester, OK (1400 E. Carl Albert) | $  231,490.00 |
| 6/14/2022 | Jackson, MS (1046, 1034 & 1038 Woodrow Wilson Ave) | $  400,000.00 |
| 6/14/2022 | Magnolia, MS (7086 US 51 & 1021 Dudley) | $  300,000.00 |
| 6/14/2022 | Gulfport, MS (18447 Hwy 49 & 16303 Hwy 53) | $  300,000.00 |
| 7/27/2022 | Gretna, LA (1000 Franklin) | $  565,000.00 |
| 7/27/2022 | Jackson & Clinton, LA | $  350,000.00 |
| 7/27/2022 | OK 5 Pack | $  300,000.00 |
| 7/27/2022 | Jackson, MS (5491 Watkins) | $  100,000.00 |
| 7/27/2022 | AR 4 Pack (Pocahontas, Oak Grove, Heber Springs, Gepp) | $  350,000.00 |
| 7/27/2022 | AR 4 Pack (Greenbrier, Naylor, Vilonia, McRae) | $  400,000.00 |
| 8/1/2022 | Saucier & Gulfport, MS | $  300,000.00 |
| 8/1/2022 | Goodman & Magnolia, MS | $  300,000.00 |
| 8/15/2022 | MN/WI/IA (Moe's Mart) | $  900,000.00 |
| 8/15/2022 | Greenville, MS | $   50,000.00 |

---

[23] The Trustee is continuing to investigate these fees and reserves the right to amend the positions in this table if later obtained facts so warrant.

| 8/15/2022 | OK/AR 5 Pack (Moe's Mart) | $ | 300,000.00 |
|---|---|---|---|
| 9/1/2022 | McAlester, OK (420 W. Carl Albert) | $ | 103,500.00 |
| 8/29/2022 | RAM Oil | $ | 50,131.55 |
| 9/20/2022 | 3103 MS-16 E, Carthage, MS | $ | 75,000.00 |
| 9/20/2022 | 5452 US 62, Green Forest, AR | $ | 350,000.00 |
| 9/20/2022 | 4775 & 5308 Clinton Blvd, Jackson, MS & 214 W Presley, McComb | $ | 500,000.00 |
| 9/20/2022 | Fitzgerald, GA | $ | 50,000.00 |
| 9/20/2022 | St Martinville (1700 S Main & 1549 Old Spanish), New Iberia, LA | $ | 500,000.00 |
| 9/20/2022 | 12515 Three River, Gulfport, MS & 24281 MS53, Saucier, MS | $ | 500,000.00 |

444.  Many, if not all, of the invoices for the above-referenced payments included a notation that the funds should be wired to InSouth Bank, which is in Tennessee. Thus, the above payments involved interstate wires from outside of Tennessee into that State. Indeed, during his Rule 2004 examination, Smith, testifying as the corporate representative for the 4Court Entities, testified that when MEX "wired funds to a 4Court entity, the funds were wired from a bank outside of Tennessee to InSouth."

445.  Interstate wires were also used to transfer funds from and between different conspirators. For example, in October 2021, 4Court Consulting wired $800,000 from InSouth Bank in Tennessee to a Time & Water account located in New York. When Smith received confirmation that the wire was effectuated, he wrote to Wadud: "Makin it rain $$$$$$$."

446.    On November 16, 2021, 4Court Consulting wired $251,090 from Tennessee to Time & Water's account in New York. And on November 19, 2021, 4Court wired $692,559 to Time & Water's account in New York.

447.    Upon information and belief, interstate wires were also used when funds were transferred from Illuminous to Wadud and from InDepth to Frady.

448.    The funds that were diverted to Frady's and Wadud's side companies like InDepth, Illuminous, 4Court Holdings and 4Court Consulting at the closing of Sale-Leaseback Transactions were funds that MEX had an interest in receiving and was entitled to receive. Indeed, Wadud testified:

> Q:    Okay. And so, if you received the money at the closing table, had Illuminous not taken that money, then the money would be inured to Mountain Express's benefit, correct?
> A:    Right….

449.    The RICO Defendants also engaged in wire fraud when they used interstate emails and interstate wires to defraud MEX of property, including funds, contracts, contractual rights, real property, and personal property.

450.    For example, with respect to the Minden Property (4132 Highway 532, Minden, LA), Frady, Wadud, and Time & Water used interstate emails and interstate wires as follows: (i) emails were sent from Georgia to Louisiana to negotiate and finalize the purchase of WebsterP; (ii) upon information and belief, funds were wired from Georgia to Louisiana in connection with the acquisition of WebsterP; (iii) emails were sent from Georgia to Louisiana to cause or effectuate the sale of the

property at 4132 Highway 532 to Time & Water for a below fair market value price; (iv) interstate wires were used to cause Time & Water to pay WebsterP to acquire 4132 Highway 532; (v) interstate emails were sent to cause MEX to lease the property at 4132 Highway 532 from Time & Water at a price that allowed Frady and Wadud to recoup their "investment" in the property in roughly two years; and (vi) interstate wires were used transmit funds from WebsterP to Time & Water for purported "rent" payments.

451.  As another example, in February 2022, with respect to the Plainfield Property (2 Prospect Street, Plainfield, Connecticut), Frady, Wadud, and Time & Water used interstate emails and interstate wires to effectuate the improper "sale" of that property (located in Connecticut) from MEX to Time & Water.

452.  Frady, Wadud, and Time & Water also used interstate emails and interstate wires to effectuate the improper assignment or sale of contracts, contractual rights, and/or properties relating to the following properties: the Enid Property, Orlando Property, Fort Wayne Property, Harlingen Property, Victoria Property, and Shreveport Property.

453.  Moreover, Frady, Wadud, and 4Court Leasing used interstate emails and interstate wires to effectuate the siphoning of funds from MEX in connection with fuel pump and other equipment leases. Specifically, Frady, Wadud, and 4Court Leasing conspired to cause MEX to send to 4Court Leasing, via interstate wire, a

purported "additional rent" that was "outside market" and done for no other purpose than to improperly convert and steal MEX's funds. The funds were sent via interstate wire from Georgia or Louisiana to 4Court Leasing's account at InSouth Bank in Tennessee.

454.    The RICO Defendants also facilitated and implemented their conspiracy through interstate mail. For example, in connection with the Sale-Leaseback Transactions that were used to siphon MEX's funds, Frady and Wadud used interstate mail to send deeds and other documents to governmental agencies to effectuate the purchase and sale of real properties. That documentation was necessary to effectuate the Sale-Leaseback Transactions.

455.    Further, 4Court Holdings, 4Court Consulting, and 4Court Leasing, at Frady's, and Wadud's direction, used interstate mail to send MEX and others fraudulent invoices.

456.    As just a few examples:

-    4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated June 14, 2022, demanding $400,000 in purported consulting fees for work allegedly performed on a property in Mississippi. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

-    4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated June 14, 2022, demanding $300,000 in purported consulting fees for work allegedly performed on two properties in

Mississippi. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

- 4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated July 27, 2022, demanding $300,000 in purported consulting fees for work allegedly performed on five properties located in Oklahoma. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

- 4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated July 27, 2022, demanding $565,000 in purported consulting fees for work allegedly performed on a property located in Louisiana. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

- 4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated July 27, 2022, demanding $350,000 in purported consulting fees for work allegedly performed on two properties located in Louisiana. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

- 4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated July 27, 2022, demanding $900,000 in purported consulting fees for work allegedly performed on nine properties located in Minnesota, Wisconsin, and Iowa. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

- 4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated July 27, 2022, demanding $100,000 in purported

consulting fees for work allegedly performed on a property in Mississippi. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

- 4Court Consulting used interstate mail (and interstate email) to send fraudulent invoices for purported consulting services through an invoice dated August 29, 2022, demanding $50,131 in purported consulting fees for work allegedly performed in connection with RAM Oil. Per the face of the invoice, it was sent from 4Court Consulting in Tennessee to MEX in Georgia. The invoice included wiring instructions for a bank (InSouth Bank) located in Tennessee.

457.  The RICO Defendants' conduct was intentional, willful, and in bad faith.

458.  The RICO Defendants conspired to conduct or participate, directly or indirectly, in the affairs of the enterprise through other patterns of racketeering activity, including, but not limited to:

a)  Theft by Taking in violation of O.C.G.A. § 16-8-2: The RICO Defendants unlawfully took or misappropriated MEX's property with the intention of depriving MEX of that property. The RICO Defendants engaged in theft by taking when, among other times: (i) Frady and Wadud caused proceeds owed to MEX or that it was otherwise entitled to receive to be unlawfully transmitted to InDepth, Illuminous, 4Court Consulting, and/or 4Court Holdings as purported "fees" in connection with the closing of the Sale-Leaseback Transactions; (ii) Frady, Wadud, and Time & Water caused MEX to sell or transfer property or contractual rights to Time & Water for

well below fair market value (*e.g.*, the Minden Property) or for the purpose of causing Time & Water to obtain profits and other benefits that MEX had interest in receiving and should have received (*e.g.*, the Orlando Property, Enid Property, Shreveport Property, Fort Wayne Property, Victoria Property, and Plainfield Property); (iii) Frady, Wadud, and 4Court Leasing caused MEX to transmit funds to 4Court Leasing that were "outside market," *i.e.*, they were simply siphoning MEX's assets; (iv) Frady and Wadud caused MEX to pay American Express charges for personal items unrelated to MEX's business; (v) Wadud caused MEX to pay at least $1500 per month for a Land Rover that was registered to Illuminos in Montana; and (vi) Frady and Wadud caused MEX to pay legal fees for work performed for Frady and Wadud's side businesses that was unrelated to MEX.

