# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| JANET NORTHRUP, as Chapter 7 Trustee for the Estate of Mountain Express Oil Company and affiliated debtors, <br><br> *Plaintiff*, <br><br> v. <br><br> TURJO WADUD, et al., <br><br> *Defendants*. | Civil Action No. 1:25-cv-01404-MLB |

## PLAINTIFF JANET S. NORTHRUP'S OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANT MEHBOOB ALI HUSAIN, ARASH <u>INVESTMENTS INC., AND BANO ENTERPRISES INC.</u>

# **TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................1

II.   STATEMENT OF THE RELEVANT FACTS ................................................3

  A.  The Facts Relating to Husain that Are Relevant to this Motion ...................3

  B.  MEX'S Insolvency ...........................................................................6

III.  LEGAL STANDARD ........................................................................8

IV.   ARGUMENT AND CITATION OF AUTHORITIES ...................................9

  A.  The Claims Are Not Time Barred .........................................................9

  B.  The Trustee Properly Alleges Constructive Fraudulent Transfers...............14

    1.  The Trustee Pleaded Lack of Reasonably Equivalent Value....................15

    2.  The Trustee Sufficiently Alleges Insolvency.....................................19

  C.  The Trustee Plausibly Alleges Actual Fraudulent Transfers .....................22

    1.  Rule 9(b) Does Not Apply to These Claims ......................................22

    2.  The Trustee Alleges Fraud with Specificity .....................................23

  D.  Counts 16 and 20 for Preservation and Recovery Are Well Pleaded...........25

  E.  At a Minimum, Leave to Amend is Appropriate...........................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliant Tax Credit Fund 31-a, Ltd. v. Murphy*,
2014 WL 1415181 (N.D. Ga. Apr. 14, 2014)....................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................8

*Bd. of School Comm'rs v. Architects Grp.*,
752 So. 2d 489 (Ala. 1999)........................................................................11

*In re Brown Publ. Co.*,
2015 WL 1009177 (Bankr. E.D.N.Y. Mar. 4, 2015).........................................16

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) ...................................................................8

*In re Buncher Co.*,
229 F.3d 245 (3d Cir. 2000) ......................................................................16

*In re Canyon Sys. Corp.*,
343 B.R. 615 (Bankr. S.D. Ohio 2006) .........................................................25

*Connor v. Midland Credit Mgmt. Inc.*,
2019 WL 717413 (S.D. Fla. 2019) ...............................................................12

*In re Corporate Jet Aviation, Inc.*,
57 B.R. 195 (Bankr. N.D. Ga. 1986) .............................................................2

*Dye v. Autumn Breeze Holding, LLC*,
2005 WL 8154946 (N.D. Ga. 2005) .............................................................8

*Ellis v. Gen. Motors Acceptance Corp.*,
160 F.3d 703 (11th Cir. 1998) ...................................................................12

*In re Emergency Monitoring Techs.*,
347 B.R. 17 (Bankr. W. D. Pa. 2006)...........................................................11

*In re Gaither*,
595 B.R. 201 (Bankr. D.S.C. 2018)..............................................................11

*Glass v. Respected Roots, LLC*,
  2023 WL 11956156 (N.D. Ga. Apr. 10, 2023)....................................................13

*In re Greater Southeast Cmty. Hosp. Corp. I*,
  365 B.R. 293 (Bankr. D.D.C. 2006) ...................................................................11

*Griffin v. Verizon Communs. Inc.*,
  746 F. App'x 873 (11th Cir. 2018) .......................................................................8

*Hillis v. Equifax Consumer Servs., Inc.*,
  2005 WL 8155139 (N.D. Ga. 2005) ......................................................................8

*In re HVI Cat Canyon, Inc.*,
  658 B.R. 558 (C.D. Cal. Bankr. 2024) ...............................................................10

*In re Joshua Slocum, Ltd.*,
  103 B.R. 610 (Bankr. E.D. Pa. 1989) .................................................................16

*In re Kaiser*,
  525 B.R. 697 (Bankr. N. D. Ill. 2014) ................................................................11

*In re Kipnis*,
  555 B.R. 877 (Bankr. S.D. Fla. 2016) ................................................................11

*In re Lawson*,
  342 B.R. 98 (E.D. Okla. 2006) ...........................................................................11

*In re Louisiana Indus. Coatings, Inc.*
  31 B.R. 688 (Bankr. E.D. La. 1983) ..................................................................17

*In re LSC Wind Down, LLC*,
  610 B.R. 779 (Bankr. D. Del. 2020).....................................................................14

*In re Maui Indus. Loan & Fin. Co.*,
  454 B.R. 133 (Bankr. D. Haw. 2011) ..................................................................13

*In re Medici*,
  524 B.R. 902 (Bankr. N.D. Ga. 2014) ....................................................15, 18, 23

*In re Menser*,
  2021 WL 4484894 (Bankr. N.D. Ga. Sept. 30, 2021) .................................15, 18

*Mock v. Bell Helicopter Textron, Inc.*,
  373 F. App'x 989 (11th Cir. 2010) .......................................................................11

*Mooney v. Emory Univ.*,
  2024 WL 6083391 (N.D. Ga. Mar. 25, 2024) ....................................................11

*In re Musselwhite*,
  2021 WL 4342902 (Bankr. E.D.N.C. Sept. 23, 2021)........................................11

*Nesco, Inc. v. Cisco*,
  2005 WL 2493353 (S.D. Ga. Oct. 7, 2005).........................................................22

*In re Noble*,
  2008 Bankr. LEXIS 1987 (Bankr. N.D. Ga. May 5, 2008)................................19

*Nohr v. Jang*,
  2015 WL 13904675 (N.D. Ga. Sept. 28, 2015)...................................................23

*Nohr v. Jang*,
  2017 WL 11627872 (N.D. Ga. Mar. 2, 2017) .....................................................22

*In re Northlake Foods, Inc.*,
  715 F.3d 1251 (11th Cir. 2013) ..........................................................................18

*Northrup v. Bierenbaum, et al*,
  No. 1:25-cv-00943-SEG (N.D. Ga.)..............................................................*passim*

*Off. Comm. of Unsecured Creditors of Fedders N. Am. Inc. v.
  Goldman Sachs Credit Partners*,
  405 B.R. 527 (Bankr. D. Del. 2009).....................................................................23

*In re Omansky*,
  2022 WL 4281472 (Bankr. S.D.N.Y. Sept. 15, 2022)........................................10

*In re Palm Beach Fin. Partners, L.P.*,
  2013 WL 12478838 (Bankr. S.D. Fla. July 30, 2013).........................................21