b.      <u>Theft by Deception in violation of O.C.G.A. § 16-8-3</u>: The RICO Defendants obtained MEX's property (*e.g.,* money and property) by deceitful means or artful practice with the intention of depriving MEX of its property. The RICO Defendants engaged in by deception when, among other times,: (i) Frady and Wadud caused proceeds owed to MEX or that it was otherwise entitled to receive to be unlawfully transmitted to InDepth, Illuminous, 4Court Consulting, and/or 4Court Holdings as purported "fees" in connection with the closing of the Sale-Leaseback Transactions; (ii) Frady, Wadud, and Time

155

& Water caused MEX to sell or transfer property or contractual rights to Time & Water for well below fair market value (*e.g.*, the Minden Property) or for the purpose of causing Time & Water to obtain profits and other benefits that MEX had interest in receiving and should have received (*e.g.*, the Orlando Property, Enid Property, Shreveport Property, Fort Wayne Property, Victoria Property, and Plainfield Property); (iii) Frady, Wadud, and 4Court Leasing caused MEX to transmit funds to 4Court Leasing that were "outside market," *i.e.*, they were simply siphoning MEX's assets; (iv) Frady and Wadud caused MEX to pay American Express charges for personal items unrelated to MEX's business; (v) Wadud caused MEX to pay at least $1500 per month for a Land Rover that was registered to Illuminous in Montana; and (vi) Frady and Wadud caused MEX to pay legal fees for work performed for Frady and Wadud's side businesses that was unrelated to MEX.

c.    <u>Theft by Receiving Stolen Property in violation of O.C.G.A. § 16-8-7</u>: Frady and Wadud received or retained property from InDepth, Illuminous, 4Court Consulting, 4Court Leasing and 4Court Holdings (and potentially other entities) that they knew was stolen from MEX. For example, when Frady and Wadud took distributions or otherwise obtained money from InDepth, Illuminous, Time & Water, 4Court Consulting, 4Court Leasing, and 4Court Holdings, Frady and Wadud knew that such funds were stolen from MEX.

d.    <u>Tampering with Evidence in violation of O.C.G.A. § 16-10-94</u>: Frady

destroyed or deleted texts, emails, and other documents evidencing and

reflecting the RICO Defendants unlawful acts. Indeed, in his Rule 2004

examination, he testified that he has "delete[d] all text messages" and

"delete[s] emails off [his] phone regularly."

e.    <u>Perjury in violation of O.C.G.A. § 16-10-70</u>: Frady and Wadud each

provided false testimony in their Rule 2004 examinations.

459.    The RICO Defendants' predicate acts were related to one another and

formed a pattern of racketeering activity in that the acts were constant, repeated, and

occurred over the course of greater than one year.

460.    The RICO Defendants' pattern of racketeering activity consists of more

than two acts of racketeering activity, the most recent of which occurred within four

years after the commission of a prior act of racketeering activity. For example, each

time the RICO Defendants unlawfully caused funds to be transmitted to InDepth,

Illuminous, 4Court Consulting, 4Court Leasing, and 4 Court Holdings as purported

"fees" in connection with the closing of Sale-Leaseback Transaction or other

transactions, an act of racketeering activity occurred. The last Sale-Leaseback

Transaction occurred in 2022, *i.e.*, within the last four years.

461.    The RICO Defendants' predicate acts demonstrated criminal conduct

of a continuing and longstanding enterprise.

462.   The RICO Defendants have engaged in their pattern of racketeering activity through an association-in-fact enterprise consisting of at least Illuminous, InDepth, 4Court Holding, 4Court Leasing, 4Court Consulting, Time and Water, Frady, Wadud, and potentially others.

463.   The acts of racketeering activity committed by the RICO Defendants had a common goal and the same or similar objective: to siphon funds and property from MEX to the RICO Defendants or entities they own or control.

464.   The acts of racketeering activity committed by the RICO Defendants have the same victim, *i.e.*, MEX.

465.   Each of the RICO Defendants were aware of each other and were interdependent upon each other. As just some examples: (i) Frady and Wadud were aware that Illuminous, InDepth, 4Court Holdings and 4Court Consulting were receiving MEX's proceeds at the closing of many Blue Owl Sale-Leaseback Transactions because the closing statements thereto so indicated; (ii) 4Court Holdings, 4Court Consulting, 4Court Leasing, Illuminous, and InDepth knew that Frady and Wadud were taking unlawful actions to cause them to receive funds from MEX that they were not entitled to receive; and (iii) Time & Water was aware that at least Frady, Wadud, Illuminous, InDepth and all the 4Court entities were obtaining MEX's property/funds since it was owned by Frady and Wadud who also owned those entities.

466. Further, the RICO Defendants were interdependent upon each other. For example: (i) Illuminous, InDepth, 4Court Holdings, 4Court Consulting, and 4Court Leasing were dependent upon Frady and Wadud effectuating Sale-Leaseback Transactions to obtain the purported "fees" they received and (ii) 4Court Leasing needed Frady and Wadud to effectuate Sale-Leaseback Transactions so there would be C-Stores for which it could purportedly "lease" fuel equipment and other equipment and, in connection therewith, siphon funds through the "outside market" purported fees.

467. The RICO Defendants have acquired and maintained an interest in and control of personal property, including money, through their pattern of racketeering activity.

468. To the extent any RICO Defendant joined the conspiracy after it was already formed, the RICO Defendant knew of the conspiracy's existence and purposes and knowingly joined therein. As a result, any RICO Defendant that joined the conspiracy after it was formed is liable as if he/it was an original member of the conspiracy. *See, e.g., Savannah College of Art & Design v. School of Visual Arts of Savannah*, 219 Ga. App. 296, 297 (1995) ("And anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto as if he had been an original member.").

469.    Further, under *Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 569-57 (2019), *Hansford v. Veal*, 369 Ga. App. 641 (2023), and other authority, each individual RICO Defendant is jointly and severally liable for <u>all</u> the damages caused by the conspiracy, regardless of whether a portion of the damage was caused by another RICO Defendant. Thus, each of the RICO Defendants is jointly and severally liable for the full damages caused by the conspiracy. Indeed, "if a conspiracy exists, a conspiring defendant 'could be held jointly liable for any torts committed by the other defendants to effect the common design of the conspiracy, even if he did not directly engage in each and every tort alleged." *Metro Atlanta Task Force for the Homeless v. Ichthus Community Trust*, 298 Ga. 221, 225-26 (2015).

470.    MEX was injured and suffered substantial harm by the RICO Defendants' overt acts committed in furtherance of their enterprise.

471.    MEX was injured and suffered substantial harm as a direct and proximate result of the RICO Defendants' pattern of racketeering activity.

472.    Pursuant to O.C.G.A. § 16-14-6, the Trustee is entitled to recover actual damages in an amount to be proven at trial along with attorneys' fees, costs of investigation, punitive damages, treble damages, and equitable relief.

473.    The RICO Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences and specific intent to cause harm, entitling

the Trustee to receive punitive damages sufficient to deter, penalize, or punish the RICO Defendants in light of the circumstances of this case.

## COUNT SIX: CONSPIRACY
## (AGAINST THE RICO DEFENDANTS)

474.  The Trustee incorporates Paragraphs 429 thorough 473 above as if fully set forth herein.

475.  The RICO Defendants joined together to accomplish unlawful ends, including, without limitation, to (i) siphon millions of dollars from MEX to companies owned by Frady and Wadud (*e.g.*, InDepth, Illuminous, 4Court Consulting, 4Court Leasing, and 4 Court Holdings) and  (ii) defraud MEX of its property and contractual rights and benefits (*e.g.*, the Minden Property, Shreveport Property, the Fort Wayne Property, the Orlando Property, the Plainfield Property, and the Victoria Property).

476.  Further, as set forth in Counts Nine through Sixteen below (the allegations of which are incorporated into this Count by reference), the RICO Defendants engaged in fraudulent transfers under Georgia's Uniform Fraudulent Transfers Act. The RICO Defendants, acting in concert, engaged in conduct that violates Georgia's Uniform Fraudulent Transfers Act. As such, they are liable for civil conspiracy. *See, e.g., Chepstow Ltd. v. Hunt*, 381 F.3d 1077 (11th Cir. 2004).

477.    The RICO Defendants joined together to accomplish the unlawful ends enumerated throughout this Complaint by direct agreement or through a positive or tacit mutual agreement or understanding.

478.    The allegations underlying the Trustee's tort and RICO claims also underly her conspiracy claims and are incorporated herein by reference.

479.    MEX was harmed by the RICO Defendants' unlawful conspiracy.

### COUNT SEVEN: UNJUST ENRICHMENT
### (AGAINST ILLUMINOUS, INDEPTH, LTE CAPITAL, 4COURT HOLDINGS, 4COURT CONSULTING, FRADY, AND WADUD)

480.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-97, 104-201, and 218 through 342 above as if fully set forth herein.

481.    InDepth, Illuminous, LTE Capital, 4Court Consulting, and 4Court Holdings did not have a contract with MEX.

482.    In connection with Sale-Leaseback Transactions, InDepth, Illuminous, LTE Capital, 4Court Consulting, and 4Court Holdings received millions of dollars in purported "fees."

483.    InDepth, Illuminous, LTE Capital, 4Court Consulting, and 4Court Holdings did not provide MEX with any services for which they were entitled to receive fees, let alone millions of dollars in fees. Alternatively, at a minimum, the purported "fees" those entities received was materially above the market value for the services they allegedly provided.

484.  InDepth, Illuminous, LTE Capital, 4Court Consulting, and 4Court Holdings were conferred a benefit, *i.e.*, millions of dollars in purported "fees."

485.  Frady and Wadud, as the owners and alter egos of InDepth, Illuminous, LTE Capital, 4Court Consulting, and 4Court Holdings, were conferred a benefit, *i.e.*, millions of dollars in purported "fees."

486.  It would be inequitable for InDepth, Illuminous, LTE Capital, 4Court Holdings, 4Court Consulting, Frady, and Wadud to retain the purported "fees" they received in connection with Sale-Leaseback Transactions.