*In re Palmieri*,
  651 B.R. 349 (N.D. Ill. Bankr. 2023) ..................................................................10

*In re Pearlman*,
  472 B.R. 115 (Bankr. M.D. Fla. 2012).................................................................22

iv

*Perkins v. Haines*,
    661 F.3d 623 (11th Cir. 2011) ................................................................25

*In re Porras*,
    312 B.R. 81 (Bankr. W. D. Tex. 2004)..................................................10

*Post-Confirmation Comm. for Small Loans, Inc. v. Martin*,
    2016 WL 1274127 (M.D. Ga. Mar. 31, 2016)...............................12, 13

*Ralls Corp. v. Huerfano Rivier Wind*,
    27 F. Supp. 3d 1303 (N.D. Ga. 2014)..................................................15

*In re Roco Corp.*,
    701 F.2d 978 (1st Cir. 1983).................................................................16

*Scarver v. Patel*,
    461 B.R. 910 (Bankr. N.D. Ga. 2011) .................................................19

*Sec'y of Labor v. Labbe*,
    319 F. Appx. 761 (11th Cir. 2008) ........................................................9

*In re Southern Home & Ranch Supply, Inc.*,
    2013 WL 7393247 (Bankr. N.D. Ga. Dec. 20, 2013)...................14, 19

*In re Southern Home & Ranch Supply, Inc.*,
    515 B.R. 699 (Bankr. N.D. Ga. 2014) .................................................25

*Taylor v. DOJ*,
    615 F. App'x 659 (11th Cir. 2015) ........................................................8

*In re TOUSA, Inc.*,
    680 F.3d 1298 (11th Cir. 2012) ...........................................................15

*In re Tri-Star Techs. Co.*,
    260 B.R. 319 (Bankr. D. Mass. 2001) .................................................17

*U.S. Capital Funding VI, Ltd. v. Patterson Bankshares, Inc.*,
    137 F. Supp. 3d 1340 (S.D. Ga. 2015).................................................22

*United States v. Bushlow*,
    832 F. Supp. 574 (E.D.N.Y. 1993) ......................................................11

*United States v. Cody*,
   961 F. Supp. 220 (S.D. Ind. 1997)....................................................................10

*United States v. Hoyt*,
   524 F. Supp. 2d 638 (D. Md. 2007)..................................................................10

*In re Universal Health Care Group, Inc.*,
   560 B.R. 594 (Bankr. M.D. Fl. 2016)...............................................................16

*In re Webster*,
   629 B.R. 654 (Bankr. N.D. Ga. 2021) .....................................................2, 10, 15

*Wiand v. Lee*,
   753 F.3d 1194 (11th Cir. 2014) ........................................................................22

*In re Zagaroli*,
   2020 WL 6495156 (Bankr. W.D.N.C. 2020) ....................................................11

**Statutes**

11 U.S.C. § 547(f).............................................................................................6, 21

26 U.S.C. § 6502...................................................................................................10

26 U.S.C. § 6502(a).............................................................................................10

26 U.S.C. § 6502(a)(1).........................................................................................10

O.C.G.A. § 18-2-71(7)(B)(ii)...............................................................................23

O.C.G.A. § 18-2-74(a)(1) ....................................................................................22

O.C.G.A. § 18-2-74(b)(1) ....................................................................................23

O.C.G.A. § 18-2-74(b)(8) ....................................................................................23

O.C.G.A. § 18-2-74(b)(9) ....................................................................................24

O.C.G.A. § 18-2-74(b)(10) ..................................................................................24

O.C.G.A. § 18-2-79...........................................................................................2, 13

O.C.G.A. § 18-2-79(1).........................................................................................13

**Other Authorities**

Fed. R. Civ. P. 15(a)(2) ........................................................................25

Fed. R. Civ. P. 8 ...................................................................................14

Fed. R. Civ. P. 8(a)(2) ..........................................................................15

Fed. R. Civ. P. 9(b) .......................................................................15, 22

N.D. Ga. L.R. 5.1(C) ............................................................................27

# I.    INTRODUCTION

The Trustee's claims against Mehboob Ali Husain ("Husain"), Arash Investments Inc. ("Arash"), and Bano Enterprises Inc. ("Bano," and together with Husain and Arash, the "Defendants") are straightforward. The Trustee alleges that Husain, MEX's former Chief Operating Officer and a former minority owner in MEX, received five fraudulent transfers totaling $3,645,920. D.E. 1 ("Compl.") ¶¶ 92, 103, 205–17. The Trustee seeks to avoid and recover those transfers under the Bankruptcy Code and Georgia's Uniform Voidable Transactions Act ("UVTA").

Defendants assert two bases for dismissing the claims against them, each of which is without merit. ***First***, they raise a statute of limitations defense. D.E. 63-1 (the "Motion" or "Mot.") at 11. But as Defendants concede, the lookback period "begins on the [March 18, 2023] bankruptcy petition date, and the challenged transfer must be made within four years prior to the petition date to be timely." *Id.* Thus, any transfer after March 18, 2019, is timely. *Id.* As shown below, the majority of transfers at issue occurred after March 18, 2019, making this argument inapplicable to most transfers.

With respect to the remaining transfers, the statute of limitations does not bar the Trustee's claim because the Trustee "step into the shoes of the IRS" and other government creditors and obtains the benefits of the ten-year statute of limitations applicable thereto: "[b]ased on the extensive number of cases holding that § 6502 is

the appropriate period to apply to the IRS when it brings avoidance actions under state law, the Court finds that the ten-year statute of limitations in § 6502 would apply to Trustee, whose standing is derivative of the IRS, when pursuing state law fraudulent conveyance claims." *In re Webster*, 629 B.R. 654, 675 (Bankr. N.D. Ga. 2021). The statute of limitations argument also fails under (i) equitable tolling and (ii) O.C.G.A. § 18-2-79, which extends the statute of limitations based on the date that the **last** creditor could reasonably have discovered the fraud.

***Second***, Defendants argue that the Complaint fails to sufficiently plead insolvency and MEX's failure to receive reasonably equivalent value. Mot. at 14–23. With respect to insolvency, the Complaint not only expressly alleges that "MEX was insolvent at the time [the transfers] were made," it also provides detailed allegations as why MEX was insolvent during those periods. *Infra* at 6–8. With respect to reasonably equivalent value, the Complaint alleges that MEX was insolvent at the time MEX paid Husain $1 million for his 0.5% interest in MEX, Compl. ¶ 217, and it is well settled that when a company is insolvent at the time of a stock redemption, the company did not receive reasonably equivalent value for its payment (since the stock it acquired was worthless). *In re Corporate Jet Aviation, Inc.,* 57 B.R. 195, 198 (Bankr. N.D. Ga. 1986); *infra* at 16–17 (citing cases). Further, for the Husain Fee Transfers, the Trustee alleges that MEX did not receive reasonably equivalent value for these payments as evidenced by the fact that Husain

could not identify anything he provided to MEX for those payments.  Compl. ¶ 204.