487.  Equity requires that InDepth, Illuminous, LTE Capital, 4Court Holdings, 4Court Consulting, Frady, and Wadud return the purported "fees" they received in connection with Sale-Leaseback Transactions.

488.  MEX was harmed by InDepth, Illuminous, LTE Capital, 4Court Holdings, 4Court Consulting, Frady, and Wadud receiving funds they were not entitled to receive, and should not have received, in connection with Sale-Leaseback Transactions.

489.  Through this Count, the Trustee seeks to recover the millions of dollars in fees that unjustly enriched InDepth, Illuminous, LTE Capital, 4Court Holdings, 4Court Consulting, Frady, and Wadud.

## COUNT EIGHT – BREACH OF STATUTORY DUTIES
### (AGAINST FRADY, WADUD, HUSAIN, SCOTT, AND LACY)

490.   The Trustee incorporates Paragraphs 1 -8, 11-21, 28-54, 94-342 above as if fully set forth herein.

491.   While serving as officers or directors of MEX, Frady, Wadud, Husain, Scott, and Lacy owed MEX statutory duties, including, without limitation, the duties owed under O.C.G.A. §§ 14-2-830, 14-2-831, 14-2-832, 14-2-640, 14-2-842, and/or 14-2-860 (the "**Statutory Duties**").

492.   Specifically: (i) Frady and Wadud owed MEX the Statutory Duties in their roles as both officers (co-CEOs) and directors (Board members), (ii) Scott and Lacy owed MEX the Statutory Duties in their role as officers (they are each a former MEX Chief Financial Officer), and (iii) Husain owed MEX the Statutory Duties in his role as an officer (he was the Chief Operating Officer of MEX from 2015 through November 3, 2019).

493.   Frady, Wadud, Husain, Scott, and Lacy each breached their Statutory Duties to MEX as described throughout this Complaint.

494.   O.C.G.A. § 14-2-830 provides that "[a] director shall perform his [] duties as a director in good faith and with the degree of care an ordinarily prudent person in a like position would exercise under similar circumstances."

495.   Frady and Wadud breached their duties to MEX under O.C.G.A. § 14-2-830 by, *inter alia*, (i) directing, facilitating, and/or approving MEX's engagement in Sale-Leaseback Transactions without first causing MEX to perform proper due

diligence on the properties being acquired, including, in many cases, failing to have a professional valuation or appraisal performed and failing to receive and/or adequately review the underlying C-Stores financials; (ii) failing to establish, implement, and maintain internal controls for the C-Stores individually and the Retail Business as a whole; (iii) directing, facilitating, and/or approving MEX to continue engaging in Sale-Leaseback Transactions without conducting an accurate or reliable financial analysis of whether such transactions were financially sound, economically viable (in the short or long term), or profitable; (iv) directing, facilitating, and/or approving MEX's continued expansion of its Retail Business without conducting an accurate or reliable financial analysis of whether that business or the growth thereof was financially sound, economically viable (in the short or long term), or profitable; (v) causing, facilitating, and/or approving MEX's continuing to engage in Sale-Leaseback Transactions because such transactions personally benefitted themselves (and thus putting their own interests above of those of MEX) and to continue a scheme whereby purported "gains" from new Sale-Leaseback Transactions were used to (temporarily) pay existing obligations relating to previous Sale-Leaseback Transactions and other obligations including the loan relating to the LBO; (vi) siphoning millions of dollars from MEX to themselves or businesses that they owned (directly or indirectly), including, without limitation, causing millions of dollars to be funneled to InDepth,  Illuminous, LTE Capital,

4Court Consulting, and 4Court Holdings in connection with Sale-Leaseback Transactions; (vii) causing MEX to agree to pay "additional rent" that was "outside market" to 4Court Leasing with the purpose of siphoning funds from MEX to their side company; (viii) causing, facilitating, and/or approving MEX's agreement to pay higher lease rates in connection with Sale-Leaseback Transactions because such rates were based upon the inflated purchase prices that counterparties to the Sale-Leaseback Transactions paid for properties to account for the purported "fees" paid to Frady's and Wadud's side companies like Illuminous, InDepth, 4Court Consulting, and LTE Capital; (ix) engaging in conflicted, self-dealing transactions without having an independent party evaluate whether such transactions were at fair market value or otherwise fair to MEX; and (x) causing, facilitating, and/or approving MEX's assumption of unsustainable debt in the form of, among other things, lease obligations agreed to in connection with Sale-Leaseback Transactions and/or payments owed under the Credit Agreement.

496. MEX's own Board member, Sheiker, conceded in his Rule 2004 examination that there were instances where Frady and Wadud breached their Statutory Duties to MEX. Indeed, when asked whether Frady and Wadud satisfied their duties of good faith and loyalty to MEX, Sheiker testified that there were "instances where [they] didn't."

497. O.C.G.A. § 14-2-832 provides that "[a] director who votes for or

assents to a distribution made in violation of Code Section 14-2-640 or the articles of incorporation is personally liable to the corporation for the amount of the distribution that exceeds what could have been distributed without violating Code Section 14-2-640 or the articles of incorporation if it is established that he did not perform his duties in compliance with Code Section 14-2-830."

498.  O.C.G.A. § 14-2-640, in turn, provides that "[a] board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection (c) of this Code section." Subsection (c) states that "[n]o distribution may be made if, after giving it effect: (1) [t]he corporation would not be able to pay its debts as they become due in the usual course of business; or (2) [t]he corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution."

499.  Frady and Wadud breached the duties they owed MEX under O.C.G.A. §§ 14-2-832 and 14-2-640.

500.  Frady and Wadud breached their duties under O.C.G.A. §§ 14-2-832 and 14-2-640 by, *inter alia*, voting or assenting to distributions that, after giving

effect, caused MEX not to be able to pay its debts as they became due in the usual course of business, caused MEX's total assets to be less than the sum of its total liabilities, and otherwise pushed MEX deeper into insolvency. Those distributions included, without limitation, (i) compensation (in the form of dividends, distributions, salary, or bonuses) to themselves and (ii) the transmission of purported "fees" to companies they owned such as InDepth, Illuminous, LTE Capital, 4Court Consulting, 4Court Leasing, and 4Court Holdings.

501.   O.C.G.A. § 14-2-842(a) provides that "[a]n officer shall perform his or her duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

502.   Frady and Wadud each breached his duties as a MEX officer under O.C.G.A. § 14-2-842 for the same reasons that he breached his duties as a MEX director under O.C.G.A. § 14-2-830.

503.   Chase Begor, an owner of West Hill Ranch and thus an indirect owner of MEX (West Hill Ranch owned 3% of MEX), testified that Frady and Wadud breached their duty to operate MEX with the proper degree of care:

> Q:    Sure. Is it fair to say that Turjo Wadud did not perform his duties as MEX's co-CEO with a degree of care that an ordinarily prudent person in his position would use under similar circumstances?
> A:    Yes.
> Q:    Based on your personal knowledge and observations, is it fair to say that Lamar Frady did not perform his duties as MEX's co-CEO with a degree of care that an ordinarily prudent person in

his position would use under similar circumstances?

A:    Yes.

504.    Husain served as MEX's Chief Operating Officer from 2015 through November 3, 2019.

505.    Husain breached his duties to MEX under O.C.G.A. § 14-2-842 by failing to use the degree of care an ordinarily prudent person in a like position would exercise under similar circumstances. Among other things, when Husain served as MEX's Chief Operating Officer, he had a duty to establish, implement, and maintain internal controls for the C-Stores individually and the Retail Business as a whole, but failed to do so. He also failed to use an appropriate degree of care and loyalty in connection with (i) the LBO, from which he personally profited; (ii) his receipt of $2.6 million as a purported bonus relating to the LBO; and (iii) engaging in conflicting and self-interested transactions with MEX on behalf of Arash and Bano that depleted MEX of over $429,000.

506.    From 2019 until 2021, Vic Lacy served as MEX's Chief Financial Officer. From 2021 until roughly October 2022, Scott served as MEX's Chief Financial Officer.

507.    Lacy and Scott each breached his duties to MEX under O.C.G.A. § 14-2-842 by failing to use the degree of care an ordinarily prudent person in a like position would exercise under similar circumstances. Among other things, when Lacy and Scott served as MEX's Chief Financial Officer, they each had a duty to

establish, implement, and maintain internal controls for the C-Stores individually and the Retail Business as a whole, but failed to do so. They also failed to use an appropriate degree of care in connection with (i) obtaining and analyzing financial data relating to the C-Stores and Retail Business; (ii) obtaining and analyzing financial data relating to the viability of continuing to engage in Sale-Leaseback Transactions; (iii) obtaining and analyzing financial data relating to whether MEX could satisfy its ongoing debt obligations, including, without limitation, its lease obligations and obligations under the Credit Agreement; (iv) ensuring that financial and accounting statements were performed in accordance with GAAP and other applicable standards; (v) failing to identify, detect,  raise issues about, and prevent the siphoning of millions of dollars from MEX to Frady's and Wadud's side companies in connection with Sale-Leaseback Transactions and leases with 4Court Leasing; and (vi) permitting or facilitating the payments of funds from MEX to Frady's and Wadud's side companies without adequately analyzing, reviewing, or vetting whether those payments were fair to MEX.