For these and other reasons discussed below, the Motion should be denied.

## II.    STATEMENT OF THE RELEVANT FACTS

The facts underlying the Trustee's claims are detailed in both the Trustee's 219-page Complaint and her opposition to the Wadud-Frady Defendants' sixty-page motion to dismiss. To avoid duplication, the Trustee will not recount those facts here. Instead, this Opposition will focus on the facts specific to Husain.

### A.    The Facts Relating to Husain that are Relevant to this Motion.

Husain served as MEX's Chief Operating Officer ("COO") from 2015 to 2019 and remained a shareholder of MEX until July of 2022. Compl. ¶¶ 98, 216, 504. The Trustee's claims against Husain relate to five transfers as follows:

**The LBO Bonus:** On October 25, 2018, MEX's then-98.46% owners, the Bierenbaums, caused MEX to execute a Stock Redemption Plan and Agreement (the "2018 Stock Redemption Plan") through which MEX would acquire the Bierenbaums' interest in the company for $99.5 million (paid out over five years). *Id.* ¶¶ 90–91. As detailed in parallel litigation against the Bierenbaums, the Bierenbaums breached their duties to MEX by causing MEX to execute the 2018 Stock Redemption Plan because, *inter alia*, MEX was either insolvent at the time of, or rendered insolvent by, the 2018 Stock Redemption Plan. *See Northrup v. Bierenbaum, et al*, No. 1:25-cv-00943-SEG (N.D. Ga.) ("*Bierenbaum*") at D.E. 1 ¶

2. In fact, "[a]ccording to MEX's audited 2018 financial statements, the value of MEX's liabilities exceeded the value of its assets by nearly $10.5 million" when the 2018 Stock Redemption Plan was executed. Compl. ¶ 207.

When the Bierenbaums executed the 2018 Stock Redemption Plan, they caused Husain and MEX's other minority shareholders (who collectively owned 37.5 of the then-existing 2437.5 shares) to sign a document purporting to consent to the plan.[1] On the same day that Husain signed the purported consent to the Bierenbaums' windfall, the Bierenbaums caused MEX to provide him with a purported "bonus" of $2.6 million (the "LBO Bonus"). *Id.* ¶ 92. MEX, however, was in no position to provide Husain with a multi-million-dollar bonus. Among other things, at that time "MEX had assets of $87,006,857 and liabilities of $97,499,451," *i.e.*, its liabilities exceeded its assets by nearly ten million dollars. *Id.* ¶ 335.

**The Husain Fee Transfers**: Bano and Arash are companies Husain owned when he served as MEX's COO. Between July 31, 2018 and September 25, 2019, MEX caused $413,783 to be transferred to Bano or Arash in connection with the closing of sale-leaseback transactions. Compl. ¶¶ 203–04. But Bano and Arash, who have no employees other than Husain, provided no value to MEX in exchange for those payments, as evidenced by the fact that Husain was unable to provide any explanation as to why he received those funds during his Rule 2004 examination. *Id.*

---

[1] The Trustee notes that the purported consents are ineffectual and/or irrelevant.

**The Improper Shareholder Payments**: Husain resigned as MEX's COO on November 3, 2019, but retained his 0.5% interest in MEX. *Id.* ¶ 98. As a result of that interest, in March 2020 Husain received a purported dividend of $45,920 from MEX (the "Improper Shareholder Payment"). *Id.* ¶ 103. The Improper Shareholder Payment was made when "MEX's existing revenue stream was insufficient to cover its expenses." *Id.* ¶¶ 335–339. As nothing more than a 0.5% shareholder of MEX at the time, Husain provided no consideration for the Improper Shareholder Payment.

**The Husain Redemption Transfers**: On October 15, 2018, days before the 2018 Stock Redemption Plan was executed and many years after Husain started working for MEX, Husain executed an Employment Agreement with MEX providing that, upon the termination of his employment, the Bierenbaums would have the right to repurchase his MEX stock for $100,000. *Id.* ¶¶ 206–07. That right was later assigned to MEX. *Id.* At the time of this transaction, Husain's 12.5 shares (a 0.5% interest in MEX) were not worth $100,000 given that "the value of MEX's liabilities exceeded the value of its assets by nearly $10.5 million." *Id.* ¶ 207.

MEX's financial condition worsened after 2018, and in (and after) 2020 MEX was insolvent. *Id.* ¶¶ 207, 213, 217, 335–39. Yet on February 20, 2020, MEX and Husain executed a Stock Redemption Agreement (the "Husain Redemption Agreement") pursuant to which MEX agreed to provide Husain with $1 million purportedly to redeem and purchase his 0.5% interest in MEX  (the "Husain

Redemption Obligations"), *i.e.*, MEX agreed to pay Husain ten times more than what Husain was entitled to under his Employment Agreement. *Id.* ¶¶ 210, 336–38. Thereafter, Husain received the $1 million from MEX as follows: (i) $250,000 on March 11, 2020, (ii) $382,500 on April 1, 2022, and (iii) $383,456 on July 1, 2022 (the "Husain Redemption Transfers"). *Id.* at ¶¶ 214–16.

Hereafter, the LBO Bonus, Improper Shareholder Payment, Husain Fee Transfers, and Husain Redemption Transfers are the "Transfers."

## B.    MEX'S Insolvency.

As alleged in the Complaint, "MEX was insolvent on the date of **<u>each</u>** of the LBO Bonuses,…Improper Shareholder Payments,… the Husain Fee Transfers [and] the Husain Redemption Transfers." Compl. ¶ 525. The Complaint contains detailed allegations of insolvency such as:[2]

> **<u>2018:</u>** "According to MEX's audited 2018 financial statements, the value of MEX's liabilities exceeded the value of its assets by nearly $10.5 million at this time." *Id.* ¶ 207. "MEX's stock was not worth $100,000, but was instead valueless" in October 2018. *Id.* ¶ 208.
>
> "MEX's financial condition worsened after 2018." *Id.* ¶ 336.
>
> **<u>2019:</u>** "According to MEX's audited 2019 financial statements, as of December 31, 2019, it had assets of $96,616,944 and liabilities of $95,359,428.10." *Id.* ¶ 337. But "MEX's asset values were inflated including [] the value of MEX's fuel supply contracts, which proved to be nearly valueless during MEX's bankruptcy." *Id.* n.20.