508.   O.C.G.A. § 14-2-860 states that a "'[c]onflicting interest' with respect to a corporation means the interest a director of the corporation has respecting a transaction effected or proposed to be effected by the corporation (or by a subsidiary of the corporation or any other entity in which the corporation has a controlling interest) if:

A.    Whether or not the transaction is brought before the board of directors of the corporation for action, to the knowledge of the director at the time of commitment he or a related person is a party to the transaction or has a beneficial financial interest in or so closely linked to the transaction and of such financial significance to the director or a related person that it would reasonably be expected to exert an influence on the director's judgment if he were called upon to vote on the transaction; or

B.    The transaction is brought (or is of such character and significance to the corporation that it would in the normal course be brought) before the board of directors of the corporation for action, and to the knowledge of the director at the time of commitment any of the following persons is either a party to the transaction or has a beneficial financial interest so closely linked to the transaction and of such financial significance to that person that it would reasonably be expected to exert an influence on the director's judgment if he were called upon to vote on the transaction: (i) an entity (other than the corporation) of which the director is a director, general partner, agent, or employee; (ii) a person that controls one or more of the entities specified in division (i) or an entity that is controlled by, or is under common control with, one or more of the entities specified in division (i) of this subparagraph; or (iii) an individual who is a general partner, principal, or employer of the director.

509.  O.C.G.A. § 14-2-860 states that a "'Director's conflicting interest transaction' with respect to a corporation means a transaction effected or proposed to be effected by the corporation (or by a subsidiary of the corporation or any other entity in which the corporation has a controlling interest) respecting which a director of the corporation has a conflicting interest."

510.  Frady and Wadud each breached the duties they owed MEX under O.C.G.A. §§ 14-2-860, 14-2-861, 14-2-862, and 14-2-864 by voting for or otherwise

assenting to Director's conflicting interest transactions and by effectuating, facilitating, or permitting such transactions.

511.    The Director's conflicting interest transactions that Frady and Wadud voted for, assented to, and effectuated, included, without limitation, (i) the Sale-Leaseback Transactions which involved purported "fees" being transmitted to side companies owned by Frady and Wadud such as InDepth, Illuminous, LTE Capital, 4Court Consulting, and 4Court Holdings; (ii) the Sale-Leaseback Transactions involving the purchase, sale, or lease of properties with side companies owned by Frady and Wadud such as the Sale-Leaseback Transactions with Time & Water (*e.g.*, the Minden Property and Fort Wayne Property); (iii) the equipment lease transactions between MEX and 4Court Leasing (which included the "additional rent" that was "outside market"); and (iv) the purported "fees" MEX paid for services it allegedly received from side companies owned by Frady and Wadud such as the payments made to Adelphi Transport and Adelphi Environmental Services.

512.    Through the actions and omissions particularly described in this Count, and more generally described throughout this Complaint, Frady, Wadud, Husain, Lacy, and Scott neglected, failed to perform, or otherwise violated their Statutory Duties in the management of MEX or in the disposition of corporate assets.

513.    Through the actions and omissions, Frady, Wadud, Husain, Lacy, and Scott transferred, lost, or wasted corporate assets and, in so doing, neglected, failed to perform, and violated their Statutory Duties to MEX.

514.    The conduct by Frady, Wadud, Husain, Lacy, and Scott constitute gross negligence and a gross deviation of the standard of care of an officer in a like position under the circumstances.

515.    MEX suffered harm as a result of Frady, Wadud, Husain, Lacy, and Scott breaching their Statutory Duties.

516.    Pursuant to O.C.G.A. § 14-2-831(a)(3), this Court should, among other things, set aside all unlawful conveyances, assignments, and transfers of corporate assets where Frady, Wadud, or Husain knew of the unlawfulness of those conveyances, assignments, and transfers. This includes, without limitation, all conveyances, assignments, and transfers of corporate assets to entities owned, in whole or in part, by Frady, Wadud, and Husain such as InDepth, Illuminous, LTE Capital, 4Court Consulting, 4Court Holdings, 4Court Leasing, Time & Water, Bano, and Arash.

517.    Through this Complaint, the Trustee seeks and is entitled to receive the relief permitted by O.C.G.A. § 14-2-831 in addition to all other relief sought through this Complaint.

**COUNT NINE – AVOIDABLE FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO 11 U.S.C. § 544 AND O.C.G.A. § 18-2-75(a)**

**(AGAINST FRADY, HUSAIN, WADUD, ARASH, BANO, AND THE RELATED ENTITY DEFENDANTS)**

518.   The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

519.   Pursuant to 11 U.S.C. § 544, the Trustee brings this claim on behalf of MEX's estates and their creditors under the Georgia Uniform Voidable Transfer Act, O.C.G.A. §§ 18-2-75, *et seq.*[24]

520.   MEX has one or more creditors for whom the Trustee can act whose claim arose before or within a reasonable time after the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers, were made, including, without limitation, the Predicate Creditors.

521.   Under O.C.G.A. § 18-2-75, "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made

---

[24] Pursuant to O.C.G.A. § 18-2-80(b), "a cause of action in the nature of a claim for relief under [the Uniform Voidable Transactions Act] is governed by the law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred." MEX's headquarters and principal place of business was located in Alpharetta, Georgia, and thus MEX was located in Georgia when the obligations for each of the transfers was incurred pursuant to O.C.G.A. § 18-2-80(a). Accordingly, the causes of action regarding all avoidable transfers are governed under both Bankruptcy and Georgia law.

or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation."

522.   While they served as officers or directors of MEX, Frady, Husain, and Wadud facilitated, approved, engaged in, or caused numerous fraudulent transfers of MEX's assets, including, without limitations, its funds, real and personal property, contracts, and contractual rights.

523.   MEX made the transfers or incurred obligation to and for the benefit of Frady, Husain, Wadud, Arash, and Bano, as well as the Related Entity Defendants. These fraudulent transfers include, without limitation, the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers. The fraudulent obligations include, without limitation, the Contractual Obligations and the Obligations.

524.   MEX received less than a reasonably equivalent value in exchange for the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers,

the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, the Contractual Obligations, and the Obligations.

525.   MEX (i) was insolvent on the date of each of the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers,  the Contractual Obligations and the Obligations (and, even if MEX was not insolvent (it was), these transfers would have pushed MEX into insolvency), (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with MEX was an unreasonably small capital; or (iii) intended to incur, or believed that MEX would incur, debts that would be beyond MEX's ability to pay as such debts matured.

526.   MEX made the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers,  and incurred the Contractual Obligations and the Obligations, within four (4) years of the Petition Date or, alternatively, the four-year

lookback period contained in O.C.G.A. § 18-2-79(2) can be extended through equitable tolling or *nullum termpus*.

527. The four-year lookback period contained in O.C.G.A. § 18-2-79(2) is a statute of limitation that is subject to equitable tolling under Georgia law. *See, e.g.,* Post-*Confirmation Comm. for Small Loans, Inc. v. Martin,* 2016 U.S. Dist. LEXIS 43974 (M.D. Ga., Mar. 13, 2016) (compiling cases).

528. The LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, the Contractual Obligations, and the Obligations were hidden from many of MEX's creditors, including, without limitation, the Predicate Creditors.

529. The Predicate Creditors, among other creditors of MEX, had no means of discovering the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, the Contractual Obligations and the Obligations.

530. The LBO Bonuses, the Improper Shareholder Payments, the Sale-

Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers made, as well as the Contractual Obligations and the Obligations incurred, constitute transfers of interests of MEX in property.

531.    At the time the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made, and the Contractual Obligations and the Obligations were incurred, there existed one or more actual and/or future creditors of MEX holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b) including without limitation the Predicate Creditors.

### COUNT TEN – AVOIDABLE TRANSFERS AND OBLIGATION PURSUANT TO 11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(1) (AGAINST FRADY, HUSAIN, WADUD, ARASH, BONO, AND THE RELATED ENTITY DEFENDANTS)

532.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

533.    Pursuant to 11 U.S.C. § 544, the Trustee brings this claim on behalf of the MEX's estates and its creditors under O.C.G.A. §§ 18-2-74, *et seq.*

534.    MEX has one or more creditors for whom the Trustee can act whose

claim arose before or within a reasonable time after the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made, including, without limitation, the Predicate Creditors.

535.    MEX made transfers for the benefit of Frady, Husain, and Wadud, Arash, and Bono as well as the Related Entity Defendants. These fraudulent transfers include but are not limited to the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers. The Fraudulent Obligations include but are not limited to the Contractual Obligations and the Obligations.

536.    The LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made, and the Contractual Obligations and the Obligations were incurred, with actual intent to hinder, delay, or defraud entities to

which MEX was obligated to, or became obligated to, on or after the date of the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the Related Entity Transfers,   or the Contractual Obligations and the Obligations.

537.    The LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made with the actual intent to hinder, delay, or defraud creditors, demonstrated by, among other things, that:

  i,    essential assets of MEX were transferred to insiders, i.e., Frady, Husain, and Wadud,[25] as well as their entities, the Related Entity Defendants;

  ii.    after they effectuated the transfers, Frady, Husain, and Wadud retained possession or control of the funds (directly or indirectly through companies they owned or controlled), including the

_____

[25] As directors and officers of MEX, Frady and Wadud constitute statutory insiders pursuant to section 101(31)(B) of the Bankruptcy Code.

Related Entity Defendants;

iii. Frady, Husain, and Wadud caused MEX to remove and conceal certain assets;

iv. MEX received less than a reasonably equivalent value in exchange for the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, the Contractual Obligations and the Obligations;

v. MEX was insolvent prior to the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers (and, even if it was not insolvent prior to these transfers and payments (it was), they caused MEX to become insolvent);

vi. the LBO Bonuses, the Improper Shareholder Payments, the Sale-

Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were paid to, or made for the benefit of, an insider who was aware of the financial peril MEX was facing; and

vii.  the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers occurred shortly before or shortly after a substantial debt was incurred.

538.  MEX made the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers and incurred the Contractual Obligations and the Obligations, within four (4) years of the Petition Date.

539. With respect to the LBO Bonuses, certain of the Sale-Leaseback Fee Transfers, certain of the Husain Fee Transfers, and any other transfers made outside of the four (4) years prior to the Petition Date, the Trustee has brought this action within one year of the same being reasonably discoverable by, without limitation, the Trustee or the Predicate Creditors.