---

[2] The Bankruptcy Code presumes MEX was insolvent during the ninety days before the March 17, 2023, Petition Date, *i.e.*, throughout 2023. *See* 11 U.S.C. § 547(f).

**2020:** "MEX was insolvent at the time" (*i.e.*, March 2020). *Id*. ¶ 213. The Bierenbaums caused "MEX to close [on] a new credit facility which increased its long-term debt by nearly $70 million, resulting in MEX's clear insolvency at the time of the March 2020 completion of the LBO. That insolvency was worsened by the Sale-Leaseback Transactions that created what were in effect long-term 'loan' obligations of seven to nine-and-a-half percent that MEX could not cover through its normal business operations…" *Id*. ¶ 338. "In March 2020, MEX's existing revenue stream was insufficient to cover its expenses, particularly after excluding the phantom revenues from Sale-Leaseback Transactions." *Id*. ¶ 339.

**2021–22:** "The Sale-Leaseback Transactions with Blue Owl [which started in June 2021] and other parties after the LBO worsened MEX's insolvency following the LBO." *Id*. ¶ 341.

"MEX was insolvent at the time [the Husain Redemption Transfers] were made." *Id*. ¶ 217 (Those transfers were on March 11, 2020, *id*. ¶ 214, April 2022, *id*. ¶ 215, and July 1, 2022, *id*. ¶ 216.)

Frady's and Wadud's distributions "pushed MEX deeper into insolvency," with such distributions including "purported 'fees' to companies they owned." *Id*. ¶ 500. Those distributions occurred throughout 2021 and 2022. *Id*. ¶¶ 151, 168.

MEX [] was insolvent on the date of **each** of the… Improper Shareholder Payments (years 2020 and 2021, ¶ 102–03).

These facts, which show insolvency at the time of each of the Transfers, are confirmed by two Affidavits the Trustee recently obtained from Vic Lacy (MEX's CFO in 2020 and 2021) and John Scott (MEX's CFO from 2021 to 2022) who respectively attest that "MEX was insolvent from at least January 2020 (when I started working at MEX) until I left the Company in October 2022" and "MEX was insolvent from at least the Spring of 2021 (when I started working at MEX) until I

left the Company in November 2022." *Bierenbaum* at D.E. 28–29. The Trustee requests that the Court take judicial notice of those Affidavits (which, for the Court's convenience, are attached as Exhibits A and B): "Courts typically take judicial notice of record documents from other judicial proceedings." *Griffin v. Verizon Communs. Inc.*, 746 F. App'x 873, 876 (11th Cir. 2018). For example, in *Taylor v. DOJ*, 615 F. App'x 659, 660 (11th Cir. 2015), the Court found "meritless" the argument that "the district court abused its discretion by considering the FBI agent's affidavit" from another proceeding because "[a] district court may take judicial notice of public records within its files relating to the particular case before it or other related cases."

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." *Dye v. Autumn Breeze Holding, LLC*, 2005 WL 8154946, at *5 (N.D. Ga. 2005). In short, "[a] motion to dismiss is disfavored and rarely granted." *Hillis v. Equifax Consumer Servs., Inc.*, 2005 WL 8155139, at *1 (N.D. Ga. 2005).

## IV.    ARGUMENT AND CITATION OF AUTHORITIES

### A.    The Claims Are Not Time Barred.

While Husain vigorously argues about the statute of limitations, Mot. at 17–18, he concedes that a "challenged transfer must be made within four years prior to the petition date to be timely." *Id.* Here, the Petition Date was March 17, 2023, so any Transfers after March 17, 2019 are timely. Compl. ¶ 1. Thus, the statute of limitations argument does <u>not</u> apply to the (i) Improper Shareholder Payment (March 2020); (ii) the February 2020 Husain Redemption Obligations; (iii) one of the Husain Fee Transfers (September 25, 2019), and (iv) the Husain Redemption Transfers (in March 2020, April 2022, and July 2022). *Id.* ¶¶ 103, 203, 216.

With respect to the transfers allegedly time barred (the 2018 $2.6 million LBO Bonus and three Husain Fee Transfers), a motion to dismiss on statute of limitations grounds is "appropriate only if it is apparent from the face of a complaint that the claim is time-barred," and "only if it appears beyond a doubt that [a plaintiff] can prove no set of facts that toll the statute." *Sec'y of Labor v. Labbe*, 319 F. Appx. 761, 764 (11th Cir. 2008). Here, the Complaint alleges a "set of facts" from which the Court can find that the tolling of the statute of limitations may be warranted.

***First***, for the fraudulent transfer claims, the Trustee steps into the shoes of MEX's government creditors who are not subject to the limitations period in the Bankruptcy Code or the UVTA. Compl. ¶ 253. For example, the IRS holds claims

9

against MEX for unpaid taxes and, as a result, the Trustee stands in the shoes of the IRS and can rely on the ten-year statute of limitation under 26 U.S.C. § 6502.[3] That is precisely what this Court held in *In re Webster*: "[b]ased on the extensive number of cases holding that § 6502 is the appropriate period to apply to the IRS when it brings avoidance actions under state law, the Court finds that the ten-year statute of limitations in § 6502 would apply to Trustee, whose standing is derivative of the IRS, when pursuing state law fraudulent conveyance claims." 629 B.R. at 675.

Numerous cases are in accord. *See, e.g., United States v. Hoyt*, 524 F. Supp. 2d 638, 641 (D. Md. 2007) ("As courts have consistently held, the statute of limitations relevant to the government's fraudulent transfer action against a taxpayer is the ten-year limitation imposed by 26 U.S.C. § 6502(a)."); *In re HVI Cat Canyon, Inc.*, 658 B.R. 558, 581 (C.D. Cal. Bankr. 2024) ("Most courts have held that section 544(b) allows the trustee to step into the shoes of the IRS and enjoy the ten-year statute of limitations in 26 U.S.C. § 6502(a)(1)").[4]

---

[3] The Court can take judicial notice of the schedules and claims register in the associated bankruptcy proceeding: No. 23-90147 (S.D. Tex. Bankr.).