540. The time for a transfer or obligation being reasonably discoverable runs from the time the last creditor could have discovered the transfer. *See Field v. Estate of Rose Kepoikai (In re Maui Indus. Loan & Fin. Co.)*, 454 B.R. 133, 138 (Bankr. D. Haw. 2011) ("[T]he period for the trustee [begins] to run when the *last* creditor could reasonably have discovered the fraudulent nature of a particular transfer.") (citing *Picard v. Chais (In re Madoff)*, 445 B.R. 206, 219 (Bankr. S.D.N.Y 2011); *G-I Holdings Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings)*, 313 B.R. 612, 639 (Bankr. D. N.J. 2004) (emphasis in original)).

541. Accordingly, even if some of MEX's creditors could have discovered the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, the Contractual Obligations and the Obligations earlier, that will not prevent the Trustee from standing in the shoes of other creditors who could not have

reasonably discovered the LBO Transfers, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the Related Entity Transfers, the Contractual Obligations and the Obligations prior to the Petition Date.

542.   Moreover, the Trustee has two years following the Petition Date to commence actions under section 544 of the Bankruptcy Code. *See* 11 U.S.C. § 546(a)(1)(A).

543.   The LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers and the Contractual Obligations and the Obligations incurred constitute transfers of interests of MEX in property.

544.   At the time the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers were made, there existed one or more actual and/or future creditors of MEX holding unsecured claims allowable within the meaning of

11 U.S.C. §§ 502 and 544(b) including without limitation the Predicate Creditors.

545.    The Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(1) and 18-2-77(a), avoiding the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, the Contractual Obligations, and the Obligations.

## COUNT ELEVEN – VOIDABLE TRANSFERS AND OBLIGATIONS AS TO PRESENT OR FUTURE CREDITORS PURSUANT TO 11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(2)
## (AGAINST FRADY, HUSAIN, WADUD, ARASH, BONO, AND THE RELATED ENTITY DEFENDANTS)

546.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

547.    The Trustee is entitled to recover the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers pursuant to, *inter alia*, 11 U.S.C. § 544 and O.C.G.A. § 18-2-74.

548.    MEX made transfers or incurred obligations for the benefit of Frady, Husain, Wadud, Arash, and Bono, as well as the Related Entity Defendants. These

fraudulent transfers include but are not limited to the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers. The Fraudulent Obligations include but are not limited to the Contractual Obligations and the Obligations.

549.    The LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers,  the Contractual Obligations and the Obligations constitute transfers of interest of MEX in property.

550.    MEX made the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers and incurred the Contractual Obligations and the Obligations (i) with the actual intent to hinder, delay, or defraud MEX's creditors or (ii) without receiving a reasonably equivalent value in exchange for the LBO

Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, the Contractual Obligations or the Obligations.

551.  At or around the time at which the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made, and the Contractual Obligations and the Obligations were incurred, MEX was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

552.  At or around the time at which the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made and the Contractual Obligations and the Obligations were incurred, MEX intended to incur, or believed or reasonably should have believed that it would incur, debts

beyond its ability to pay as they became due.

553.   The LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made to insiders or to companies they owned.

554.   The Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-77(a), avoiding the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers, as well as the Contractual Obligations and the Obligations.

555.   At the time the LBO Bonuses, the Improper Shareholder Payments, the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, and the Related Entity Transfers were made, and the Contractual Obligations and the Obligations were incurred, there existed one or more actual and/or future creditors of MEX holding unsecured claims allowable within the meaning of 11

U.S.C. §§ 502 and 544(b), including without limitation the Predicate Creditors.

### COUNT TWELVE – AVOIDANCE OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 544 and O.C.G.A. § 18-2-75(b) (AGAINST FRADY, WADUD, AND THE RELATED ENTITY DEFENDANTS)

556.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

557.    MEX made the One-Year Transfers during the one year prior to the Petition Date.

558.    MEX made the One-Year Transfers to insiders of MEX.  The One-Year Transfers were to or for the benefit of Frady and Wadud, as well as the Related Entity Defendants, who were insiders of MEX, as seen in the disclosures made in the *Statement of Financial Affairs for Mountain Express Oil Company (Case No. 23-90147)* where MEX disclosed that the Related Entity Defendants have a common ownership with the owners of MEX.

559.    MEX made the One-Year Transfers to pay antecedent debts.

560.    The One-Year Transfers were made while MEX was insolvent.[26]

561.    Each of the recipients of the One-Year Transfers had reasonable cause to believe that MEX was insolvent as, among other things, Wadud and Frady (who

---

[26] MEX is presumed to have been insolvent on and during the 90 days immediately preceding the Petition Date pursuant to 11 U.S.C. § 547(f).

held the majority if not all of the equity in the Related Entity Defendants) had reasonable cause to know of MEX's insolvency.

562.    The Trustee is entitled to a judgment under 11 U.S.C. § 544 and O.C.G.A. § 18-2-75(b), avoiding the One-Year Transfers.

563.    The One-Year Transfers are recoverable from Frady, Wadud, and the Related Entity Defendants pursuant to 11 U.S.C. § 550(a).

564.    At the time the One-Year Transfers were made there existed one or more actual and/or future creditors of MEX holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b), including without limitation the Predicate Creditors.

## COUNT THIRTEEN – AVOIDANCE OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547
### (AGAINST FRADY, WADUD, AND THE RELATED ENTITY DEFENDANTS)

565.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

566.    Based on reasonable due diligence in the circumstances of the case and taking into account, Frady's, Wadud's, and the Related Entity Defendants' known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c), the One-Year Transfers constitute avoidable preferential transfers pursuant to 11 U.S.C. § 547.

567.    The One-Year Transfers constitute transfers of interests of MEX in

property.

568.   The One-Year Transfers were to or for the benefit of Frady and Wadud, as well as the Related Entity Defendants, who were insiders of MEX, as seen in the disclosures made in the *Statement of Financial Affairs for Mountain Express Oil Company (Case No. 23-90147)* where MEX disclosed that the Related Entity Defendants have a common ownership with the owners of MEX.

569.   At the time of the One-Year Transfers, Frady, Wadud, and the Related Entity Defendants were "creditors" of MEX within the meaning of section 101(10) of the Bankruptcy Code.

570.   The One-Year Transfers were made for or on account of an antecedent debt or debts owed by MEX to Frady, Wadud, and the Related Entity Defendants before these transfers were made related to the purported "services" that Frady, Wadud, and the Related Entity Defendants preformed for MEX.

571.   The One-Year Transfers were made while MEX was insolvent.[27]

572.   The One-Year Transfers were made within the one (1) year preceding the Petition Date to insiders.[28]

---

[27] MEX is presumed to have been insolvent on and during the 90 days immediately preceding the Petition Date pursuant to 11 U.S.C. § 547(f).

[28] To the extent any of the Related Entity Defendants do not constitute insiders, and those defendants received transfers within 90 days of the Petition Date such that the transfers are avoidable pursuant to 11 U.S.C. § 547(b)(4)(A), the Trustee seeks the avoidance and recovery of these transfers through this claim.

573.   The One-Year Transfers enabled Frady, Wadud, and the Related Entity Defendants to receive more money than they would receive under Chapter 7 of the Bankruptcy Code, if these amounts had not been paid and if Frady, Wadud, and the Related Entity Defendants had been paid as provided in the Bankruptcy Code.

574.   The One-Year Transfers constitute preferential transfers avoidable by the Trustee pursuant to 11 U.S.C. § 547(b) and recoverable from Frady, Wadud, and the Related Entity Defendants pursuant to 11 U.S.C. § 550(a).

## COUNT FOURTEEN – AVOIDABLE TRANSFERS AND OBLIGATIONS PURSUANT TO 11 U.S.C. § 548
## (AGAINST ILLUMINOUS, INDEPTH, LTE CAPITAL, 4COURT CONSULTING, 4COURT LEASING, FRADY, AND WADUD)

575.   The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

576.   Frady and Wadud caused and allowed MEX to incur obligations and improperly transmit funds as purported "fees" to or for the benefit of side companies owned by Frady and Wadud, including, without limitation, purported "fees" to Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Leasing.  These fraudulent transfers include but are not limited to the Sale-Leaseback Fee Transfers and the 4Court Leasing Above Market Payments, which totaled transfers of funds in an amount greater than eighteen million dollars ($18,000,000.00) to Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Leasing. The fraudulent obligations include, without limitation, the Contractual Obligations.

192

577.    Certain of the Sale-Leaseback Fee Transfers[29] and the 4Court Leasing Above Market Payments were made and certain of the Contractual Obligations were incurred within two (2) years prior to the Petition Date.

578.    The Sale-Leaseback Fee Transfers were made and the Contractual Obligations were incurred to, or for the benefit of, Illuminous, InDepth, LTE Capital, 4Court Consulting, 4Court Leasing, Frady and Wadud. The 4Court Leasing Above Market Payments were made to, or for the benefit of, 4Court Leasing.

579.    The Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, and the Contractual Obligations constitute a transfer of MEX's interest in property as (i) the Sale-Leaseback Fee Transfers included certain of MEX's proceeds from the Sale-Leaseback Transactions that were deducted at closing from the net proceeds MEX would have received and (ii) the 4Court Leasing Above Market Payments include an "outside market" fee that was nothing more than a disguised attempt to move money to 4Court Leasing.

580.    MEX did not receive reasonably equivalent value in exchange for the Sale-Leaseback Fee Transfers or the Contractual Obligations as Illuminous, InDepth, LTE Capital, 4Court Consulting and 4Court Leasing did not provide any actual services. To the extent any actual services were provided, they were

---

[29] All of the Sale-Leaseback Fee Transfers, with the exception of the Illuminous and InDepth Sale-Leaseback Fees set forth in Paragraph 152 above were made within two (2) years prior to the Petition Date.

performed by Frady and Wadud in their capacity as MEX's officers and therefore did not provide any actual value to MEX.