[4] *See also United States v. Cody*, 961 F. Supp. 220, 221 (S.D. Ind. 1997) (collecting cases and observing that "Federal case law in favor of the government on this question is 'overwhelming'"); *In re Palmieri*, 651 B.R. 349, 355–56 (N.D. Ill. Bankr. 2023) ("the majority of courts have concluded, based on the unambiguous language of the statute, that § 544(b) allows a trustee to take advantage of the longer limitations period as long as the IRS is a creditor in the bankruptcy case, seeking collection of back taxes."); *In re Omansky*, 2022 WL 4281472, at *9 (Bankr. S.D.N.Y. Sept. 15, 2022) ("The Court follows the majority of bankruptcy courts that have decided this issue and finds that the applicable statute of limitations with

Moreover, the Alabama Department of Revenue, Oklahoma Tax Commission, and Georgia Department of Revenue are also creditors of MEX, in whose shoes the Trustee can stand to assert *nullum tempus.* Compl. ¶¶ 251, 253. The doctrine of *nullum tempus* holds that statutes of limitations are construed narrowly against the government, and indeed often do not run at all. That doctrine applies here. *See, e.g., Bd. of School Comm'rs v. Architects Grp.,* 752 So. 2d 489 (Ala. 1999) (*nullum tempus* does applies to the state); *In re Lawson,* 342 B.R. 98, 99 n.1 (E.D. Okla. 2006) ("The statute of limitations does not bar suit of any governmental entity").

In a footnote, Husain argues that the *nullum tempus* doctrine does not apply. Mot. at 11 n.5. Because this argument is relegated only to a footnote, it is waived. *See, e.g., Mooney v. Emory Univ.*, 2024 WL 6083391, at *8 (N.D. Ga. Mar. 25, 2024) ("But burying a substantive argument in a footnote (only) is impermissible and waives the argument."); *Mock v. Bell Helicopter Textron, Inc.,* 373 F. App'x 989, 992 (11th Cir. 2010) (deeming argument waived because it was raised only in a

---

respect to this action is ten years from the date of assessment of the relevant taxes.") (collecting cases); *United States v. Bushlow*, 832 F. Supp. 574, 580–81 (E.D.N.Y. 1993); *In re Zagaroli*, 2020 WL 6495156 (Bankr. W.D.N.C. 2020); *In re Gaither*, 595 B.R. 201 (Bankr. D.S.C. 2018); *In re Kipnis*, 555 B.R. 877 (Bankr. S.D. Fla. 2016); *In re Kaiser*, 525 B.R. 697 (Bankr. N. D. Ill. 2014); *In re Greater Southeast Cmty. Hosp. Corp. I*, 365 B.R. 293 (Bankr. D.D.C. 2006); *In re Emergency Monitoring Techs.*, 347 B.R. 17 (Bankr. W. D. Pa. 2006); *In re Porras*, 312 B.R. 81 (Bankr. W. D. Tex. 2004); *In re Musselwhite*, 2021 WL 4342902, at *10 (Bankr. E.D.N.C. Sept. 23, 2021).

footnote); *Connor v. Midland Credit Mgmt. Inc.,* 2019 WL 717413, at *4, n.1 (S.D. Fla. 2019) ("[A]ddressing a legal argument only in a footnote is an incorrect method to present substantive arguments on the merits."). Even if it was not waived, the argument has been flatly rejected by the numerous cases cited above.

*Second*, "[i]t is well-recognized under Georgia law that statutes of limitation, unlike statutes of repose, are subject to equitable doctrines such as tolling." *Post-Confirmation Comm. for Small Loans, Inc. v. Martin,* 2016 WL 1274127, at *10 (M.D. Ga. Mar. 31, 2016) (citing *Simmons v. Sonyika*, 279 Ga. 378, 379 (2005)). "'Equitable tolling' is the doctrine under which plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to inequitable circumstances." *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998). Equitable tolling applies to the Trustee's claims under the Bankruptcy Code and Georgia's UVTA. *See Martin*, 2016 WL 1274127, at *10.

Here, the Trustee alleges that at least some creditors could not have discovered the fraudulent nature of the LBO Bonus because, among other things, the Defendants engaged in actions to conceal or otherwise make it difficult to uncover. *See, e.g.*, Compl. ¶ 529. For example, the Trustee cited testimony from a former MEX consultant who testified (i) "based on [her] review of MEX's documents, [] the financial covenants [MEX provided to banks] were false"; (ii) "MEX's financial and accounting records were a complete mess"; and (iii) "MEX lacked adequate internal

controls." *Id.* ¶¶ 6, 283. The Trustee also alleged that the fraudulent nature of the LBO was concealed because "MEX's asset values were inflated." *Id.* ¶ 337 n. 20. This testimony was confirmed by Vic Lacy, MEX's former CFO, who attested that MEX's operations "had characteristics of a Ponzi scheme" and that the purported "gain" that MEX booked in its financials from Sale-Leaseback Transactions were more akin to "loans that MEX [had to pay] back with interest." *Bierenbaum* at D.E. 29. Notably, Lacy testified that these views relate to "2018 through 2021." *Id.* ¶ 25. At this stage, the Court must credit those allegations and draw all inferences in favor of tolling. *See Glass v. Respected Roots, LLC,* 2023 WL 11956156, at *3 (N.D. Ga. Apr. 10, 2023).

**Third**, with respect to the actual fraudulent transfer claims in Count Ten, the statute of limitations is extended under O.C.G.A. § 18-2-79, which provides that a claim brought thereunder can be brought "**within one year after the transfer or obligation was or could reasonably have been discovered by the claimant**." O.C.G.A. § 18-2-79(1). Most courts hold that the one-year period runs upon the discovery of the fraudulent nature of the transfer. *See Martin*, 2016 WL 1274127, at *10 (citing cases). Critically, the time for a transfer or obligation being reasonably discoverable runs from the time the ***last*** creditor could have discovered the transfer. *Id.* at *8 (court considers "whether all creditors of the Debtors were able to reasonably discover the alleged fraudulent nature" of the payments); *In re Maui*

13

*Indus. Loan & Fin. Co.*, 454 B.R. 133, 138 (Bankr. D. Haw. 2011) (period beings "to run when the *last* creditor could reasonably have discovered" the fraud).

Again, Defendants concealed from outside creditors the fraudulent nature of the LBO Bonus by, *inter alia*, providing "financial covenants [that] were false" and "reporting "asset values [that] were inflated," thereby masking the fraudulent nature of the LBO Bonus. *Id.* ¶¶ 6, 283; ¶ 337 n. 20. These allegations support the existence of a predicate creditor that could have sought to avoid that bonus as of the Petition Date. *See* Compl. ¶ 252–54. Accordingly, the avoidance claims in Count Ten are timely. *See In re LSC Wind Down, LLC*, 610 B.R. 779, 786 (Bankr. D. Del. 2020) (complaint alleges "creditors did not know of and could not have reasonably known of the Transfer or its fraudulent nature prior to the Petition Date, thereby capturing the one-year savings clause under UFTA.").