581.   MEX did not receive reasonably equivalent value for the 4Court Leasing Above Market Payments as such payments were "outside market" and nothing more than a disguised means of moving money to 4Court Leasing.

582.   MEX was insolvent at the time of or as a result of the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, and the Contractual Obligations.

583.   In addition, at the time of the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, and the Contractual Obligations, MEX was engaged in transactions, or was about to engage in transactions, for which any property remaining was insufficient.

584.   In addition, from and after the date of the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, and the Contractual Obligations MEX was to incur debts that would be beyond its ability to pay as such debts matured.

585.   The Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, and the Contractual Obligations are avoidable under Section 548(a)(1)(B) of the Bankruptcy Code. The Trustee is entitled to a judgment under the Bankruptcy Code avoiding the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market

Payments, and the Contractual Obligations.

## COUNT FIFTEEN – AVOIDABLE TRANSFERS AND OBLIGATION PURSUANT TO 11 U.S.C. § 548
### (AGAINST ILLUMINOUS, INDEPTH, LTE CAPITAL, 4COURT CONSULTING, 4COURT LEASING, FRADY, AND WADUD)

586.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

587.    Frady and Wadud caused and allowed MEX to wrongfully incur obligations and improperly transmit funds as purported "fees" to or for the benefit of side companies owned by Frady and Wadud, including, without limitation, purported "fees" to Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Leasing. These fraudulent transfers include but are not limited to the Sale-Leaseback Fee Transfers and the 4Court Leasing Above Market Payments, which totaled transfers of funds in an amount greater than eighteen million dollars ($18,000,000.00) to Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Leasing. The fraudulent obligations include, without limitation, the Contractual Obligations.

588.    Certain of the Sale-Leaseback Fee Transfers[30] and the 4Court Leasing Above Market Payments were made and the Contractual Obligations were incurred

---

[30] All the Sale-Leaseback Fee Transfers, with the exception of the Illuminous and InDepth Sale-Leaseback Fees set forth in Paragraph 152 above were made within two (2) years prior to the Petition Date.

within two (2) years prior to the Petition Date.

589.   The Sale-Leaseback Fee Transfers were made and the Contractual Obligations were incurred to, or for the benefit of, Illuminous, InDepth, LTE Capital, 4Court Consulting, Frady and Wadud. The 4Court Leasing Above Market Payments were made to, or for the benefit of, 4Court Leasing, Frady, and Wadud.

590.   The Sale-Leaseback Fee Transfers and the Contractual Obligations constitute a transfer of MEX's interest in property as the Sale-Leaseback Fee Transfers included certain of MEX's proceeds from the Sale-Leaseback Transactions that were deducted at closing from the net proceeds MEX would have received.

591.   The 4Court Leasing Above Market Payments constitute a transfer of MEX's funds.

592.   The Sale-Leaseback Fee Transfers and 4Court Leasing Above Market Payments were made and the Contractual Obligations were incurred with the actual intent to hinder, delay, or defraud creditors, demonstrated by, among other things, that:

      i.    essential assets of MEX were transferred to insiders, i.e., Frady and Wadud, as well as their entities, including Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Leasing;

ii. after they effectuated the Transfers and Payments, Frady and Wadud retained possession or control of the funds (directly or indirectly through companies they owned or controlled) including Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Leasing;

iii. Frady and Wadud caused MEX to remove and conceal certain assets;

iv. MEX received less than a reasonably equivalent value in exchange for the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, and the Contractual Obligations;

v. MEX was insolvent prior to the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market Payments and the Contractual Obligations (and, even if MEX was not insolvent (it was), these transfers and payments would have caused MEX to become insolvent);

vi. the Sale-Leaseback Fee Transfers and the 4Court Leasing Above Market Payments were paid to, or made for the benefit of, an insider who was aware of the financial peril MEX was facing; and

vii.    the Sale-Leaseback Fee Transfers, the 4Court Leasing Above

Market Payments, and the Contractual Obligations occurred

shortly before or shortly after a substantial debt was incurred.

593.    The Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market

Payments, and the Contractual Obligations are avoidable under Section 548(a)(1)(A)

of the Bankruptcy Code.  The Trustee is entitled to a judgment under the Bankruptcy

Code avoiding the Sale-Leaseback Fee Transfers, the 4Court Leasing Above Market

Payments, and the Contractual Obligations.

**COUNT SIXTEEN – RECOVERY OF TRANSFERS**
**PURSUANT TO 11 U.S.C. § 550**
**(AGAINST FRADY, HUSAIN, WADUD, ARASH, BONO, THE RELATED**
**ENTITY DEFENDANTS, THE 317 TRUSTEE, RITA FRADY, THE LKF**
**TRUSTEE, ILLUMINOUS, INDEPTH, LTE CAPITAL, 4COURT**
**CONSULTING, 4COURT LEASING)**

594.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above

as if fully set forth herein.

595.    Pursuant to 11 U.S.C. § 550, the Trustee may recover "the property

transferred, or, if the court so orders, the value of such property, from (1) the initial

transferee of such transfer or the entity for whose benefit such transfer was made or

(2) any immediate or mediate transferee of such initial transferee."

596.    The LBO Bonuses, the Improper Shareholder Payments, the Sale-

Leaseback Fee Transfers, the 4Court Leasing Above Market Payments, the Spartan

Tank Transfers, the Husain Fee Transfers, the Husain Redemption Transfer, the

198

Time & Water Transfers, the AR Brinkley Transfers, the Related Entity Transfers, and the One-Year Transfers, are avoidable pursuant to 11 U.S.C. §§ 544, 547, and 550.

597.   Frady, Wadud, and the Related Entity Defendants were the initial transferees of the Spartan Tank Transfers, the Time & Water Transfers, the AR Brinkley Transfers, and the Related Entity Transfers, including the One-Year Transfers, or the immediate or mediate transferees or the persons for whose benefit the transfers were made.

598.   The Interest Transfers, which occurred subsequent to the Spartan Tank Transfers, the Time & Water Transfers, the AR Brinkley Transfers and certain of the Related Entity Transfers, including certain One-Year Transfers are avoidable pursuant to 11 U.S.C. §§ 544, 547, and 550.

599.   317 Irrevocable Trust, Rita Frady, and LKF Irrevocable Trust were the immediate or mediate transferees of such initial transferee or the persons for whose benefit the Interest Transfers were made.

600.   The Interest Transfers were made for the benefit of Wadud as trustee and beneficiary of 317 Irrevocable Trust, Rita Frady, and Frady as trustee and beneficiary of LKF Irrevocable Trust as the Interest Transfers permitted Frady and Wadud to further hide MEX's assets that were wrongfully transferred to 4Court Holdings, 4Court Leasing, 4Court Consulting, Illuminous, InDepth, 4Court

Imaging, 4Court Solutions, AR Brinkley, Adelphi Environmental, Time & Water, Hamdan Freight, Golden Gallons, and Red Mountain Fuel through the Spartan Tank Transfers, the Time & Water Transfers, the AR Brinkley Transfers and certain of the Related Entity Transfers, including the One-Year Transfers.

601.    The Wadud Interest Transfers were made from MEX through 4Court Holdings, Adelphi Environmental, and Time & Water to 317 Irrevocable Trust.  317 Irrevocable Trust was the mediate transferee of such initial transfers, which renders the Wadud Interest Transfers to be avoidable transfers.

602.    The Frady Interest Transfers were made from MEX through 4Court Holdings and Time & Water to Rita Frady and then from Rita Frady to LKF Irrevocable Trust.  Rita Frady was the immediate transferee of such initial transfers and LKF Irrevocable Trust was the mediate transferee of such initial transfers, which renders the Frady Interest Transfers to be avoidable transfers.

603.    Frady, Wadud, Illuminous, InDepth, LTE Capital, 4Court Consulting, and 4Court Leasing were the initial transferees of the Sale-Leaseback Fee Transfers or the immediate or mediate transferees or the persons for whose benefit the Sale-Leaseback Fee Transfers were made.

604.    Frady, Husain, and Wadud were the initial transferees of the LBO Bonuses and the Improper Shareholder Payments or the immediate or mediate transferees or the persons for whose benefit the LBO Bonuses and the Improper

Shareholder Payments were made.

605. Husain, Aresh, and Bono were the initial transfers of the Husain Fee Transfers and the Husain Redemption Transfer or the immediate or mediate transferees or the persons for whose benefit the Husain Fee Transfers and the Husain Redemption Transfers were made.

606. The Trustee is entitled to a judgment against the Related Entity Defendants, the 317 Trustee, Rita Frady and the LKF Trustee, as well as Frady and Wadud, in an amount of the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Time & Water Transfers, the AR Brinkley Transfers, the Related Entity Transfers, and the subsequent Interest Transfers pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

607. The Trustee is entitled to a judgment against Frady, Wadud, the Related Entity Defendants, the 317 Trustee, Rita Frady and the LKF Trustee, in an amount of the One-Year Transfers and the subsequent Interest Transfers pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

608. The Trustee is entitled to a judgment against Illuminous, InDepth, LTE Capital, 4Court Consulting, 4Court Leasing, Frady and Wadud in an amount of the Sale-Leaseback Fee Transfers pursuant to 11 U.S.C. § 550, for the respective

amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

609.   The Trustee is entitled to a judgment against Frady, Husain, and Wadud in the amount of the LBO Bonuses and the Improper Shareholder Payments pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

610.   The Trustee is entitled to a judgment against Husain, Arash, and Bono in the amount of the Husain Fee Transfers and the Husain Redemption Transfer pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

## COUNT SEVENTEEN – AVOIDABLE TRANSFERS PURSUANT TO O.C.G.A. § 18-2-74(a)(1)
### (AGAINST WADUD, HABIBA, AND THE BAYT TRUSTEE)

611.   The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

612.   Pursuant to O.C.G.A. §§ 18-2-74, *et seq.*, the Trustee brings this claim on behalf of MEX's bankruptcy estate.

613.   The Trustee is a creditor of Wadud and was a creditor of Wadud at the time the deeds conveying the Alpharetta Property and the Buckhead Property were recorded.