 For all the reasons above, Husain's statute of limitation argument fails.

## B.    The Trustee Properly Alleges Constructive Fraudulent Transfers.

The Trustee's claims for constructive fraudulent transfer under the Bankruptcy Code and UVTA require her to allege (i) MEX was insolvent when it made the transfers at issue (or those transfers rendered MEX insolvent) and (ii) MEX did not receive reasonably equivalent value in exchange for those transfers. *See, e.g.*, *In re Southern Home & Ranch Supply, Inc.*, 2013 WL 7393247, at *4 (Bankr. N.D. Ga. Dec. 20, 2013). Both these issues involve "question[s] of fact, as to which

considerable latitude must be allowed to the trier of the facts." *In re TOUSA, Inc.,* 680 F.3d 1298, 1311 (11th Cir. 2012).

### 1.    The Trustee Pleaded Lack of Reasonably Equivalent Value.

Husain argues that the Trustee "failed to sufficiently plead facts showing that MEX did not receive reasonably equivalent value for the [Transfers]." Mot. at 16. That argument ignores the Trustee's well-pleaded Complaint.

As an initial matter, Husain concedes that the bar for pleading lack of reasonably equivalent value is low. Specifically, Husain admits that the Trustee need only allege "some information about the value the debtor received in exchange for the transfer" such that an allegation is "more than a bald assertion." *Id.*

Further, in considering Husain's argument it is important to remember that (i) the Trustee's reasonably equivalent value allegations are governed by "the pleading requirements of Rule 8(a)(2)," not Rule 9(b)[5] and (ii) whether reasonably equivalent value was provided is a "question of fact not to be decided on a motion to dismiss."[6]

Under these standards, the Complaint more than sufficiently alleges that MEX did not receive reasonably equivalent value for the Transfers:

<u>LBO Bonus</u>: Husain concedes that the Trustee has stated a claim for this

---

[5] *Ralls Corp. v. Huerfano Rivier Wind*, 27 F. Supp. 3d 1303, 1333 (N.D. Ga. 2014); *In re Medici*, 524 B.R. 902, 907 (Bankr. N.D. Ga. 2014) (Rule 8 applies to reasonably equivalent value allegations).

[6] *In re Menser*, 2021 WL 4484894, at *7(Bankr. N.D. Ga. Sept. 30, 2021); *In re Webster*, 629 B.R. 654 at 670–71 (Bankr. N.D. Ga. 2021).

transfer (he only moves to dismiss on statute of limitations grounds). Mot. at 14 n.7.

Improper Shareholder Payment: At the time of the March 2020 Improper Shareholder Payment, Husain was not employed by MEX, but rather just a 0.5% shareholder. *Supra* at 5. Husain received this payment for no reason other than the fact that he owned MEX stock, *i.e.*, he provided no value at all. *Id.*

Husain Fee Transfers: As alleged in the Complaint, when Husain was asked under oath what value he provided to MEX for these transfers, Husain was unable to provide a response.  Compl. ¶ 204.

Husain Redemption Transfer: "[C]ourts have uniformly concluded that a stock redemption by an insolvent company fails to supply reasonably equivalent value to the company." *In re Brown Publ. Co.*, 2015 WL 1009177, at * 11 (Bankr. E.D.N.Y. Mar. 4, 2015); *In re Joshua Slocum, Ltd.,* 103 B.R. 610, 618 (Bankr. E.D. Pa. 1989) (same and citing cases); *see also In re Roco Corp.,* 701 F.2d 978, 982–83 (1st Cir. 1983) ("We agree with the bankruptcy court that this stock was virtually worthless to Roco"); *In re Universal Health Care Group, Inc.*, 560 B.R. 594, 604– 05 (Bankr. M.D. Fl. 2016) (allegation that a stock redemption occurred when company was insolvent sufficient to allege debtor "received less than reasonably equivalent value"); *In re Buncher Co.,* 229 F.3d 245, 252–53 (3d Cir. 2000). The reason is obvious: when "the corporation was insolvent at the time of the transfer…, the consideration given the corporation by [the defendant], *viz.,* his stock, was

worthless." *In re Louisiana Indus. Coatings, Inc.* 31 B.R. 688, 695 (Bankr. E.D. La. 1983); *In re Tri-Star Techs. Co.*, 260 B.R. 319, 327 (Bankr. D. Mass. 2001) ("equity interests of an insolvent company have generally no value whatsoever.").

Here, the Complaint alleges that MEX was insolvent when the Husain Redemption Transfers were made in March 2020, April 2022, and July 2022, *i.e.*, that Husain provided MEX with worthless stock in exchange for the $1 million payment. *Supra* at 5–6. Nothing more is required.[7]

Yet the Trustee goes further through the Husain Redemption Agreement, which proves a lack of reasonably equivalent value on its face. Mot. at Ex. B. That agreement states that Husain will only receive $1 million for his 0.5% interest **if** MEX is successful in borrowing $160 million through a First Amended and Restated Credit Agreement. *Id.* ¶¶ 95, 211–12, 214; *see also* Mot. Ex. B ¶ 2 ("**[I]f** the IberiaBank loan closes on March 12, 2020 as aforesaid, MEX will owe Ali an additional sum of $750,000."). Notably, if MEX did not obtain the $160 million loan, MEX was only required to pay Husain $250,000 for his 0.5% interest in MEX, thereby showing that Husain's shares were not worth $1 million. *Id.* Indeed, MEX's value did not **increase by 400%** after it saddled itself with $160 million in debt.

Likely recognizing that the Complaint properly pleaded that MEX did not

---

[7] The $1 million purchase price for Husain's 0.5% of MEX imputes MEX's value at roughly $151 million. At a minimum, there is a fact dispute as to whether MEX received reasonably equivalent value at that inflated valuation.

receive reasonably equivalent value for Husain's worthless shares, Husain tries to circumvent the issue by arguing that, through the Husain Redemption Agreement, he provided an "affirmation of his post-termination covenants" and a release. Mot. at 18–19. But an "affirmation" of existing contractual obligations is not consideration. It is simply acknowledging a **pre-existing** duty. And, with respect to the release, based on the Trustee's current knowledge, Husain never threatened or filed any lawsuit against MEX, rendering the release worthless (and, again, certainly not worth $1 million). In all events, whether the "affirmation" or release provided MEX with reasonably equivalent value is, at a minimum, a "question of fact not to be decided on a motion to dismiss." *In re Menser*, 2021 WL 4484894 (Bankr. N.D. Ga 2021), at *7; *In re Medici,* 524 B.R. at 907 (Bankr. N.D. Ga. 2014).