614.   Wadud and Habiba made transfers to the Bayt Irrevocable Trust through the Bayt Trustee. These fraudulent transfers include but are not limited to the conveyances of the Alpharetta Property and the Buckhead Property (the "**Property Transfers**").

615.   The Property Transfers were made with actual intent to hinder, delay, or defraud creditors, including the Trustee, to which Wadud and Habiba were obligated to, or became obligated to, on or after the date of the Property Transfers.

616.   The Property Transfers were made with the actual intent to hinder, delay, or defraud creditors, demonstrated by, among other things, that:

   i,    essential assets of Wadud and Habiba were transferred to insiders, *i.e.*, Wadud as Trustee of the Bayt Irrevocable Trust,[31];

   ii.   after they effectuated the transfers, Wadud and Habiba retained possession or control of the Alpharetta Property and the Buckhead Property (through the Bayt Irrevocable Trust)

   iii.  Wadud and Habiba removed and concealed certain assets by, among other things, conveying these properties out of his name after the Trustee had made demand on him;

   iv.   at the time the Property Transfers were made, Wadud had been

---

[31] As directors and officers of MEX, Frady and Wadud constitute statutory insiders pursuant to section 101(31)(B) of the Bankruptcy Code.

threatened with this lawsuit;

iv.    Wadud and Habiba received no value in exchange for the Property Transfers;

v.    Wadud and Habiba were insolvent prior to or immediately following the Property Transfers;

vi.    the Property Transfers were paid to, or made for the benefit of, an insider of Wadud and Habiba who was aware of the financial peril MEX was facing and this impending litigation; and

vii.    the Property Transfers occurred shortly before or shortly after a substantial debt was incurred.

617.    Wadud and Habiba made the Property Transfers within four (4) years of the date of the filing of this Complaint.

618.    The Property Transfers constitute transfers of interests of Wadudand Habiba in property.

619.    The Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(1) and 18-2-77(a), avoiding the Property Transfers

## COUNT EIGHTEEN – VOIDABLE TRANSFERS AS TO PRESENT OR FUTURE CREDITORS PURSUANT TO O.C.G.A. § 18-2-74(a)(2) (AGAINST WADUD, HABIBA, AND THE BAYT TRUSTEE)

620.    The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

621.    Pursuant to O.C.G.A. §§ 18-2-74, *et seq.*, the Trustee brings this claim on behalf of MEX's bankruptcy estate.

622.    The Trustee is a creditor of Wadud and Habiba and was a creditor of Wadud and Habiba at the time the deeds conveying the Alpharetta Property and the Buckhead Property were recorded.

623.    Wadud and Habiba made the Property Transfers for the benefit of himself and his family.

624.    The Property Transfers constitute transfers of interests of Wadud and Habiba in property.

625.    Wadud and Habiba made the Property Transfers without receiving a reasonably equivalent value in exchange for the Property Transfers.

626.    At or around the time at which the Property Transfers were made, Wadud and Habiba were engaged or were about to be engaged in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

627.    At or around the time at which the Property Transfers were made, Wadud and Habiba intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

628.    The Property Transfers were made to insiders, i.e. Habiba and the Bayt Irrevocable Trust.

629. The Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-77(a), avoiding and recovering the Property Transfers.

## COUNT NINETEEN – AVOIDABLE FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO O.C.G.A. § 18-2-75(a) (AGAINST WADUD, HABIBA, AND THE BAYT TRUSTEE)

630. The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

631. Pursuant to O.C.G.A. §§ 18-2-70, *et seq.*, the Trustee brings this claim on behalf of MEX's bankruptcy estate.

632. The Trustee is a creditor of Wadud and Habiba and was a creditor of Wadud and Habiba at the time the deeds conveying the Alpharetta Property and the Buckhead Property were recorded.

633. Under O.C.G.A. § 18-2-75, "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation."

634. After MEX filed for bankruptcy, Wadud continued to fraudulently transfer and hide assets that he had taken from MEX and MEX's creditors.

635. Upon information and belief, at the time of the Property Transfers,

206

Wadud had assets worth less than $50 million and liabilities exceeding $500 million based on the estates' claims against him.

636.   Wadud and Habiba made the Property Transfers to and for the benefit of themselves and their family. These fraudulent transfers include, without limitation, the Property Transfers.

637.   Wadud and Habiba received less than a reasonably equivalent value in exchange for the Property Transfers.

638.   Wadud and Habiba (i) were insolvent on the date of each of the Property Transfers (and, even if Wadud and Habiba were not insolvent, these transfers would have pushed Wadud and Habiba into insolvency), (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with Wadud and/or Habiba was an unreasonably small capital; or (iii) intended to incur, or believed that Wadud and Habiba would incur, debts that would be beyond their ability to pay as such debts matured.

639.   Wadud and Habiba made the Property Transfers within four (4) years of the Petition Date.

640.   The Property Transfers made constitute transfers of interests of Wadud and Habiba in property.

641.   The Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-77(a), avoiding and recovering the Property Transfers.

## COUNT TWENTY – PRESERVATION OF AVOIDED TRANSFERS
### (11 U.S.C. § 551)
### (AGAINST FRADY, HUSAIN, WADUD, ARASH, BANO, THE RELATED ENTITY DEFENDANTS, THE 317 TRUSTEE, RITA FRADY, THE LKF TRUSTEE, ILLUMINOUS, INDEPTH, LTE CAPITAL, 4COURT CONSULTING, 4COURT LEASING)

642.   The Trustee incorporates Paragraphs 1-8, 11-21, 28-54, 94-342 above as if fully set forth herein.

643.   Pursuant to 11 U.S.C. § 551, any transfer avoided is preserved for the benefit of the estates, but only with respect to property of the estates.

644.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to 11 U.S.C. § 544, 547, 550(a) and 551 (a) avoiding and preserving each of the 4Court Leasing Above Market Payments, the Spartan Tank Transfers, the Time & Water Transfers, the AR Brinkley Transfers, the One-Year Transfers, the Related Entity Transfers, and the Interest Transfers to the Related Entity Defendants, 317 Irrevocable Trust, Rita Frady, LKF Irrevocable Trust, Frady and Wadud and (b) directing that those transfers be set aside.

645.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to 11 U.S.C. § 544, 547, 550(a) and 551 (a) avoiding and preserving each of the One-Year Transfers and subsequent Interest Transfers to Frady, Wadud, the Related Entity Defendants, the 317 Trustee, Rita Frady, and the LKF Trustee, and (b) directing that those transfers be set aside.

646.   As a result of the foregoing, the Trustee is entitled to a judgment

pursuant to 11 U.S.C. § 544, 547, 550(a) and 551 (a) avoiding and preserving each of the Sale-Leaseback Fee Transfers to Illuminous, InDepth, LTE Capital, 4Court Consulting, 4Court Leasing, Frady and Wadud and (b) directing that those transfers be set aside.

647.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to 11 U.S.C. § 544, 547, 550(a) and 551 (a) avoiding and preserving each of the LBO Bonuses and the Improper Shareholder Payments to Frady, Husain, and Wadud and (b) directing that those transfers be set aside.

648.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to 11 U.S.C. § 544, 547, 550(a) and 551 (a) avoiding and preserving each of the Husain Fee Transfers and the Husain Redemption Transfers to Husain, Arash, and Bono and (b) directing that those transfers be set aside.[32]

### COUNT TWENTY-ONE – DECLARATORY JUDGMENT REGARDING ALTER EGO/PIERCING THE CORPORATE VEIL (AGAINST FRADY, WADUD, INDEPTH, ILLUMINOUS)

649.    Paragraphs 1-8, 11-21, 28-54, 94-97, 104-201, and 218 through 342 are incorporated herein by reference as if fully set forth herein.

650.    The Trustee seeks a Declaratory Judgment that Frady and InDepth are alter egos for purposes of, among other things, obtaining the relief sought through

---

[32] Should additional transfers or transferees be discovered, the Trustee reserves the right to seek leave from the Court to amend the Complaint and name such transferees as Defendants in this action.

this Complaint.

651.    The Trustee seeks a Declaratory Judgment that Wadud and Illuminous are alter egos for purposes of, among other things, obtaining the relief sought through this Complaint.

652.    There is a bona fide dispute between the Trustee, on the one hand, and Frady and InDepth, on the other hand, as to whether Frady and InDepth are alter egos.

653.    There is a bona fide dispute between the Trustee, on the one hand, and Wadud and Illuminous, on the other hand, as to whether Wadud and Illuminous are alter egos.

654.    The Trustee has a justiciable question as to some fact upon which the existence or non-existence of her rights, status, immunity, power, or privilege, *i.e.*, her right to recover from certain entities, does or may depend.

655.    Because Frady and InDepth deny that they are alter egos, the Trustee is in doubt as to her rights, status, immunity, power, or privilege.

656.    Because Wadud and Illuminous deny that they are alter egos, the Trustee is in doubt as to her rights, status, immunity, power, or privilege.

657.    There is a bona fide actual dispute as to whether Frady and InDepth are alter egos which creates a need for a Declaratory Judgment.

658.    There is a bona fide actual dispute as to whether Wadud and Illuminous

are alter egos which creates a need for a Declaratory Judgment.

659.   Frady and InDepth are alter egos and indistinguishable.

660.   InDepth has (a) no office; (b) no Board (and has never held any Board meetings); (c) no employees (other than Frady himself); (d) no e-mail; (e) no formal contracts; and (f) conducts no business other than actions taken by Frady himself.