Husain's reliance on *In re Northlake Foods, Inc.,* 715 F.3d 1251 (11th Cir. 2013) is misplaced. In that case, the agreement at issue was clear on its face that the debtor company received a benefit, *i.e.*, the ability to change tax election status. *Id.* at 1255 ("Because Northlake would have had to pay income taxes itself had it not elected to be an S corporation, the District Court concluded that the 2006 Transfer did not make Northlake or its creditors worse off and thus constituted a reasonably equivalent exchange of value."). Here, the Stock Redemption Agreement is clear on its face that MEX received only MEX shares worth little, if anything, in exchange for paying $1 million. Again, Husain's arguments to the contrary only create a fact

dispute that cannot be resolved now because "what constitutes 'reasonably equivalent value' and whether the debtor is solvent or insolvent at the time of the transfer are questions of fact for the jury." *Alliant Tax Credit Fund 31-a, Ltd. v. Murphy,* 2014 WL 1415181, at *5 (N.D. Ga. Apr. 14, 2014).

### 2.    The Trustee Sufficiently Alleges Insolvency.

Husain argues that the Complaint "failed to allege sufficient facts to show that MEX was insolvent at the time of the Improper Shareholder Payment [and] Husain Redemption Transfers." Mot. at 19–20. Again, not so.

At the pleading stage, the Trustee need only assert allegations that make insolvency "more than mere speculation." *Scarver v. Patel*, 461 B.R. 910, 914 (Bankr. N.D. Ga. 2011). "[A] specific value of liabilities and assets in the relevant transfer period… is not required to state a plausible claim." *Id.*; *see also In re Southern Home & Ranch Supply, Inc.*, 2013 WL 7393247, at *4 (requiring only allegations that "the transfers were made at a time when the debtor was insolvent or rendered the debtor insolvent"); *In re Noble*, 2008 Bankr. LEXIS 1987, at *13–15 (Bankr. N.D. Ga. May 5, 2008) (substantially the same).

Here, the well-pleaded Complaint alleges insolvency at the time of the Transfers in a manner that is "more than mere speculation." For example, the Complaint alleges that, at the time of the March 2020 $250,000 Husain Redemption Transfer, "MEX was insolvent," Compl. ¶ 217, and supports that allegation with

numerous facts such as: (i) "[a]According to MEX's audited 2018 financial statements, the value of MEX's liabilities exceeded the value of its assets by nearly $10.5 million at this time" (¶ 207); (ii) "MEX's stock was not worth $100,000, but was instead valueless" in October 2018 (¶ 208); (iii) "MEX's financial condition worsened after 2018" (¶ 336); (iv) [a]ccording to MEX's audited 2019 financial statements, as of December 31, 2019, it had assets of $96,616,944 and liabilities of $95,359,428.10," but "MEX's asset values were inflated including [] the value of MEX's fuel supply contracts, which proved to be nearly valueless during MEX's bankruptcy."( ¶ 337); (v) "MEX was insolvent at the time" of the LBO (*i.e.*, March 2020) (¶ 213); (vi) "[t]he Bierenbaums caused "MEX to close [on] a new credit facility which increased its long-term debt by nearly $70 million, resulting in MEX's clear insolvency at the time of the March 2020 completion of the LBO. That insolvency worsened by the Sale-Leaseback Transactions that created what were in effect long-term 'loan' obligations of seven to nine-and-a-half percent that MEX could not cover through its normal business operations…"(¶ 338); and (vii) "[i]n March 2020, MEX's existing revenue stream was insufficient to cover its expenses, particularly after excluding the phantom revenues from Sale-Leaseback Transactions" (¶ 339).

Likewise, with respect the $382,500 April 1, 2022, transfer and the $382,456 July 1, 2022, transfer, the Complaint alleges that "MEX was insolvent at the time,"

¶ 217, and supports that allegation with not only the facts above (showing MEX was already insolvent by March 2020) but numerous additional facts. For example, the Complaint alleges that MEX "was insolvent on the date of **each** of the…Sale-Leaseback Transfers" with such transfers occurring in, among other dates, each month from March through September 2022. *Id.* ¶¶ 151, 168, 525. The Complaint further alleges that MEX was insolvent from 2021 until 2023, including alleging that: (i) "[t]he Sale-Leaseback Transactions with Blue Owl [which started in June 2021] and other parties after the LBO worsened MEX's insolvency following the [March 2020] LBO. (¶ 341); (ii) Frady's and Wadud's 2021 and 2022 payments to their Insider Companies "pushed MEX deeper into insolvency" (¶¶ 151, 168, 500); and (iii) "MEX [] was insolvent on the date of **each** of the [2020 and 2021] Improper Shareholder Payments" (¶ 102–03). Moreover, under 11 U.S.C. § 547(f), MEX was presumptively insolvent as of December 17, 2022. And all these allegations were recently confirmed by MEX's former CFO who attests that "MEX was insolvent from at least the Spring of 2021 (when I started working at MEX) until I left the Company in November 2022." *See Bierenbaum* at D.E. 28 ¶ 24 (attached at Ex. A).

These allegations easily distinguish this case from Husain's cited cases, like *In re Palm Beach Fin. Partners, L.P.*, where the only allegation related to insolvency was that "MGI was insolvent at the time of the Transfers.", 2013 WL 12478838, at *3 n.4 (Bankr. S.D. Fla. July 30, 2013).

Moreover, because the Trustee alleges MEX operated, in part, as a Ponzi scheme in which it booked phantom "gains" from new Sale Leaseback Transactions to pay obligations from prior transactions, the Court can presume insolvency even absent the well-pleaded allegations detailed above. *See* Compl. ¶ 349; *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) ("Since Ponzi schemes do not generate profits sufficient to provide their promised returns, but rather use investor money to pay returns, they are insolvent and become more insolvent with each investor payment.").[8] Indeed, MEX's former CFO attests that "[l]ooking back at MEX's operations in hindsight, it had characteristics of a Ponzi scheme in that MEX was using funds from new Sale-Leaseback Transactions to pay debts incurred through prior Sale-Leaseback Transactions." *Bierenbaum* D.E. 29 ¶ 18 (attached at Ex. A).