661.   InDepth did not create or maintain adequate company records.

662.   Any purported "business" that InDepth performed was performed in or at Frady's personal residence using Frady's personal assets such as his home computer.

663.   Frady used InDepth as a mere instrumentality to conduct his own personal affairs.

664.   Frady used InDepth's assets as his own personal assets.

665.   Upon information and belief, Frady used InDepth's funds to pay for some of his personal, non-business related expenses.

666.   There is such a unity of interest between Frady and InDepth that the separate personalities of Frady and InDepth do not exist.

667.   For the reasons set forth in this Count, InDepth failed to honor the corporate form.

668.   Frady formed and operated InDepth to defeat justice, perpetrate fraud, or to evade contractual or tort responsibility.

669.   Frady formed and operated InDepth to secretly siphon funds from MEX, including, without limitation, funds it received in connection with Sale-Leaseback Transactions as described above.

670.   To the extent Frady does not have sufficient assets to pay any judgment in this case, the Trustee is without an adequate remedy at law as to Frady. Thus, finding that InDepth is Frady's alter ego or piercing the corporate veil as to that entity, is warranted and equitable.

671.   Wadud and Illuminous are alter egos and indistinguishable.

672.   Illuminous has (a) no office; (b) no Board (and has never held any Board meetings); (c) no employees (other than Wadud himself); (d) no e-mail; (e) no formal contracts; and (f) conducts no business other than actions taken by Wadud himself.

673.   Illuminous did not create or maintain adequate company records.

674.   Any purported "business" that Illuminous performed was performed in or at Wadud's personal residence using Wadud's personal assets such as his home computer.

675.   Wadud used Illuminous as a mere instrumentality to conduct his own personal affairs.

676.   Wadud used Illuminous's assets as his own personal assets.

677.   Upon information and belief, Wadud caused Illuminous to use its funds

to pay for some of Wadud's personal, non-business related expenses.

678.    There is such a unity of interest between Wadud and Illuminous that the separate personalities of Wadud and Illuminous do not exist.

679.    For the reasons set forth in this Count, Illuminous failed to honor the corporate form.

680.    Wadud formed and operated Illuminous to defeat justice, perpetrate fraud, or to evade contractual or tort responsibility.

681.    Wadud formed and operated Illuminous to secretly siphon funds from MEX, including, without limitation, funds it received in connection with Sale-Leaseback Transactions as described above, which are incorporated herein by reference.

682.    To the extent Wadud does not have sufficient assets to pay any judgment in this case, the Trustee is without an adequate remedy at law as to Wadud. Thus, finding that Illuminous is Wadud's alter ego or piercing the corporate veil as to that entity, is warranted and equitable.

## COUNT TWENTY-TWO - DECLARATORY JUDGMENT REGARDING ALTER EGO/PIERCING THE CORPORATE VEIL (AGAINST 4COURT HOLDINGS, 4COURT CONSULTING, AND 4COURT LEASING)

683.    Paragraphs 1-8, 11-21, 28-54, 94-97, 104-201, and 218 through 342 are incorporated herein by reference as if fully set forth herein.

684.   The Trustee seeks a Declaratory Judgment that 4Court Holdings, 4Court Consulting, and 4Court Leasing are alter egos for purposes of, among other things, obtaining the relief sought through this Complaint.

685.   There is a bona fide dispute between the Trustee, on the one hand, and 4Court Holdings, 4Court Consulting, and 4Court Leasing, on the other hand, as to whether 4Court Holdings, 4Court Consulting, and 4Court Leasing are alter egos.

686.   The Trustee has a justiciable question as to some fact upon which the existence or non-existence of her rights, status, immunity, power, or privilege, *i.e.*, her right to recover from certain entities, does or may depend.

687.   Because 4Court Holdings, 4Court Consulting, and 4Court Leasing deny that they are alter egos, the Trustee is in doubt as to her rights, status, immunity, power, or privilege.

688.   There is a bona fide actual dispute as to whether 4Court Holdings, 4Court Consulting, and 4Court Leasing are alter egos which creates a need for a Declaratory Judgment.

689.   4Court Holdings, 4Court Consulting, and 4Court Leasing are alter egos and indistinguishable.

690.   Smith, testifying as the corporate representative for 4Court Holdings, 4Court Consulting, and 4Court Leasing, conceded facts showing that 4Court

Holdings, 4Court Consulting, and 4Court Leasing are alter egos. Among other things, he testified:

> Q:    Does 4Court Holdings currently have any employees?
> A:    No.
> Q:    Has it ever had any employees?
> A:    No.
> ….
> Q:    Okay. And I may have asked this before, so I apologize if I did, but 4Court Holdings does business at the 1730 White Station Road address?
> A:    Correct.
> ….
> Q:    Okay. And I think you testified to this earlier, but just to be clear, 4Court Consulting also did business at 1730 South White Station?
> A:    Correct.
> Q:    Okay. And it did not have a separate lease at that office, did it?
> A:    No.
> Q:    Okay. And did 4Court Consulting have any clients or customers other than Mountain Express?
> A:    No.
> Q:    Did it do business at any other location other than the White Station address?
> A:    No.
> Q:    Did it ever own any real estate?
> A:    No.
> Q:    And does it or did it ever have any employees?
> A:    No.
> ….
> **Q:    Okay. Did 4Court Consulting pay any of its utility bills or did it have any utility bills?**
> **A:    No. No, it didn't pay anything. Again, Holdings was the only thing that I know of that had the lease, utility, cable, that kind of thing at that location**.
> Q:    No separate email accounts?
> A:    No.
> ….

Q:   Okay. But the other—is it accurate that the other entities that you're testifying on behalf of today didn't pay utilities?

A:   Correct. I mean, I can say this: **no other entities paid any expenses related to the office space or that building other than 4Court Holdings**.

Q:   Okay. But they were all operating there—

A:   Correct.

Q:   Is that right?

A:   Yes.

Q:   Okay. And did those 4Court entities and the other entities that you're testifying on behalf of today hold any board meetings?

A:   No.

….

Q:   Okay. Were there any written consents or other actions taken by the boards of those companies?

A:   No.

Q:   Do you know if those companies had a board of directors?

A:   I don't believe so.

…

Q:   Okay. Now, 4Court Holdings in turn made loans to other 4Court entities, didn't it?

A:   Yes. There were probably intercompany loans.

Q:   Okay. And did – were there documents or – or promissory notes that documents those intercompany loans?

A:   No.

…

Q:   Okay. Now did 4Court Holdings charge interest for those intercompany loans to the other 4Court entities?

A:   No.

…

Q:   Okay. When 4Court Holdings made loans to other 4Court entities, was there a term to the loans or were they for an indefinite period?

A:   Indefinite.

691.   4Court Holdings, 4Court Consulting, and 4Court Leasing interchangeably used its other offices, furniture, computers, and other assets without honoring or recognizing the corporate form.

216

692.    Upon information and belief, 4Court Holdings, 4Court Consulting, and 4Court Leasing intermingled and comingled funds.

693.    Upon information and belief, 4Court Holdings, 4Court Consulting, and 4Court Leasing used each other's funds to pay each other's expenses.

694.    There is such a unity of interest between 4Court Holdings, 4Court Consulting, and 4Court Leasing that the separate personalities of 4Court Holdings, 4Court Consulting, and 4Court Leasing do not exist.

695.    For these and other reasons, 4Court Holdings, 4Court Consulting, and 4Court Leasing should be deemed alter egos of each other and, consequently, each jointly and severally liable for any Judgment against the other.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court grant judgment as follows:

(a)    Award actual, compensatory, and punitive damages for the Wadud and Frady's breaches of their Statutory Duties and fiduciary duties;

(b)    Award actual, compensatory, and punitive damages against 4Court Holdings, 4Court Consulting, 4Court Leasing, Time & Water, Illuminous, Indepth, A/R Brinkley, and Habiba for aiding and abetting Wadud and Frady's breaches of their Statutory Duties and fiduciary duties;

(c)    Declare the fraudulent and preferential transfers and fraudulent

217

obligations described herein to be invalid and avoided;

(d)    Enter judgment against the Defendants for all claims asserted against each and in the amount of the various transfers set forth herein plus all other damage suffered by MEX;

(e)    Award the Trustee all direct, consequential, and punitive damages;

(f)    Declare that Illuminous and Wadud are alter egos of each other and thus all liable for any judgment entered into against any one of them;

(g)    Declare that Indepth and Frady are alter egos of each other and thus all liable for any judgment entered into against any one of them;

(h)    Declare that the corporate veil should be pierced as to Illuminous and Wadud and thus all liable for any judgment entered into against any one of them;

(i)    Declare that the corporate veil should be pierced as to Indepth and Frady and thus all liable for any judgment entered into against any one of them;

(j)    Declare that 4Court Holdings, 4Court Consulting, and 4Court Leasing are alter egos of each other and thus all liable for any judgment entered into against any one of them;

(k)    Declare that the corporate veil should be pierced as to 4Court Holdings, 4Court Consulting, and 4Court Leasing and thus all liable for any judgment

entered into against any one of them;

(l)    Award pre-judgment and post-judgment interest;

(m)    Award the Trustee the reasonable attorneys' fees incurred in connection with this action; and

(n)    Grant such other and further relief to the Trustee as may be just and proper.

Dated: March 17, 2025

        Respectfully submitted,

**GREENBERG TRAURIG, LLP**

*/s/ Steven J. Rosenwasser*
Steven J. Rosenwasser
Georgia Bar No. 614908
John D. Elrod
Georgia Bar No.  246604
William E. Eye
Georgia Bar No. 688914
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2269
Email:
Steven.Rosenwasser@gtlaw.com
ElrodJ@gtlaw.com
Eyew@gtlaw.com

*Counsel for the Plaintiff Janet*
*Northrup, as Chapter 7 Trustee*