For these reasons, the Trustee has properly pleaded a constructive fraud claim.

## C.    The Trustee Plausibly Alleges Actual Fraudulent Transfers.

### 1.    Rule 9(b) Does Not Apply to These Claims.

Husain asserts that Rule 9(b) governs claims under O.C.G.A. § 18-2-74(a)(1). Mot. at 21. While courts are admittedly split on this issue, the better-reasoned opinions hold it does not. *See, e.g.*, *Nesco, Inc. v. Cisco,* 2005 WL 2493353, at *3 (S.D. Ga. Oct. 7, 2005); *U.S. Capital Funding VI, Ltd. v. Patterson Bankshares, Inc.*,

---

[8] *See also Nohr v. Jang*, 2017 WL 11627872, at *1(N.D. Ga. Mar. 2, 2017) ("[A] Ponzi scheme is insolvent ab initio."); *In re Pearlman*, 472 B.R. 115, 125 (Bankr. M.D. Fla. 2012) (insolvency sufficiently pled by alleging a Ponzi scheme).

137 F. Supp. 3d 1340, 1370 (S.D. Ga. 2015); *Nohr v. Jang,* 2015 WL 13904675, at * 5 (N.D. Ga. Sept. 28, 2015). And even if Rule 9(b) applies, its requirements "are relaxed and interpreted liberally where a trustee ... is asserting the fraudulent transfer claims." *Off. Comm. of Unsecured Creditors of Fedders N. Am. Inc. v. Goldman Sachs Credit Partners,* 405 B.R. 527, 544 (Bankr. D. Del. 2009).

### 2. The Trustee Alleges Fraud with Specificity.

The Trustee's actual fraudulent transfer claims easily satisfy either pleading standard. The UVTA sets out eleven factors—or "badges of fraud"—to assess whether a transfer is fraudulent. "As long as the parties plead ***one or more*** of the badges of fraud above, they have pled the intent element with the requisite degree of particularity." *Nohr,* 2015 WL 13904675, at * 5; *In re Medici,* 524 B.R. at 906 ("The Trustee may plead fraudulent intent generally, and pleading one or more of the badges of fraud sufficiently pleads the required element of intent."). The Trustee alleges several badges of fraud for the Transfers.

***"The transfer or obligation was to an insider."*** O.C.G.A. § 18-2-74(b)(1). At the time of the LBO Bonus and the Husain Fee Transfers, Husain was MEX's COO. Compl. ¶¶ 98, 504; O.C.G.A. § 18-2-71(7)(B)(ii) ("insider" includes an "officer").

***"The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the obligation incurred."*** O.C.G.A. § 18-2-74(b)(8). MEX did not receive any value—let alone reasonably

equivalent value—for the Transfers. As shown above, because MEX was insolvent, Husain's shares were worthless in 2020 and 2022 and, at a minimum, they were not worth anywhere near $1 million. *Supra* at 5–6. The lack of reasonably equivalent value is further shown by the Stock Redemption Agreement, which values the shares at $250,000 if MEX did not obtain a $160 million loan. *See* Mot. at Exhibit B. Of course, incurring $160 million in debt did not **increase** MEX's value by 400%.

For the Husain Fee Transfers, Husain has not and cannot identify any value he purportedly provided MEX in exchange for receiving $413,783. Compl. ¶ 204.

*The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.* O.C.G.A. § 18-2-74(b)(9). The Trustee alleges MEX was insolvent at the time of the Transfers. *Supra* at 19–22.

*The transfer occurred shortly before or shortly after a substantial debt was incurred.* O.C.G.A. § 18-2-74(b)(10). The Trustee alleges that in the same year that MEX incurred significant loan obligations under the Credit Agreement, MEX made the Improper Shareholder Payments and two Husain Redemption Transfers. Compl. ¶¶ 94–95, 103, 214. In fact, payment of the Husain Redemption Transfers was contingent upon MEX securing $160 million in new debt. *See* Mot. at Ex. B ¶ 2. With respect to the Husain Fee Transfers, the Trustee alleged that in 2018, MEX entered into a leveraged buyout in October 2018 (*i.e.*, shortly before or after the Husain Fee Transfers were made).  Compl. ¶¶ 90–92.

While these allegations are more than sufficient to allege fraudulent intent at the pleading stage, the Court can presume such intent without assessing the badges of fraud because the Trustee alleges that Defendants operated MEX, at least in part, as a Ponzi scheme. *See* Compl. ¶ 349; *supra* at 13, 22; *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011) (fraudulent intent presumed if Ponzi scheme alleged).[9]

At a minimum, fraudulent intent "is a heavily fact-dependent question" not suited for a motion to dismiss. *See, e.g., In re Southern Home & Ranch Supply, Inc.,* 515 B.R. 699, 705 (Bankr. N.D. Ga. 2014).

### D.    Counts 16 and 20 for Preservation and Recovery Are Well Pleaded.

Husain argues that if the Trustee's fraudulent transferred claims are dismissed, Counts 16 and 20 should be dismissed. But, the Trustee has stated viable fraudulent transfer claims. Thus, there is no basis for dismissing Counts 16 or 20.

### E.    At a Minimum, Leave to Amend is Appropriate.

To the extent the Court finds merit in Husain's arguments, the Trustee should be provided with leave to amend the Complaint as justice requires such a result. *See* Fed. R. Civ. Proc. 15(a)(2).

Respectfully submitted this 15th day of August, 2025.

---

[9] *See also In re Canyon Sys. Corp.,* 343 B.R. 615, 636–37 (Bankr. S.D. Ohio 2006) (intent "may be established as a matter of law [when] debtor runs a Ponzi scheme").

/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser
Georgia Bar No. 614908
John D. Elrod
Georgia Bar No. 246604
William E. Eye
Georgia Bar No. 688914

**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE
Terminus 200, Suite 2500
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
Steven.Rosenwasser@gtlaw.com
ElrodJ@gtlaw.com
Eyew@gtlaw.com

*Counsel for the Plaintiff Janet Northrup, as Chapter 7 Trustee*

26

## **CERTIFICATE OF SERVICE AND TYPE SIZE COMPLIANCE**

I hereby certify, pursuant to LR 5.1(C), NDGa., the foregoing pleading is prepared in Times New Roman, 14-point font, and was filed using the CM/ECF system, which will automatically provide notice to all attorneys of record by electronic means.

This 15th day of August, 2025.

/s/*Steven J. Rosenwasser*
Steven J. Rosenwasser
Georgia Bar No. 614908